EXHIBIT 1

E-FILED | 1/30/2026 11:45 AM
CC-54-2026-C-22
Wood County Circuit Clerk
Celeste Ridgway

IN THE CIRCUIT COURT OF WOOD COUNTY, WEST VIRGINIA

PHOENIX ASSOCIATES, INC., a West Virginia corporation,

Plaintiff

vs. CASE NO. ____________
JUDGE: ________________

SMG LAND DEVELOPMENT, LLC, a Kentucky limited liability company, BANK OF HINDMAN, a corporation engaged in the business of banking in the State of Kentucky, GREG ISAAC, Trustee, SPINNAKER INSURANCE COMPANY, an Illinois based insurance company, SHERIFF OF WOOD COUNTY, and OTIS BAKER, AKA JOHN DOE, individually,

Defendants.

**AMENDED** **COMPLAINT**

Now comes the Plaintiff, Phoenix Associates, Inc., by and through its attorney, Robert L. Bays and Bowles Rice LLP, and for its complaint, states as follows:

**PARTIES**

1. Phoenix Associates, Inc., (hereinafter referred to as "Phoenix"), is a West Virginia corporation, with a local address of 501 East Street, Parkersburg, West Virginia 26101. At all relevant times, Phoenix Associates is engaged in the construction business.

2. SMG Land Development, LLC, (hereinafter referred to as "SMG"), is a limited liability company organized and existing under the laws of Kentucky (verify) and has an address of P.O. Box 487, Allen, Kentucky 41601. At all times relevant hereto, SMG was the owner of a tract of land in Tygart District, Wood County, West Virginia, and the owner of a warehouse constructed by Phoenix and leased to Frito Lay.

3. The Bank of Hindman is a corporation engaged in the business of banking, organized under the laws of the State of Kentucky, which has an address of 1362 Hindman ByPass, Hindman, Kentucky 41822, and the holder of a Deed of Trust and Assignment of Leases and Renton the Frito Lay Product Exchange Center Facility, owned by SMG.

4. Greg Issac is a resident of the State of Kentucky, with a mailing address of 199 North Lake Drive, Suite 201, Prestonburg, Kentucky 41653 and is the Trustee for Bank of Hindman on its Deed of Trust granted by SMG to Bank of Hindman, as described herein.

5. Spinnaker Insurance is an Illinois based insurance company with a notice of process address of Corporation Service Company, 209 West Washington Street, Charleston, West Virginia 25302. At all times relevant hereto, Spinnaker conducted insurance business throughout the State of West Virginia, including Wood County, West Virginia.

6. The Sheriff of Wood County has a lien on the subject real estate for real estate taxes that may be currently due or due in the future during the pendency of this litigation, and therefore is an interested party with respect to the claim for enforcement of a mechanic's lien.

7. Otis Baker, aka John Doe, address unknown, hacked the Phoenix computer system and fraudulently misdirected payment of a Phoenix invoice.

## STATEMENT OF FACTS

8. SMG Land Development, LLC acquired the subject real estate by deed dated 29th day of May, 2024, and of record in the Office of the Clerk of the County Commission of Wood County, West Virginia, in Deed Book 1375, at page 533. See ***Exhibit 1***, hereto attached.

9. By Deed of Trust, dated May 30, 2024, of record in the Office of the Clerk of the County Commission of Wood County, West Virginia in Lien Book 2331, at page 556. SMG Land Development granted the subject property to Greg Issac as Trustee for the Bank of Hindman. See ***Exhibit 2***, hereto attached.

10. By Assignment of Leases and Rents, dated May 30, 2024, SMG granted a Security Interest in the leases and rents from the subject property to the Bank of Hindman. See ***Exhibit 3***, hereto attached.

11. By Construction Contract Agreement dated February 5, 2024, SMG hired Phoenix Associates, Inc. to construct the Frito-Lay Product Exchange Center Facility buildings on Emerson Avenue, in Parkersburg, Wood County, West Virginia. A copy of that contract is hereto attached as ***Exhibit 4***.

12. The Contract provides, in Section 12.2, as follows:

> All claims or disputes between the Contractor and the Owner arising out of, or relating to, the Contract Documents or the breach thereof shall be decided by arbitration in accordance wit the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. Notice of the demand for arbitration shall be filed in writing with the other party to the Construction Contract Agreement and with the American Arbitration Association and shall be made within reasonable time after the dispute has risen. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. Except by written consent of the person or entity sought to be joined, no arbitration arising out f or relating to the Contract Documents shall include, by consolidation, joinder or in any other manner, any person or entity to a party to the agreement under which such arbitration arises, unless it is shown at the time the demand for arbitration is filed that (1) such person or entity is

EXHIBIT 1

> substantially involved in a common question of fact or law, (2) the presence of such person or entity is required if complete relief is to be accorded in the arbitration, and (3) the interest or responsibility of such person or entity in the matter is not insubstantial. The agreement herein among the parties to the Agreement and any other written agreement to arbitrate referred to herein shall be specifically enforceable under the prevailing arbitration law.

13. All payments that have been made pursuant to the Contract, were made by check, written by SMG to Phoenix after being invoiced, as provided in the Contract, save one payment described hereafter.

14. The work has been substantially completed, and all payments invoiced by the contractor, have been made except for the sum of $262,058.11, which remains unpaid.

15. A Certificate of Occupancy was issued by the City of Parkersburg, reflecting that the project was completed in conformance with all applicable codes. See ***Exhibit 5***, hereto attached.

16. The last day of work, by Phoenix, was September 8, 2025.

17. Phoenix has filed its verified Notice of Mechanic's Lien on December 10, 2025. A copy of which is attached as ***Exhibit 6***.

18. A complete description of all billings by Phoenix and payments by SMG is attached to the Notice of Mechanic's Lien. See ***Exhibit 6***.

19. On the March 6, 2025, Travis Rector, on behalf of Phoenix, submitted to Glenn D. May, II, the February 2024 invoice in the sum of $262,058.11. See ***Exhibit 7***, hereto attached.

20. On or prior to March 6, 2025, a hacker, identified as Otis Baker, aka John Doe, hacked the computer system of Phoenix and appropriated the e-mail communications of Travis Rector, the Project Manager for Phoenix, and utilizing a Phoenix formatted e-mail, contacted Glenn D. May, II of SMG and requested that the February monthly invoice for the Frito-Lay project, in the sum of $262,058.11, not be paid by check, but rather be forwarded by wire transfer to an bank at 66 Hudson Boulevard E, New York, New York. A copy of the pirated e-mails and fraudulent wiring instructions is hereto attached as ***Exhibit 8***.

21. On or about March 12, 2025, Glenn D. May, II, on behalf of SMG, wired the sum of $262,058.11, pursuant to the fraudulent wiring instructions from the hacker believed to be named Otis Baker.

22. At no time relevant to the Complaint, has Phoenix employed either as an employee of the company or as an independent contractor and individual named Otis Baker.

23. At no time relevant to the Complaint, has Phoenix had any bank accounts with any banking or financial institutions in the State of New York.

24. The actions of the hacker described herein constitute a security breach, wrongful act and cyber event under the terms of the Spinnaker Cyber Insurance Policy.

25. Prior to April 1, 2025, Travis Rector, Project Manager, contacted Glenn D. May, II by telephone and inquired as to the status of the February invoice and learned, for the first time, that SMG had made payment by wire transfer to the New York bank, pursuant to the fraudulent e-mails and wiring instructions, as shown by ***Exhibit 8***.

26. By letter dated April 1, 2025, from SMG's attorney, SMG reserved all rights to seek indemnification or pursue insurance recovery regarding the wire transfer fraudulently procured by Otis Baker, aka John Doe. See ***Exhibit 9***, hereto attached.

27. At all times relevant to the Complaint, Phoenix had contracted with Spinnaker Insurance Company for commercial cyber insurance policy, a copy of which is hereto attached as ***Exhibit 10***.

28. Phoenix notified Spinnaker of the security breach and cyber incident on the 2nd day of May 2025 and 9th day of December 2025. See ***Exhibits 11*** and ***12***.

29. Spinnaker denied coverage or reserved as claims its rights by communications from Cowbell Cyber, Inc. administration, dated the 9th day of July 2025, and 5th day of January 2026 [sic 2025], hereto attached as ***Exhibits 13*** and ***14***.

**CAUSES OF ACTION**

**Count I – Breach of Contract**

30. Plaintiff adopts and realleges Paragraphs 1 through 29, as set forth herein.

31. The Construction Contract between Phoenix and SMG constitutes a valid and enforceable contract.

32. Phoenix fully performed all of its obligations pursuant to the Contract and completed the project on September 8, 2025.

33. SMG has failed to remit full and timely payment pursuant to the terms of the contract.

34. SMG's failure to remit full and timely payments, pursuant to the terms of the contract, constitutes a breach of the contract.

35. As a direct and proximate result of SMG's breach of contract, Phoenix has sustained damages. Specifically, SMG owes Phoenix the sum of $262,058.11 plus legal interest from April 6, 2025.

## Count II - Arbitration

36. Plaintiff adopts and realleges Paragraphs 1 through 35, as set forth herein.

37. Unless SMG agrees to waive arbitration, Phoenix requests that this Court refer the Breach of Contract disputes set forth in Count I to an arbitrator in conformance with the parties' contract and upon the rendering of an arbitration decision, enter judgment upon said arbitration award.

## Count III – Enforcement of Mechanic's Liens

38. Plaintiff adopts and realleges Paragraphs 1 through 32, as set forth herein.

39. The contract between SMG and Phoenix, attached hereto as ***Exhibit 4***, is a valid enforceable contract.

40. Phoenix has performed all of its obligations pursuant to the contract completing the project on September 8, 2025.

41. SMG failed to remit full and timely payment pursuant to the terms of the contract.

42. As a result of SMG's failure to remit Phoenix recorded its Mechanic's Lien within the time period required by West Virginia law.

43. The Lien property identifies SMG as the owner of the property and sets forth an adequate and accurate description of the property.

44. Despite the existence of a valid and enforceable lien, SMG is yet to remit the balance due and owing to Phoenix pursuant to the terms of the contract. Therefore, Phoenix must resort to seeking judicial intervention to enforce the lien pursuant to West Virginia Code §38-2-34 and West Virginia Code §38-2-1, *et seq.*

45. This action was filed within six months from the recordation of the lien, as required by West Virginia Code §38-2-34.

**Count IV – Action for Declaratory Judgment – RE: Insurance Contract**

46. Plaintiff adopts and realleges Paragraphs 1 through 45, as set forth herein.

47. The insurance contract between Spinnaker and Phoenix, hereto attached as ***Exhibit 9***, constitutes a valid and enforceable contract of insurance in the State of West Virginia.

48. The Contract of Insurance was in full force and in effect at all times relevant to the security breach and cyber loss sustained by Phoenix on or about March 2025.

49. Spinnaker was notified of the existence of this insurance claim by correspondence dated the 2nd day of May 2025, hereto attached as ***Exhibit 11***, and by letter 9th day of December 2025, from Phoenix' counsel, Robert L. Bays, attached as ***Exhibit 12***.

50. Spinnaker, by and through its adjuster, Cowbell, has denied or reserved rights with respect to coverage by its correspondence dated the 9th day of July 2025, and by correspondence dated January 5, 2026 [sic 2025], hereto attached as ***Exhibits 13*** and ***14***.

51. Phoenix had a reasonable expectation that its cyber insurance policy with Spinnaker would provide insurance coverage for any loss sustained by virtue of a hacker breaching the security systems of Phoenix and causing a loss to its business operations by fraudulently redirecting a payment of a Phoenix invoice to the hacker's bank account.

52. SMG has taken the position that it has paid Phoenix all sums that were due and owing to Phoenix, including the sum of $262,058.11, pursuant to the wiring instructions fraudulently transmitted to SMG by Otis Baker, aka John Doe in March 2025.

53. Phoenix has sustained a loss of business income in the sum of $262,058.11 by virtue of the breach of its security, cyber event and wrongful act by the hacker Otis Baker, aka John Doe, as described herein.

54. Phoenix alleges that the actions of Otis Baker, aka John Doe, in breaching the security of the Phoenix computer system has directly and proximately caused a business loss in the sum of $262,058.11 and is covered by the Commercial Cyber Insurance Policy issued by Spinnaker, and in particular, but not limited to, the provisions of the policy dealing with business income security breach and wrongful act.

55. In the event that it is determined that SMG is liable to Phoenix for the sum of $262,058.11, and makes payment of same, Phoenix may be subject to a claim from SMG due

EXHIBIT 1

to the unauthorized and appropriated e-mail communications by Otis Baker, aka John Doe, resulting in a loss to SMG, in the sum of $262,058.11, by virtue of a double payment.

56. Phoenix prays that the Court issue a declaratory judgment, pursuant to West Virginia Code §5-13-1 *et seq*, as to whether or not the unauthorized breach of the computer system by Otis Baker, aka John Doe, constitutes a security breach, cyber incident or wrongful act, under the terms and provisions of the Spinnaker policy and whether the Spinnaker provides insurance coverage for the direct loss of Phoenix in the sum of $262,058.11, or provides coverage for any claim made by SMG.

**Count V – First Party Bad Faith Refusal of Coverage by Insurance Carrier**

57. Plaintiff adopts and realleges Paragraphs 1 through 56, as set forth herein.

58. By letter dated January 5, 2025 [sic] 2026, Spinnaker denied insurance coverage to Phoenix for the breach of its computer system and misdirection of payments lawfully owed to Phoenix by SMG by the acts of the hacker, Otis Baker, aka John Doe, as described herein.

59. The insurance contract issued by the Defendant Spinnaker for commercial cyber insurance created a contractual relationship between Phoenix and Spinnaker. Spinnaker, therefore, was subject to the implied-in-law duty to act fairly and in good faith in order not to deprive Plaintiff of the benefits of the policy.

60. Spinnaker, by and through its agents, acted willfully, fraudulently, intentionally, and in bad faith in denying coverage to Phoenix with respect to Phoenix' financial loss and with respect to the potential claim of SMG.

61. Spinnaker has no legitimate or arguable reason for refusing to extend coverage to Phoenix for its claim or the claim of SMG.

62. As a direct and proximate result of Spinnaker's intentional refusal to offer insurance coverage to Phoenix for its financial loss or to offer coverage to Phoenix for any claim of SMG constitutes a breach of the contract of insurance and a breach of the implied-in-law duty of good faith and fair dealing causing damages to Phoenix for the results and financial loss and for any costs, attorney fees or expenses it has or may incur.

WHEREFORE, Phoenix prays that the Court grant judgment to Phoenix as follows:

1. An award of $262,058.11, plus accrued interest against SMG for breach of contract;

2. Alternatively, that the Court enforce any arbitrator's award obtained as a result that Phoenix' breach of contract claim;

3. That its Mechanic's Lien be enforced and that the subject property be sold and the proceeds of the sale be distributed in the order of priority of the lienholders on the subject property;

4. That the Court determine that Spinnaker had insurance coverage for the cyber incident, security breach or wrongful act for that breach of the security of Phoenix' computer system and the misdirected payment of its invoice in the sum of $262,058.11, plus accrued interest;

EXHIBIT 1

5. That the Court determine that Spinnaker had insurance coverage for Phoenix for any claims arising from the security breach, cyber incident or wrongful act that may be asserted by SMG; and

6. That Phoenix be awarded its reasonable costs and attorney fees.

PHOENIX ASSOCIATES, INC., Plaintiff

By Counsel,

Robert L. Bays
Bowles Rice LLP
501 Avery Street, 5th Floor.
P.O. Box 49
Parkersburg, WV 26102
*Counsel for Mast, LLC*
Phone: 304-485-8500
Fax: 304-420-5587
E-mail: rbays@bowlesrice.com

EXHIBIT 1

# Deed

THIS DEED, Made this 29th day of May, 2024, by and between

**PIKE STREET LAND HOLDINGS LLC, a West Virginia limited liability company,** Grantor as party of the first part,

and

**SMG LAND DEVELOPMENT, LLC, a Kentucky limited liability company,** Grantee, as party of the second part.

SMG LAND DEVELOPMENT LLC
5520 KY RT 1428
ALLEN KY 41601

**WITNESSETH:**

That for and in consideration of the sum of **FIVE ($5.00) DOLLARS,** cash in hand paid, and other good and valuable considerations, the receipt of all of which is hereby acknowledged, the said party of the first part hereby grants and conveys unto the said party of the second part, with Covenants of **GENERAL WARRANTY,** all that certain lot, tract or parcel of real estate situate, lying and being on the waters of the Little Kanawha River and being in the District of Tygart, Wood County, West Virginia, more particularly bounded and described as follows:

BEGINNING AT A 5/8" CAPPED IRON REBAR FOUND IN THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, SAID REBAR BEING A COMMON CORNER TO THE 5.117 ACRE (TAXED) ORION PARKERSBURG WV LLC TRACT (DEED BOOK 1335, PAGE 599) AND to THE 8.53 ACRE (DEED) PIKE STREET LAND HOLDINGS LLC TRACT (DEED BOOK 1330, PAGE 467);

THENCE N 54°46'09" E 323.07 FEET, WITH THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, TO A 5/8" CAPPED IRON REBAR SET;

THENCE S 35°38'47" E 496.82 FEET, LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE AND BINDING ON

EXHIBIT
tabbies
1

THE 8.53 ACRE PIKE STREET LAND HOLDINGS LLC TRACT, TO A 5/8" CAPPED IRON REBAR SET IN THE NORTHERLY LINE OF THE 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT (DEED BOOK 1038, PAGE 520);

THENCE S 70°03'30" W 338.70 FEET, WITH SAID 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT AND then WITH THE 2.023 ACRE (TAXED) JACKIE S. COOPER TRACT (DEED BOOK 926, PAGE 729), TO A 5/8" CAPPED IRON REBAR FOUND AT A COMMON CORNER TO SAID 5.117 ACRE ORION PARKERSBURG WV LLC TRACT;

THENCE N 35°13'32" W 407.49 FEET, WITH SAID 5.117 ACRE ORION PARKERSBURG WV LLC TRACT, TO THE POINT OF BEGINNING;

CONTAINING 3.370 ACRES, PER AN ACTUAL FIELD SURVEY PERFORMED BY RANDALL R. CLINE II ON OR ABOUT 05/15/2024 AS SHOWN ON PLAT ATTACHED HERETO AND MADE A PART THEREOF.

BEING A PART OF THE SAME TRACT OR PARCEL OF LAND CONVEYED TO PIKE STREET LAND HOLDINGS LLC IN DEED BOOK 1330, PAGE 467 AND BEING PART OF TAX MAP 140, PARCEL 000G0000.

SUBJECT TO ALL LEGAL RIGHTS OF WAY, EASEMENTS, AND RESTRICTIONS OF RECORD.

BASIS OF BEARINGS: WEST VIRGINIA STATE PLANE (NORTH ZONE).

A PLAT OF THE PROPERTY BEING CONVEYED HEREIN IS ATTACHED AS EXHIBIT A.

THIS CONVEYANCE IS MADE SUBJECT TO ALL RIGHTS OF WAY, EASEMENTS, RESTRICTIONS AND RESERVATIONS, INCLUDING, BUT NOT LIMITED TO, RESTRICTIVE AND PROTECTIVE COVENANTS AND OIL, GAS AND MINERAL RESERVATIONS, EXCEPTIONS AND LEASES OF RECORD APPEARING IN THE CHAIN OF TITLE.

**DECLARATION OF CONSIDERATION OR VALUE**

Under the penalties of fine and imprisonment as provided by law, the undersigned grantor hereby declares that the total consideration for the property transferred by this document is **$505,500.00.**

Exhibit A

EXHIBIT 1



EXHIBIT 1

**ACKNOWLEDGEMENT FOR INCOME WITHHOLDING**

The Grantor certifies under penalties of perjury the following information:

EXCEPTIONS to Income Tax being withheld:

1. No Capital Gain reporting as Grantor is qualified to do business in West Virginia.

WITNESS the following signature:

PIKE STREET LAND HOLDINGS LLC

BY: [signature]
CHRISTOPHER J. COCHRANE

Its: MANAGER

STATE OF WEST VIRGINIA,

COUNTY OF WOOD, TO WIT:

The forgoing instrument was acknowledged before the undersigned authority by CHRISTOPHER J. COCHRANE, MANAGER OF PIKE STREET LAND HOLDINGS LLC a West Virginia limited liability company, this 29th day of May, 2024.

My commission expires: March 17, 2029.

(SEAL)

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
Tabitha Reed
RCDI
100 Star Avenue, Suite 112
Parkersburg, WV 26101
My Commission Expires March 17, 2029

[signature]
NOTARY PUBLIC

Wood County
Joe Gonzales, Clerk
Instrument 883463
05/31/2024 @ 10:46:07 AM
DEED
Book 1375 @ Page 535
Pages Recorded 4
Recording Cost $ 52.00
Transfer Tax $ 2780.25

This instrument was prepared by Travis Righter, Esq., Righter Legal, PLLC, 164 Bella Vista Drive, Vienna, WV 26105.

EXHIBIT 1

Return To: , Bank of Hindman, PO Box 786,
Hindman, KY 41822

Space Above This Line For Recording Data

## DEED OF TRUST

**This instrument secures an obligation that may increase and decrease from time to time.**

**DATE AND PARTIES.** The date of this Deed Of Trust (Security Instrument) is May 30, 2024. The parties and their addresses are:

**GRANTOR:**
**SMG LAND DEVELOPMENT, LLC**
A Kentucky Limited Liability Company
PO Box 487
Allen, KY 41601

**TRUSTEE:**
**GREG ISAAC**
199 N. Lake Dr. Ste. 201
Prestonsburg, KY 41653

**LENDER:**
**BANK OF HINDMAN**
Organized and existing under the laws of Kentucky
1362 Hindman Bypass
Hindman, KY 41822

1. **DEFINITIONS.** For the purposes of this document, the following term has the following meaning.

**A. Loan.** "Loan" refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.



EXHIBIT
2

EXHIBIT 1

**2. CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Grantor's performance under this Security Instrument, Grantor does hereby irrevocably grant, convey and sell to Trustee, in trust for the benefit of Lender, with power of sale, the following described property:

See attached Exhibit A

The property is located in Wood County at Bosley Industrial Dr., Parkersburg, West Virginia 26101.

Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, wells, ditches and water stock, crops, timber including timber to be cut now or at any time in the future, all diversion payments or third party payments made to crop producers and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described (all referred to as Property). This Security Instrument will remain in effect until the Secured Debts and all underlying agreements have been terminated in writing by Lender.

**3. MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time and from time to time will not exceed $4,100,000.00. Any limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**4. SECURED DEBTS AND FUTURE ADVANCES.** The term "Secured Debts" includes and this Security Instrument will secure each of the following:

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 14780, dated May 30, 2024, from Grantor to Lender, with a loan amount of $4,100,000.00 and maturing on November 30, 2045.

**B. Future Advances.** All future advances from Lender to Grantor under the Specific Debts executed by Grantor in favor of Lender after this Security Instrument. If more than one person signs this Security Instrument, each agrees that this Security Instrument will secure all future advances that are given to Grantor either individually or with others who may not sign this Security Instrument. All future advances are secured by this Security Instrument even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing.

**C. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

EXHIBIT 1

**5. LIMITATIONS ON CROSS-COLLATERALIZATION.** The cross-collateralization clause on any existing or future loan, but not including this Loan, is void and ineffective as to this Loan, including any extension or refinancing.

The Loan is not secured by a previously executed security instrument if a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. The Loan is not secured by a previously executed security instrument if Lender fails to fulfill any necessary requirements or fails to conform to any limitations of the Real Estate Settlement Procedures Act, (Regulation X), that are required for loans secured by the Property or if, as a result, the other debt would become subject to Section 670 of the John Warner National Defense Authorization Act for Fiscal Year 2007.

The Loan is not secured by a previously executed security instrument if Lender fails to fulfill any necessary requirements or fails to conform to any limitations of the Truth in Lending Act, (Regulation Z), that are required for loans secured by the Property.

**6. PAYMENTS.** Grantor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Security Instrument.

**7. WARRANTY OF TITLE.** Grantor warrants that Grantor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Grantor also warrants that the Property is unencumbered, except for encumbrances of record.

**8. PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Grantor agrees:

**A.** To make all payments when due and to perform or comply with all covenants.

**B.** To promptly deliver to Lender any notices that Grantor receives from the holder.

**C.** Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

**9. CLAIMS AGAINST TITLE.** Grantor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Grantor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Grantor's payment. Grantor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Grantor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Grantor may have against parties who supply labor or materials to maintain or improve the Property.

**10. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part

EXHIBIT 1

of the Property. This right is subject to the restrictions imposed by federal law, as applicable.

**11. TRANSFER OF AN INTEREST IN THE GRANTOR.** If Grantor is an entity other than a natural person (such as a corporation, partnership, limited liability company or other organization), Lender may demand immediate payment if:

**A.** A beneficial interest in Grantor is sold or transferred.

**B.** There is a change in either the identity or number of members of a partnership or similar entity.

**C.** There is a change in ownership of more than 25 percent of the voting stock of a corporation, partnership, limited liability company or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Security Instrument.

**12. WARRANTIES AND REPRESENTATIONS.** Grantor makes to Lender the following warranties and representations which will continue as long as this Security Instrument is in effect:

**A. Power.** Grantor is duly organized, and validly existing and in good standing in all jurisdictions in which Grantor operates. Grantor has the power and authority to enter into this transaction and to carry on Grantor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Grantor operates.

**B. Authority.** The execution, delivery and performance of this Security Instrument and the obligation evidenced by this Security Instrument are within Grantor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Grantor is a party or to which Grantor is or any of Grantor's property is subject.

**C. Name and Place of Business.** Other than previously disclosed in writing to Lender, Grantor has not changed Grantor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name. Without Lender's prior written consent, Grantor does not and will not use any other name and will preserve Grantor's existing name, trade names and franchises.

**13. PROPERTY CONDITION, ALTERATIONS, INSPECTION, VALUATION AND APPRAISAL.** Grantor will keep the Property in good condition and make all repairs that are reasonably necessary. Grantor will not commit or allow any waste, impairment, or deterioration of the Property. Grantor will keep the Property free of noxious weeds and grasses. Grantor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Grantor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Grantor will notify Lender of all demands, proceedings, claims, and actions against Grantor, and of any loss or damage to the Property.

No portion of the Property will be removed, demolished or materially altered without Lender's prior written consent except that Grantor has the right to remove items of

EXHIBIT 1

personal property comprising a part of the Property that become worn or obsolete, provided that such personal property is replaced with other personal property at least equal in value to the replaced personal property, free from any title retention device, security agreement or other encumbrance. Such replacement of personal property will be deemed subject to the security interest created by this Security Instrument. Grantor will not partition or subdivide the Property without Lender's prior written consent.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time and frequency for the purpose of inspecting, valuating, or appraising the Property. Lender will give Grantor notice at the time of or before an on-site inspection, valuation, or appraisal for on-going due diligence or otherwise specifying a reasonable purpose. Any inspection, valuation or appraisal of the Property will be entirely for Lender's benefit and Grantor will in no way rely on Lender's inspection, valuation or appraisal for its own purpose, except as otherwise provided by law.

**14. AUTHORITY TO PERFORM.** If Grantor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Grantor appoints Lender as attorney in fact to sign Grantor's name or pay any amount necessary for performance. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

Lender's right to perform for Grantor will not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument. Any amounts paid by Lender for insuring, preserving or otherwise protecting the property and Lender's security interest will be due on demand and will bear interest from the date of the payment until paid in full at the interest rate in effect from time to time according to the terms of the Secured Debts.

**15. DEFAULT.** Grantor will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** Grantor fails to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Grantor, Borrower, or any co-signer, endorser, surety or guarantor of this Security Instrument or any other obligations Borrower has with Lender.

**C. Business Termination.** Grantor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

**D. Failure to Perform.** Grantor fails to perform any condition or to keep any promise or covenant of this Security Instrument.

EXHIBIT 1

E. **Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

F. **Other Agreements.** Grantor is in default on any other debt or agreement Grantor has with Lender.

G. **Misrepresentation.** Grantor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

H. **Judgment.** Grantor fails to satisfy or appeal any judgment against Grantor.

I. **Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

J. **Name Change.** Grantor changes Grantor's name or assumes an additional name without notifying Lender before making such a change.

K. **Property Transfer.** Grantor transfers all or a substantial part of Grantor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

L. **Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

M. **Material Change.** Without first notifying Lender, there is a material change in Grantor's business, including ownership, management, and financial conditions.

N. **Insecurity.** Lender determines in good faith that a material adverse change has occurred in Grantor's financial condition from the conditions set forth in Grantor's most recent financial statement before the date of this Security Instrument or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**16. REMEDIES.** On or after the occurrence of an Event of Default, Lender may use any and all remedies Lender has under state or federal law or in any document relating to the Secured Debts, including, without limitation, the power to sell the Property. Any amounts advanced on Grantor's behalf will be immediately due and may be added to the balance owing under the Secured Debts. Lender may make a claim for any and all insurance benefits or refunds that may be available on Grantor's default.

Subject to any right to cure, required time schedules or any other notice rights Grantor may have under federal and state law, Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due and foreclose this Security Instrument in a manner provided by law upon the occurrence of an Event of Default or anytime thereafter.

If there is an occurrence of an Event of Default, Trustee will, in addition to any other permitted remedy, at the request of Lender, advertise and sell the Property as a whole or in separate parcels at public auction to the highest bidder for cash or on credit or partly cash and partly on credit, at the discretion of Trustee. Trustee will give notice of sale including the time, terms and place of sale and a description of the Property to be sold as required by the applicable law in effect at the time of the proposed sale.

To the extent not prohibited by law, Trustee will apply the proceeds of the Property's sale in the following order: to all fees, charges, costs and expenses of exercising the power of sale and the sale; to Lender for all advances made for repairs, taxes, insurance, liens, assessments and prior encumbrances and interest thereon; to the Secured Debts' principal and interest; and paying any surplus as required by law. Lender or its designee may purchase the Property.

Upon any sale of the Property, Trustee will make and deliver a trustee's deed that conveys all right, title and interest to the Property that was sold to the purchaser(s). The recitals in any deed of conveyance will be prima facie evidence of the facts set forth therein.

All remedies are distinct, cumulative and not exclusive, and Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debts after the balance is due or is accelerated or after foreclosure proceedings are filed will not constitute a waiver of Lender's right to require full and complete cure of any existing default. By not exercising any remedy, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**17. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, Grantor agrees to pay all expenses of collection, enforcement, valuation, appraisal or protection of Lender's rights and remedies under this Security Instrument or any other document relating to the Secured Debts. Grantor agrees to pay expenses for Lender to inspect, valuate, appraise and preserve the Property and for any recordation costs of releasing the Property from this Security Instrument. Expenses include, but are not limited to, attorneys' fees, court costs and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Grantor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Grantor.

**18. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

EXHIBIT 1

Grantor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

B. Except as previously disclosed and acknowledged in writing to Lender, Grantor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

C. Grantor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Grantor will take all necessary remedial action in accordance with Environmental Law.

D. Except as previously disclosed and acknowledged in writing to Lender, Grantor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous Substance located on, under or about the Property; or (2) any violation by Grantor or any tenant of any Environmental Law. Grantor will immediately notify Lender in writing as soon as Grantor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

E. Except as previously disclosed and acknowledged in writing to Lender, Grantor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

F. Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

G. Grantor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

H. Grantor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Grantor and any tenant are in compliance with applicable Environmental Law.

I. Upon Lender's request and at any time, Grantor agrees, at Grantor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the

EXHIBIT 1

Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

J. Lender has the right, but not the obligation, to perform any of Grantor's obligations under this section at Grantor's expense.

K. As a consequence of any breach of any representation, warranty or promise made in this section, (1) Grantor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Security Instrument and in return Grantor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Security Instrument.

L. Notwithstanding any of the language contained in this Security Instrument to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Security Instrument regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

**19. CONDEMNATION.** Grantor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Grantor authorizes Lender to intervene in Grantor's name in any of the above described actions or claims. Grantor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**20. ESCROW FOR TAXES AND INSURANCE.** Grantor will not be required to pay to Lender funds for taxes and insurance in escrow.

**21. SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor without any other formality than the designation in writing. The successor trustee, without conveyance of the Property, will succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.

**22. WAIVER OF HOMESTEAD EXEMPTION.** Grantor waives and releases all right to assert a homestead exemption in the Property.

**23. USE OF PROPERTY.** Grantor shall not use or occupy the Property in any manner that would constitute a violation of any state and/or federal laws involving controlled substances, even in a jurisdiction that allows such use by state or local law or ordinance. In the event that Grantor becomes aware of such a violation, Grantor shall take all actions allowed by law to terminate the violating activity.

EXHIBIT 1

In addition to all other indemnifications, obligations, rights and remedies contained herein, if the Lender and/or its respective directors, officers, employees, agents and attorneys (each an "Indemnitee") is made a party defendant to any litigation or any claim is threatened or brought against such Indemnitee concerning this Security Instrument or the related property or any part thereof or therein or concerning the construction, maintenance, operation or the occupancy or use of such property, then the Grantor shall (to the extent permitted by applicable law) indemnify, defend and hold each Indemnitee harmless from and against all liability by reason of said litigation or claims, including attorneys' fees and expenses incurred by such Indemnitee in connection with any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment. To the extent permitted by applicable law, the within indemnification shall survive payment of the Secured Debt, and/or any termination, release or discharge executed by the Lender in favor of the Grantor.

Violation of this provision is a material breach of this Security Instrument and thereby constitutes a default under the terms and provisions of this Security Instrument.

**24. CONSTRUCTION LOAN.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

**25. APPLICABLE LAW.** This Security Instrument is governed by the laws of Kentucky, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**26. JOINT AND SEVERAL LIABILITY AND SUCCESSORS.** Each Grantor's obligations under this Security Instrument are independent of the obligations of any other Grantor. Lender may sue each Grantor severally or together with any other Grantor. Lender may release any part of the Property and Grantor will still be obligated under this Security Instrument for the remaining Property. Grantor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Grantor's consent. Such a change will not release Grantor from the terms of this Security Instrument. The duties and benefits of this Security Instrument will bind and benefit the successors and assigns of Lender and Grantor.

**27. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Security Instrument may not be amended or modified by oral agreement. No amendment or modification of this Security Instrument is effective unless made in writing. This Security Instrument and any other documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Security Instrument is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**28. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Security Instrument.

EXHIBIT 1

**29. NOTICE, ADDITIONAL DOCUMENTS AND RECORDING FEES.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Grantor will be deemed to be notice to all Grantors. Grantor will inform Lender in writing of any change in Grantor's name, address or other application information. Grantor will provide Lender any other, correct and complete information Lender requests to effectively mortgage or convey the Property. Grantor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Security Instrument. Grantor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Grantor's obligations under this Security Instrument and to confirm Lender's lien status on any Property, and Grantor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**SIGNATURES.** By signing, Grantor agrees to the terms and covenants contained in this Security Instrument. Grantor also acknowledges receipt of a copy of this Security Instrument.

**GRANTOR:**

SMG Land Development, LLC

By_____________________ Date 5/30/24
Glenn May, II, Single Member

EXHIBIT 1

**ACKNOWLEDGMENT.**

Commonwealth OF Kentucky, County OF Knott ss.

This record was acknowledged before me on May 30, 2024 by Glenn May, II - Single Member of SMG Land Development, LLC a Limited Liability Company on behalf of the Limited Liability Company.

Jonathan Chapman
Notary Public

2/9/27
My commission expires:

JONATHAN M. CHAPMAN
NOTARY PUBLIC
STATE AT LARGE KY.

This instrument was prepared by , Bank of Hindman, PO Box 786, Hindman, KY 41822

EXHIBIT 1

Exhibit A

Legal Description

**3.370 ACRE TRACT**

**TYGART DISTRICT TAX MAP: 140, PART PARCEL: G**

**PART DEED BOOK 1330, PAGE 467**

---

**SITUATE** ON THE WATERS OF THE LITTLE KANAWHA RIVER AND BEING A PART OF TYGART DISTRICT, WOOD COUNTY, WEST VIRGINIA, AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

**BEGINNING** AT A 5/8" CAPPED IRON REBAR FOUND IN THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, SAID REBAR BEING A COMMON CORNER TO THE 5.117 ACRE (TAXED) ORION PARKERSBURG WV LLC TRACT (DEED BOOK 1335, PAGE 599) AND TO THE 8.53 ACRE (DEED) PIKE STREET LAND HOLDINGS LLC TRACT (DEED BOOK 1330, PAGE 467);

**THENCE N 54°46'09" E 323.07 FEET**, WITH THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, TO A 5/8" CAPPED IRON REBAR SET;

**THENCE S 35°38'47" E 496.82 FEET**, LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE AND BINDING ON THE 8.53 ACRE PIKE STREET LAND HOLDINGS LLC TRACT, TO A 5/8" CAPPED IRON REBAR SET IN THE NORTHERLY LINE OF THE 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT (DEED BOOK 1038, PAGE 520);

**THENCE S 70°03'30" W 338.70 FEET**, WITH SAID 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT AND THEN WITH THE 2.023 ACRE (TAXED) JACKIE S. COOPER TRACT (DEED BOOK 926, PAGE 729), TO A 5/8" CAPPED IRON REBAR FOUND AT A COMMON CORNER TO SAID 5.117 ACRE ORION PARKERSBURG WV LLC TRACT;

**THENCE N 35°13'32" W 407.49 FEET**, WITH SAID 5.117 ACRE ORION PARKERSBURG WV LLC TRACT, TO THE POINT OF BEGINNING;

**CONTAINING 3.370 ACRES**, PER AN ACTUAL FIELD SURVEY PERFORMED BY RANDALL R. CLINE II ON OR ABOUT 05/15/2024 AS SHOWN ON PLAT ATTACHED HERETO AND MADE A PART THEREOF.

**BEING** A PART OF THE SAME TRACT OR PARCEL OF LAND CONVEYED TO PIKE STREET LAND HOLDINGS LLC IN DEED BOOK 1330, PAGE 467.

**SUBJECT TO** ALL LEGAL RIGHTS OF WAY, EASEMENTS, AND RESTRICTIONS OF RECORD.

**BASIS OF BEARINGS:** WEST VIRGINIA STATE PLANE (NORTH ZONE).

KA
Wood County
Joe Gonzales, Clerk
Instrument 00335563
06/21/2024 @ 09:04:44 AM
TRUST
Book 2331 @ Page 556
Pages Recorded 13
Recording Cost $ 40.00

EXHIBIT 1

Return To: , Bank of Hindman, PO Box 786,
Hindman, KY 41822

Space Above This Line For Recording Data

# ASSIGNMENT OF LEASES AND RENTS

**DATE AND PARTIES.** The date of this Assignment of Leases and Rents (Assignment) is May 30, 2024. The parties and their addresses are:

**ASSIGNOR:**
**SMG LAND DEVELOPMENT, LLC**
A Kentucky Limited Liability Company
PO Box 487
Allen, KY 41601

**LENDER:**
**BANK OF HINDMAN**
Organized and existing under the laws of Kentucky
1362 Hindman Bypass
Hindman, KY 41822

1. **DEFINITIONS.** For the purposes of this document, the following term has the following meaning.

A. **Loan.** "Loan" refers to this transaction generally, including obligations and duties arising from the terms of all documents prepared or submitted for this transaction.

2. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Assignment at any one time and from time to time will not exceed $4,100,000.00. Any limitation of amount does not include interest and other fees and charges validly made pursuant to this Assignment. Also, this limitation does not apply to advances made under the terms of this Assignment to protect Lender's security and to perform any of the covenants contained in this Assignment.

3. **SECURED DEBTS AND FUTURE ADVANCES.** The term "Secured Debts" includes and this Assignment will secure each of the following:



EXHIBIT
3

EXHIBIT 1

**A. Specific Debts.** The following debts and all extensions, renewals, refinancings, modifications and replacements. A promissory note or other agreement, No. 14780, dated May 30, 2024, from Assignor to Lender, with a loan amount of $4,100,000.00.

**B. Future Advances.** All future advances from Lender to Assignor under the Specific Debts executed by Assignor in favor of Lender after this Assignment. If more than one person signs this Assignment, each agrees that this Assignment will secure all future advances that are given to Assignor either individually or with others who may not sign this Assignment. All future advances are secured by this Assignment even though all or part may not yet be advanced. All future advances are secured as if made on the date of this Assignment. Nothing in this Assignment shall constitute a commitment to make additional or future advances in any amount. Any such commitment must be agreed to in a separate writing.

**C. All Debts.** All present and future debts from Assignor to Lender, even if this Assignment is not specifically referenced, or if the future debt is unrelated to or of a different type than this debt. If more than one person signs this Assignment, each agrees that it will secure debts incurred either individually or with others who may not sign this Assignment. Nothing in this Assignment constitutes a commitment to make additional or future loans or advances. Any such commitment must be in writing. This Assignment will not secure any debt for which a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. This Assignment will not secure any debt for which a security interest is created in "margin stock" and Lender does not obtain a "statement of purpose," as defined and required by federal law governing securities. This Assignment will not secure any other debt if Lender, with respect to that other debt, fails to fulfill any necessary requirements or fails to conform to any limitations of the Truth in Lending Act (Regulation Z) or the Real Estate Settlement Procedures Act (Regulation X) that are required for loans secured by the Property.

**D. Sums Advanced.** All sums advanced and expenses incurred by Lender under the terms of this Assignment.

**4. LIMITATIONS ON CROSS-COLLATERALIZATION.** The cross-collateralization clause on any existing or future loan, but not including this Loan, is void and ineffective as to this Loan, including any extension or refinancing.

The Loan is not secured by a previously executed security instrument if a non-possessory, non-purchase money security interest is created in "household goods" in connection with a "consumer loan," as those terms are defined by federal law governing unfair and deceptive credit practices. The Loan is not secured by a previously executed security instrument if Lender fails to fulfill any necessary requirements or fails to conform to any limitations of the Real Estate Settlement Procedures Act, (Regulation X), that are required for loans secured by the Property or if, as a result, the other debt would become subject to Section 670 of the John Warner National Defense Authorization Act for Fiscal Year 2007.

The Loan is not secured by a previously executed security instrument if Lender fails to fulfill any necessary requirements or fails to conform to any limitations of the Truth in Lending Act, (Regulation Z), that are required for loans secured by the Property.

**5. ASSIGNMENT OF LEASES AND RENTS.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debts and Assignor's performance under this Assignment, Assignor does hereby assign, grant and convey to Lender as additional security all the right, title and interest in the following (Property).

A. Existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including but not limited to any extensions, renewals, modifications or replacements (Leases).

B. Rents, issues and profits, including but not limited to security deposits, minimum rents, percentage rents, additional rents, common area maintenance charges, parking charges, real estate taxes, other applicable taxes, insurance premium contributions, liquidated damages following default, cancellation premiums, "loss of rents" insurance, guest receipts, revenues, royalties, proceeds, bonuses, accounts, contract rights, general intangibles, and all rights and claims which Assignor may have regarding the Property (Rents).

C. The term Property as used in this Assignment shall include the following described real property:

See attached Exhibit A

The property is located in Wood County at Bosley Industrial Dr., Parkersburg, West Virginia 26101.

In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement.

**6. PAYMENTS.** Assignor agrees that all payments under the Secured Debts will be paid when due and in accordance with the terms of the Secured Debts and this Assignment.

**7. COLLECTION OF RENTS.** Assignor may collect, receive, enjoy and use the Rents so long as Assignor is not in default. Assignor will not collect in advance any Rents due in future lease periods, unless Assignor first obtains Lender's written consent.

Upon default, Assignor will receive any Rents in trust for Lender and Assignor will not commingle the Rents with any other funds. When Lender so directs, Assignor will endorse and deliver any payments of Rents from the Property to Lender. Amounts collected will be applied at Lender's discretion to the Secured Debts, the costs of managing, protecting, valuating, appraising and preserving the Property, and other necessary expenses.

Assignor agrees that this Assignment is immediately effective between Assignor and Lender.

EXHIBIT 1

**8. COLLECTION EXPENSES AND ATTORNEYS' FEES.** On or after the occurrence of an Event of Default, to the extent permitted by law, Assignor agrees to pay all expenses of collection, enforcement, valuation, appraisal or protection of Lender's rights and remedies under this Assignment or any other document relating to the Secured Debts. Assignor agrees to pay expenses for Lender to inspect, valuate, appraise and preserve the Property and for any recordation costs of releasing the Property from this Assignment. Expenses include, but are not limited to, attorneys' fees, court costs and other legal expenses. These expenses are due and payable immediately. If not paid immediately, these expenses will bear interest from the date of payment until paid in full at the highest interest rate in effect as provided for in the terms of the Secured Debts. In addition, to the extent permitted by the United States Bankruptcy Code, Assignor agrees to pay the reasonable attorneys' fees incurred by Lender to protect Lender's rights and interests in connection with any bankruptcy proceedings initiated by or against Assignor.

**9. ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substance," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

Assignor represents, warrants and agrees that:

**A.** Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance has been, is, or will be located, transported, manufactured, treated, refined, or handled by any person on, under or about the Property, except in the ordinary course of business and in strict compliance with all applicable Environmental Law.

**B.** Except as previously disclosed and acknowledged in writing to Lender, Assignor has not and will not cause, contribute to, or permit the release of any Hazardous Substance on the Property.

**C.** Assignor will immediately notify Lender if (1) a release or threatened release of Hazardous Substance occurs on, under or about the Property or migrates or threatens to migrate from nearby property; or (2) there is a violation of any Environmental Law concerning the Property. In such an event, Assignor will take all necessary remedial action in accordance with Environmental Law.

**D.** Except as previously disclosed and acknowledged in writing to Lender, Assignor has no knowledge of or reason to believe there is any pending or threatened investigation, claim, or proceeding of any kind relating to (1) any Hazardous

EXHIBIT 1

Substance located on, under or about the Property; or (2) any violation by Assignor or any tenant of any Environmental Law. Assignor will immediately notify Lender in writing as soon as Assignor has reason to believe there is any such pending or threatened investigation, claim, or proceeding. In such an event, Lender has the right, but not the obligation, to participate in any such proceeding including the right to receive copies of any documents relating to such proceedings.

**E.** Except as previously disclosed and acknowledged in writing to Lender, Assignor and every tenant have been, are and will remain in full compliance with any applicable Environmental Law.

**F.** Except as previously disclosed and acknowledged in writing to Lender, there are no underground storage tanks, private dumps or open wells located on or under the Property and no such tank, dump or well will be added unless Lender first consents in writing.

**G.** Assignor will regularly inspect the Property, monitor the activities and operations on the Property, and confirm that all permits, licenses or approvals required by any applicable Environmental Law are obtained and complied with.

**H.** Assignor will permit, or cause any tenant to permit, Lender or Lender's agent to enter and inspect the Property and review all records at any reasonable time to determine (1) the existence, location and nature of any Hazardous Substance on, under or about the Property; (2) the existence, location, nature, and magnitude of any Hazardous Substance that has been released on, under or about the Property; or (3) whether or not Assignor and any tenant are in compliance with applicable Environmental Law.

**I.** Upon Lender's request and at any time, Assignor agrees, at Assignor's expense, to engage a qualified environmental engineer to prepare an environmental audit of the Property and to submit the results of such audit to Lender. The choice of the environmental engineer who will perform such audit is subject to Lender's approval.

**J.** Lender has the right, but not the obligation, to perform any of Assignor's obligations under this section at Assignor's expense.

**K.** As a consequence of any breach of any representation, warranty or promise made in this section, (1) Assignor will indemnify and hold Lender and Lender's successors or assigns harmless from and against all losses, claims, demands, liabilities, damages, cleanup, response and remediation costs, penalties and expenses, including without limitation all costs of litigation and attorneys' fees, which Lender and Lender's successors or assigns may sustain; and (2) at Lender's discretion, Lender may release this Assignment and in return Assignor will provide Lender with collateral of at least equal value to the Property without prejudice to any of Lender's rights under this Assignment.

**L.** Notwithstanding any of the language contained in this Assignment to the contrary, the terms of this section will survive any foreclosure or satisfaction of this Assignment regardless of any passage of title to Lender or any disposition by Lender of any or all of the Property. Any claims and defenses to the contrary are hereby waived.

EXHIBIT 1

**10. CONDEMNATION.** Assignor will give Lender prompt notice of any pending or threatened action by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Assignor authorizes Lender to intervene in Assignor's name in any of the above described actions or claims. Assignor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds will be considered payments and will be applied as provided in this Assignment. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**11. APPOINTMENT OF A RECEIVER.** On or after an Assignor's default, Assignor agrees to Lender making an application to the court for an appointment of a receiver for the benefit of Lender to take possession of the Property and the Leases, with the power to receive, collect and apply the Rents. Any Rents collected will be applied as the court authorizes to pay taxes, to provide insurance, to make repairs and to pay costs or any other expenses relating to the Property, the Leases and Rents, and any remaining sums shall be applied to the Secured Debts. Assignor agrees that this appointment of a receiver may be without giving bond, without reference to the then-existing value of the Property, and without regard to the insolvency of any person liable for any of the Secured Debts.

**12. DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law, as applicable.

**13. TRANSFER OF AN INTEREST IN THE ASSIGNOR.** If Assignor is an entity other than a natural person (such as a corporation, partnership, limited liability company or other organization), Lender may demand immediate payment if:

**A.** A beneficial interest in Assignor is sold or transferred.

**B.** There is a change in either the identity or number of members of a partnership or similar entity.

**C.** There is a change in ownership of more than 25 percent of the voting stock of a corporation, partnership, limited liability company or similar entity.

However, Lender may not demand payment in the above situations if it is prohibited by law as of the date of this Assignment.

**14. WARRANTIES AND REPRESENTATIONS.** Assignor makes to Lender the following warranties and representations which will continue as long as this Assignment is in effect:

**A. Power.** Assignor is duly organized, and validly existing and in good standing in all jurisdictions in which Assignor operates. Assignor has the power and authority to enter into this transaction and to carry on Assignor's business or activity as it is now being conducted and, as applicable, is qualified to do so in each jurisdiction in which Assignor operates.

EXHIBIT 1

**B. Authority.** The execution, delivery and performance of this Assignment and the obligation evidenced by this Assignment are within Assignor's powers, have been duly authorized, have received all necessary governmental approval, will not violate any provision of law, or order of court or governmental agency, and will not violate any agreement to which Assignor is a party or to which Assignor is or any of Assignor's property is subject.

**C. Name and Place of Business.** Other than previously disclosed in writing to Lender, Assignor has not changed Assignor's name or principal place of business within the last 10 years and has not used any other trade or fictitious name. Without Lender's prior written consent, Assignor does not and will not use any other name and will preserve Assignor's existing name, trade names and franchises.

**D. Title.** Assignor has good title to the Leases, Rents and Property and the right to assign, grant and convey to Lender as additional security the Leases and Rents, and no other person has any right in the Leases and Rents.

**E. Recordation.** Assignor has recorded the Leases as required by law or as otherwise prudent for the type and use of the Property.

**F. Default.** No default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants. Assignor, at its sole cost and expense, will keep, observe and perform, and require all other parties to the Leases to comply with the Leases and any applicable law. If Assignor or any party to the Lease defaults or fails to observe any applicable law, Assignor will promptly notify Lender.

**G. Lease Modification.** Assignor has not sublet, modified, extended, canceled, or otherwise altered the Leases, or accepted the surrender of the Property covered by the Leases (unless the Leases so require).

**H. Encumbrance.** Assignor has not assigned, compromised, subordinated or encumbered the Leases and Rents.

15. **COVENANTS.** Assignor agrees to the following covenants:

**A. Rent Abatement and Insurance.** When any Lease provides for an abatement of Rents due to fire, flood or other casualty, Assignor will insure against this risk of loss with a policy satisfactory to Lender. Assignor may choose the insurance company, subject to Lender's approval, which will not be unreasonably withheld.

**B. Copies of Leases.** Assignor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed.

**C. Right To Rents.** After default and Lender taking the appropriate affirmative action, Assignor will notify all current and future tenants and others obligated under the Leases of Lender's right to the Leases and Rents.

**D. Accounting.** When Lender requests, Assignor will provide to Lender an accounting of Rents, prepared in a form acceptable to Lender, subject to generally

EXHIBIT 1

accepted accounting principles and certified by Assignor or Assignor's accountant to be current, accurate and complete as of the date requested by Lender.

**E. Lease Modification.** Assignor will not sublet, modify, extend, cancel, or otherwise alter the Leases, or accept the surrender of the Property covered by the Leases (unless the Leases so require) without Lender's written consent.

**F. Encumbrance.** Assignor will not assign, compromise, subordinate or encumber the Leases and Rents without Lender's prior written consent.

**G. Future Leases.** Assignor will not enter into any future Leases without prior written consent from Lender. Assignor will execute and deliver such further assurances and assignments as to these future Leases as Lender requires from time to time.

**H. Personal Property.** Assignor will not sell or remove any personal property on the Property, unless Assignor replaces this personal property with like kind for the same or better value.

**I. Prosecution and Defense of Claims.** Assignor will appear in and prosecute its claims or defend its title to the Leases and Rents against any claims that would impair Assignor's interest under this Assignment and, on Lender's request, Assignor will also appear in any action or proceeding on behalf of Lender. Assignor agrees to assign to Lender, as requested by Lender, any right, claims or defenses which Assignor may have against parties who supply labor or materials to improve or maintain the leaseholds subject to the Leases and/or the Property.

**J. Liability and Indemnification.** Lender does not assume or become liable for the Property's maintenance, depreciation, or other losses or damages when Lender acts to manage, protect or preserve the Property, except for losses or damages due to Lender's gross negligence or intentional torts. Otherwise, Assignor will indemnify Lender and hold Lender harmless for all liability, loss or damage that Lender may incur when Lender opts to exercise any of its remedies against any party obligated under the Leases.

**K. Leasehold Estate.** Assignor will not cause or permit the leasehold estate under the Leases to merge with Assignor's reversionary interest, and agrees that the Leases shall remain in full force and effect regardless of any merger of the Assignor's interests and of any merger of the interests of Assignor and any party obligated under the Leases.

**L. Insolvency.** Lender will be the creditor of each tenant and of anyone else obligated under the Leases who is subject to an assignment for the benefit of creditors, an insolvency, a dissolution or a receivership proceeding, or a bankruptcy.

**M. Use of Property and Related Indemnification.** Assignor shall not use or occupy the Property in any manner that would constitute a violation of any state and/or federal laws involving controlled substances, even in a jurisdiction that allows such use by state or local law or ordinance. In the event that Assignor becomes aware of such a violation, Assignor shall take all actions allowed by law to terminate the violating activity.

In addition to all other indemnifications, obligations, rights and remedies contained herein, if Lender and/or its respective directors, officers, employees, agents and attorneys (each an "Indemnitee") is made a party defendant to any litigation or any claim is threatened or brought against such Indemnitee concerning this Assignment or the related Property or any part thereof or therein or concerning the construction, maintenance, operation or the occupancy or use of such Property, then Assignor shall (to the extent permitted by applicable law) indemnify, defend and hold each Indemnitee harmless from and against all liability by reason of said litigation or claims, including attorneys' fees and expenses incurred by such Indemnitee in connection with any such litigation or claim, whether or not any such litigation or claim is prosecuted to judgment. To the extent permitted by applicable law, the within indemnification shall survive payment of the Secured Debt, and/or any termination, release or discharge executed by Lender in favor of Assignor.

Violation of this provision is a material breach of this Assignment and thereby constitutes a default under the terms and provisions of this Assignment.

**16. DEFAULT.** Assignor will be in default if any of the following events (known separately and collectively as an Event of Default) occur:

**A. Payments.** Assignor fails to make a payment in full when due.

**B. Insolvency or Bankruptcy.** The death, dissolution or insolvency of, appointment of a receiver by or on behalf of, application of any debtor relief law, the assignment for the benefit of creditors by or on behalf of, the voluntary or involuntary termination of existence by, or the commencement of any proceeding under any present or future federal or state insolvency, bankruptcy, reorganization, composition or debtor relief law by or against Assignor, Borrower, or any co-signer, endorser, surety or guarantor of this Assignment or any other obligations Borrower has with Lender.

**C. Business Termination.** Assignor merges, dissolves, reorganizes, ends its business or existence, or a partner or majority owner dies or is declared legally incompetent.

**D. Failure to Perform.** Assignor fails to perform any condition or to keep any promise or covenant of this Assignment.

**E. Other Documents.** A default occurs under the terms of any other document relating to the Secured Debts.

**F. Other Agreements.** Assignor is in default on any other debt or agreement Assignor has with Lender.

**G. Misrepresentation.** Assignor makes any verbal or written statement or provides any financial information that is untrue, inaccurate, or conceals a material fact at the time it is made or provided.

**H. Judgment.** Assignor fails to satisfy or appeal any judgment against Assignor.

**I. Forfeiture.** The Property is used in a manner or for a purpose that threatens confiscation by a legal authority.

**J. Name Change.** Assignor changes Assignor's name or assumes an additional name without notifying Lender before making such a change.

EXHIBIT 1

**K. Property Transfer.** Assignor transfers all or a substantial part of Assignor's money or property. This condition of default, as it relates to the transfer of the Property, is subject to the restrictions contained in the DUE ON SALE section.

**L. Property Value.** Lender determines in good faith that the value of the Property has declined or is impaired.

**M. Material Change.** Without first notifying Lender, there is a material change in Assignor's business, including ownership, management, and financial conditions.

**N. Insecurity.** Lender determines in good faith that a material adverse change has occurred in Assignor's financial condition from the conditions set forth in Assignor's most recent financial statement before the date of this Assignment or that the prospect for payment or performance of the Secured Debts is impaired for any reason.

**17. REMEDIES.** After Assignor defaults, Lender may at Lender's option do any one or more of the following.

**A. Acceleration.** Lender may make all or any part of the amount owing by the terms of the Secured Debts immediately due.

**B. Additional Security.** Lender may demand additional security or additional parties to be obligated to pay the Secured Debts.

**C. Sources.** Lender may use any and all remedies Lender has under West Virginia or federal law or in any document relating to the Secured Debts.

**D. Insurance Benefits.** Lender may make a claim for any and all insurance benefits or refunds that may be available on Assignor's default.

**E. Payments Made On Assignor's Behalf.** Amounts advanced on Assignor's behalf will be immediately due and may be added to the Secured Debts.

**F. Rents.** Lender may terminate Assignor's right to collect Rents and directly collect and retain Rents in Lender's name without taking possession of the Property and to demand, collect, receive, and sue for the Rents, giving proper receipts and releases. In addition, after deducting all reasonable expenses of collection from any collected and retained Rents, Lender may apply the balance as provided for by the Secured Debts.

**G. Entry.** Lender may enter, take possession, manage and operate all or any part of the Property; make, modify, enforce or cancel or accept the surrender of any Leases; obtain or evict any tenants or licensees; increase or reduce Rents; decorate, clean and make repairs or do any other act or incur any other cost Lender deems proper to protect the Property as fully as Assignor could do. Any funds collected from the operation of the Property may be applied in such order as Lender may deem proper, including, but not limited to, payment of the following: operating expenses, management, brokerage, attorneys' and accountants' fees, the Secured Debts, and toward the maintenance of reserves for repair or replacement. Lender may take such action without regard to the adequacy of the security, with or without any action or proceeding, through any person or agent, or receiver to be appointed by a court, and irrespective of Assignor's possession.

EXHIBIT 1

The collection and application of the Rents or the entry upon and taking possession of the Property as set out in this section shall not cure or waive any notice of default under the Secured Debts, this Assignment, or invalidate any act pursuant to such notice. The enforcement of such remedy by Lender, once exercised, shall continue for so long as Lender shall elect, notwithstanding that such collection and application of Rents may have cured the original default.

**H. Waiver.** Except as otherwise required by law, by choosing any one or more of these remedies Lender does not give up any other remedy. Lender does not waive a default if Lender chooses not to use a remedy. By electing not to use any remedy, Lender does not waive Lender's right to later consider the event a default and to use any remedies if the default continues or occurs again.

**18. TERM.** This Assignment will remain in full force and effect until the Secured Debts are paid or otherwise discharged and Lender is no longer obligated to advance funds under any loan or credit agreement which is a part of the Secured Debts. If any or all payments of the Secured Debts are subsequently invalidated, declared void or voidable, or set aside and are required to be repaid to a trustee, custodian, receiver or any other party under any bankruptcy act or other state or federal law, then the Secured Debts will be revived and will continue in full force and effect as if this payment had not been made.

**19. WAIVER OF HOMESTEAD EXEMPTION.** Assignor waives and releases all right to assert a homestead exemption in the Property.

**20. CONSTRUCTION LOAN.** This Assignment secures an obligation incurred for the construction of an improvement on the Property.

**21. APPLICABLE LAW.** This Assignment is governed by the laws of Kentucky, the United States of America, and to the extent required, by the laws of the jurisdiction where the Property is located, except to the extent such state laws are preempted by federal law.

**22. JOINT AND SEVERAL LIABILITY AND SUCCESSORS.** Each Assignor's obligations under this Assignment are independent of the obligations of any other Assignor. Lender may sue each Assignor severally or together with any other Assignor. Lender may release any part of the Property and Assignor will still be obligated under this Assignment for the remaining Property. Assignor agrees that Lender and any party to this Assignment may extend, modify or make any change in the terms of this Assignment or any evidence of debt without Assignor's consent. Such a change will not release Assignor from the terms of this Assignment. Lender may assign all or part of Lender's rights under this Assignment without Assignor's consent. If Lender assigns this Assignment, all of Assignor's covenants, agreements, representations and warranties contained in this Assignment will benefit Lender's successors and assigns. The duties of this Assignment will bind the successors and assigns of Assignor.

**23. AMENDMENT, INTEGRATION AND SEVERABILITY.** This Assignment may not be amended or modified by oral agreement. No amendment or modification of this Assignment is effective unless made in writing. This Assignment and any other

EXHIBIT 1

documents relating to the Secured Debts are the complete and final expression of the agreement. If any provision of this Assignment is unenforceable, then the unenforceable provision will be severed and the remaining provisions will still be enforceable.

**24. INTERPRETATION.** Whenever used, the singular includes the plural and the plural includes the singular. The section headings are for convenience only and are not to be used to interpret or define the terms of this Assignment.

**25. NOTICE, ADDITIONAL DOCUMENTS AND RECORDING FEES.** Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed in the DATE AND PARTIES section, or to any other address designated in writing. Notice to one Assignor will be deemed to be notice to all Assignors. Assignor will inform Lender in writing of any change in Assignor's name, address or other application information. Assignor will provide Lender any other, correct and complete information Lender requests to effectively mortgage or convey the Property. Assignor agrees to pay all expenses, charges and taxes in connection with the preparation and recording of this Assignment. Assignor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Assignor's obligations under this Assignment and to confirm Lender's lien status on any Property, and Assignor agrees to pay all expenses, charges and taxes in connection with the preparation and recording thereof. Time is of the essence.

**SIGNATURES.** By signing, Assignor agrees to the terms and covenants contained in this Assignment. Assignor also acknowledges receipt of a copy of this Assignment.

**ASSIGNOR:**

SMG Land Development, LLC

By______________________________
Glenn May, II, Single Member

EXHIBIT 1

**ACKNOWLEDGMENT.**

Commonwealth OF Kentucky, County OF Knott ss.

This record was acknowledged before me on May 30, 2024 by Glenn May, II - Single Member of SMG Land Development, LLC a Limited Liability Company on behalf of the Limited Liability Company.

Jonathan Chapman
Notary Public

2/9/27
My commission expires:

JONATHAN M. CHAPMAN NOTARY PUBLIC STATE AT LARGE, KY.

This instrument was prepared by , Bank of Hindman, PO Box 786, Hindman, KY 41822

EXHIBIT 1

Exhibit A

Legal Description

**3.370 ACRE TRACT**

**TYGART DISTRICT TAX MAP: 140, PART PARCEL: G**

**PART DEED BOOK 1330, PAGE 467**

---

**SITUATE** ON THE WATERS OF THE LITTLE KANAWHA RIVER AND BEING A PART OF TYGART DISTRICT, WOOD COUNTY, WEST VIRGINIA, AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

**BEGINNING** AT A 5/8" CAPPED IRON REBAR FOUND IN THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, SAID REBAR BEING A COMMON CORNER TO THE 5.117 ACRE (TAXED) ORION PARKERSBURG WV LLC TRACT (DEED BOOK 1335, PAGE 599) AND TO THE 8.53 ACRE (DEED) PIKE STREET LAND HOLDINGS LLC TRACT (DEED BOOK 1330, PAGE 467);

**THENCE N 54°46'09" E 323.07 FEET,** WITH THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, TO A 5/8" CAPPED IRON REBAR SET;

**THENCE S 35°38'47" E 496.82 FEET,** LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE AND BINDING ON THE 8.53 ACRE PIKE STREET LAND HOLDINGS LLC TRACT, TO A 5/8" CAPPED IRON REBAR SET IN THE NORTHERLY LINE OF THE 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT (DEED BOOK 1038, PAGE 520);

**THENCE S 70°03'30" W 338.70 FEET,** WITH SAID 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT AND THEN WITH THE 2.023 ACRE (TAXED) JACKIE S. COOPER TRACT (DEED BOOK 926, PAGE 729), TO A 5/8" CAPPED IRON REBAR FOUND AT A COMMON CORNER TO SAID 5.117 ACRE ORION PARKERSBURG WV LLC TRACT;

**THENCE N 35°13'32" W 407.49 FEET,** WITH SAID 5.117 ACRE ORION PARKERSBURG WV LLC TRACT, TO THE POINT OF BEGINNING;

**CONTAINING 3.370 ACRES,** PER AN ACTUAL FIELD SURVEY PERFORMED BY RANDALL R. CLINE II ON OR ABOUT 05/15/2024 AS SHOWN ON PLAT ATTACHED HERETO AND MADE A PART THEREOF.

**BEING** A PART OF THE SAME TRACT OR PARCEL OF LAND CONVEYED TO PIKE STREET LAND HOLDINGS LLC IN DEED BOOK 1330, PAGE 467.

**SUBJECT TO** ALL LEGAL RIGHTS OF WAY, EASEMENTS, AND RESTRICTIONS OF RECORD.

**BASIS OF BEARINGS:** WEST VIRGINIA STATE PLANE (NORTH ZONE).

KA
Wood County
Joe Gonzales, Clerk
Instrument 8853550
06/21/2024 @ 09:06:23 AM
ASSIGNMENT OF LIEN
Book 2331 @ Page 575
Pages Recorded 14
Recording Cost $ 21.00

EXHIBIT 1

# CONSTRUCTION CONTRACT AGREEMENT

This Agreement was made as of February 5th, 2024, between SMG Land Development, LLC, PO Box 487 Allen, KY 41601, hereinafter referred to as the Owner, and Phoenix Associates, Inc. 501 East Parkersburg, WV 26101, hereinafter referred to as the Contractor, for the Frito-Lay Product Exchange Center Facility Buildings, located at Emerson Ave Parkersburg, WV 26101 in Wood County

**The Owner and the Contractor agree as set forth below.**

## Article 1
## The Work

The Contractor shall perform all Work required by the Contract Documents for the Construction of the Varco-Pruden" Pre-Engineered Metal Buildings; Main Building to include 11,100 square feet warehouse space (55.5' x 200) with minimum interior clearance height of 18' and attached office area lean-to of 3,720 square feet (30' x 124') with 9' drop ceiling height, and a two-hour fire rated separation between spaces and second stand alone "Varco-Pruden" Pre-Engineered Metal Building MMU area of 1,500 square feet (30' x 50') with minimum interior clearance height of 18', and set back with a minimum distance of 30' from main building (NFPA Set-Back Rule 6.2.1.) Total proposed facility of 16,320 square feet. – **Details listed under Proposal Qualifications, Clarifications, and the latest version of the PFNA Product Exchange Center Standards also known as (PEC Manual_11.3.23 Updated PDF file received on 12/14/2023).**

**Proposal Qualifications:**

1. Our Proposal includes Acoustical Insulation (Walls surrounding private offices and restrooms. Non building perimeter walls): 3 ½" unfaced sound attenuation batt insulation full height floor to deck. Exterior Insulation: at roof to be single layer R-19 hand stretched system and R-20 IMP 3" ridged panels for all exterior walls (exceeding the R-11 minimum at warehouse walls, per P.E.C. Manual)

2. Our Proposal includes Concrete and CMU to include proper footings below frost line Sidewalk, Rodent Strip, Slab floors -Warehouse and Office 4" thick, Trash Pads and MMU Slab 6" thick with control joints. 8" thick reinforced concrete at fourteen (14) dock lanes per design layout and one (1) MMU lane pad. Loading dock CMU foundation, footer designed and quoted to allow for future dock height adjustments without modifications to footers.

3. Our Proposal includes Fifteen (14 Dock & 1 MMU) Numbered Overhead Doors & Dock equipment as specified by approved vendor with exception of



EXHIBIT
4

BM
CR

40k capacity airbag levelers in lieu of originally specified hydraulic dock levelers. Five (5) docks set at 48" elevation, nine (9) docks set at 28" elevation, and one at MMU entrance set close to ground elevation (no dock leveler included at MMU garage location). Six-foot roof eve extension at loading docks per P.E.C. Manual.

4. Our Proposal includes Windows to be clear anodized fixed aluminum frames, with 1" insulated clear glass. Nine (9) windows at 24" X 24", twelve (12) windows at 36" X 36 and one (1) window at 78" X 48". Office windows finished with new window blinds installed, per P.E.C. Manual specifications.

5. Our Proposal includes Interior and Exterior doors, frames, and hardware to be supplied and installed according to drawings and specifications, Nineteen doors in total. Four-foot-wide Individual canopies shall be provided over all exterior personnel doors.

6. Our Proposal includes Interior finishes completed per specifications listed in P.E.C. Manual. Custom casework in "Check-in" room to include file cabinets and cubie space set up for seventeen route facility with room for 50% expansion increased to thirty-four total workspaces file cabinets provided, with Commercial Ice Maker. Check in room countertops provided in solid surface. Does not include allocations for office and conference room furniture.

7. Our Proposal includes estimated 900 total feet of Fencing to include powered controlled gates, estimated at nine hundred liner feet of perimeter fencing in accordance with the P.E.C. specifications, and manual gate fencing around trash dumpster pads.

8. Our Proposal includes HVAC includes four wall mounted exhaust fans with disconnects, wall mounted collars, discharge dampers, exterior weather hoods, and 48" x 48" motorized wall louvered dampers, six gas fired units to heat all interior space of warehouse, and MMU. Duct system with roof top units to heat (90% plus gas fired) and cool office space. Cooling system supplied to office area only, with three roof mounted exhaust fans accommodating two restrooms and janitor closet. Mini-split unit to service the "LAN" room. Option of four additional 96" commercial grade ceiling fans installed in warehouse space included.

9. Our Proposal includes Plumbing to be finished to comply with local codes. Fixtures supplied by Contractor and installed per provided design and specifications.

10. Our Proposal includes Electrical includes the installation and wiring of an 800-amp single phase electrical service to 5 feet outside of building and sub service to second MMU building. Contractor supplied Interior lights fixtures, interior power receptacles, wiring of equipment, "HACK" power feeds, exterior light



GM
AR

EXHIBIT 1

fixtures including three parking lot poles and lights, installed with concrete pole bases. Includes installing boxes and conduit rough-in to accommodate data outlets and data cabling to be installed by others. Includes optional pricing for material and installation of the MMU, block heaters, materials for installation of the power gate openers and the design and installation of the WV approved fire alarm system.

11. Our proposal does not include allowances for architectural and engineering design work for building construction, surveying, or site development plans. Phoenix Associates Inc. has agreed to partner with Pickering Associates Architecture Engineering and Surveying Solutions in a design / build relationship, passing through cost by monthly invoicing to owner / developer attempting to lessen the **One Hundred Thiry Four Thousand, Seven Hundred ($134,700)** original Architecture Engineering and Surveying Package quoted directly to owner.

12. Our proposal does include the cost of providing builder risk insurance on the building during the construction period, this was added at an additional cost of **Six Thousand, Four Hundred Twenty-Eight Dollars and Zero Cents ($6,428.00).**

**Proposal Clarifications**

1. Limited Site Work (Building Foundations Only), no site utilities, no drainage / erosion control and no site excavation work budget associated in this proposal. This "Initial Site Work" will be provided and performed by Owner / Developer under direction of Pickering Associates Architecture Engineering and Surveying Solutions.

2. Our proposal does not include a new access road, asphalt paving or parking lot. Proposed with concrete paving at loading docks only. No stone, gravel, asphalt paving or lot markings associated with this proposal. **Line-item quote for optional** asphalt entry drive: 800' X 25' at 6" thick, with 8" of base for the sum of **Two Hundred, Ten Thousand, Five Hundred Nineteen Dollars and Zero Cents ($210,519.00). Not included in the total of this proposal.**

3. Our proposal does not include the security devices and cabling (by owner vendor Tyco) and Atlanta equipment (by owner vendor Tel) from our proposal.

4. Our proposal does not include back-up power. The portable back-up generator shall be provided by the Tenant (Frito-Lay).

5. Our proposal does not include a landscape allowance.

6. Our proposal is based upon performing the work during normal working hours (M-F 7am -3:30pm) and having free access to all areas where our work is to take place.



GM
YR

7. Our proposal is based upon property located in Wood County WV for construction and material pricing logistics purposes. Does not include fire sprinkler system per correspondence with WV State Fire Marshal's Office.

8. Our proposal is based upon performing the work during the time of the year when cold weather protection is not necessary, as we have not included the cost of cold weather protection. Bid Proposal based on a springtime start date.

9. Our proposal does not include any specialty County permits (site developmental permits), occupancy licensing fees needed outside a local Wood Co, building permit provided by Phoenix Associates, Inc. nor does it cover any cost associated with removal of rock, blasting, testing and abatement of hazard materials. Any charges for specialty permits will be additional charges to this proposal invoiced as pass-thru cost as received from Pickering Associates Architecture Engineering and Surveying Solutions.

## Article 2
## Dates of Commencement and Completion

2.1 The Work to be performed under this Contract shall be commenced upon the Contractor's receipt of a fully executed copy of this Agreement, VP Building Material ordered no later than February 2, 2024, as well as a written notice from the Owner that the "Initial Site Work" is substantially complete and acceptable to the Contractor by a return written acceptance notice from the Contractor, which shall not be unreasonably conditioned, withheld or delayed. The Contractor will diligently pursue the Work on a continuous basis and complete the work as expeditiously as reasonably possible based upon a normal forty hour per week work schedule. The "Target Completion Date" is June 1, 2025, or One Year to-Date of the written notice from the Contractor accepting "Initial Site Work" from the Owner, therefore the greater of the two calendar dates will become the "Target Completion Date"." Substantially complete", "Substantial Completion" and "Date of Substantial Completion" shall mean the date a responsible party completes construction of its required work under this Contract, subject only to minor items of uncompleted work which do not adversely affect the ability the other party to proceed with its required work under this Contract and/or use the proposed facility for its intended purposes, as identified on a list approved by the Owner and the Contractor ("Punchlist")..

## Article 3
## Contract Sum

3.1 The Owner shall pay the Contractor in current funds for the performance of the Contract. Contract Sum shall be **Three Million, Twenty-Three Thousand, Three Hundred Fifty-Two Dollars and Zero Cents**



GM
CJR

EXHIBIT 1

($3,023,352.00), plus pass-thru billings from Pickering Associates Architecture Engineering and Surveying Solutions for their project services (See Proposal Qualification line item # 12 for details), subject to additions and deductions as provided in the Contact Documents.

## Article 4
## Progress Payments

4.1 At or near the end of each month the Contractor shall submit to the Owner an invoice covering the value of the work performed and materials stored during the month. With each invoice submitted for payment, the Contractor shall submit to the Owner, in a form acceptable to the Owner, (i) the Contractor's current lien waivers for all labor and materials associated with the prior month's payment submission, (ii) a verification in the form of a 5 23519230.v2 contractor's affidavit with the names, addresses and amounts owed to each materialmen and sub-contractor for labor, and (iii) summary of progress of work. Within fifteen days after receiving the invoice, subject to the Owner's review and approval, the Owner shall make payment to the Contractor in the amount equal to 90% of the approved invoice with the other 10% being held as retainage for any unfinished or defective Work or the Punchlist.

## Article 5
## Final Payment

5.1 Final payment, constituting the entire unpaid balance of the Contract Sum shall be paid by the Owner to the Contractor within twenty days after the Work has been completed and a final invoice has been submitted by the Contractor. The Contractor shall provide prior written notice of 10 days and not more than 30 days of the anticipated Date of Substantial Completion for the Contractor and the Owner to inspect the Work.

## Article 6
## Enumeration of Contract Documents

6.1 The Contract Documents, which constitute the entire agreement between the Owner and the Contractor, are listed in Article 7 and, except for Modifications issued after execution of this Agreement, are enumerated as follows:

a. This Construction Contract Agreement dated December 18, 2023, consists of Articles 1 through 19, and signature page.
b. PFNA Product Exchange Center Standards, a copy of which attached hereto (PEC Manual_11.3.23 Updated PDF file)

## Article 7
## Contract Documents

7.1 The Contract Documents consist of this Agreement, all documents listed in Paragraph 6.1, and all Modifications issued by the Owner after execution of



GM
JM

EXHIBIT 1

the Contract such as Change Orders, written interpretations, and written orders for minor changes in the Work. The intent of the Contract Documents is to include all items necessary for the proper execution and completion of the Work. The Contract Documents are complementary, and what is required by anyone shall be as binding as if required by all. Work not covered in the Contract Documents will not be required unless it is consistent therewith and reasonably therefrom as being necessary to produce the intended results.

7.2 Nothing contained in the Contract Documents shall create any contractual relationship between the Owner and any Subcontractor or Sub-subcontractor.

7.3 By executing the Contract, the Contractor represents that he has visited the site and familiarized himself with the local conditions under which the Work is to be performed.

7.4 The Work comprises the construction required by the Contract Documents and includes all labor necessary to produce such construction, and all materials and equipment incorporated or to be incorporated in such construction.

## Article 8
## Owner

8.1 The Owner shall secure and pay for any necessary approvals, permits (other than the Wood County, WV Building Permit), governmental fees, licenses, inspections, easements, assessments, and charges required for the construction, use or occupancy of permanent structures or permanent changes in existing facilities.

8.2 The Owner shall at all times have access to the Work wherever it is in preparation and progress.

8.3 The Owner will have authority to reject Work which does not conform to the Contract Documents.

8.4 If the Contractor fails to correct defective Work or persistently fails to carry out the Work in accordance with the Contract Documents, the Owner, by a written order, may order the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, this right of the Owner to stop the Work shall not give rise to any duty on the part of Owner to exercise this right for the benefit of the Contractor or any other person or entity

8.5 The Owner has termination rights in Article 19.2.

## Article 9
## Contractor

9.1 The Contractor shall supervise and direct the Work, using his best skill and attention and he shall be solely responsible for all construction means, methods, techniques, sequences, and procedures and for coordinating all portions of the Work under the Contract.

9.2 Unless otherwise specifically provided in the Contract Documents, the Contractor shall provide and pay for all labor, materials, equipment, tools, construction equipment and machinery necessary for the proper execution



GM CHR

EXHIBIT 1

and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

9.3 The Contractor shall at all times enforce strict discipline and good order among his employees and shall not employ on the Work any unfit person or anyone not skilled in the task assigned to him.

9.4 The Contractor warrants to the Owner that all materials and equipment incorporated in the Work will be new unless otherwise specified, and that all Work will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not conforming to these requirements may be considered defective.

9.5 Unless otherwise provided in the Contract Documents, the Contractor shall pay all sales, consumer, use and other similar taxes which are legally enacted at the time the Contractor provided his Proposal to the Owner.

9.6 The Contractor shall give all notices and comply with all laws, ordinances, rules, regulations, and lawful orders on any public authority bearing on the performance of the Work.

9.7 The Contractor shall be responsible to the Owner for the acts and omissions of his employees, Subcontractors and their agents and employees, and other persons performing any of the Work under a contract with the Contractor.

9.8 The Contractor at all times shall keep the premises free from accumulation of waste materials or rubbish caused by his operations. At the completion of the Work, he shall remove all his waste materials and rubbish from and about the Project as well as his tools, construction equipment, machinery and surplus materials.

9.9 The Contractor shall pay all royalties and license fees. He shall defend all suits or claims for infringement of any patent rights and shall save the Owner harmless from loss on account thereof.

9.10 To the fullest extent permitted by law, the Contractor shall indemnify and hold harmless the Owner and his agents and employees from and against all claim, damages, losses and expenses, including but not limited to attorneys' fees arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (1) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom; and (2) is caused in whole or in part by any negligent act or omission of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in the Paragraph 9.10. In any and all claims against the Owner or any of his agents or employees by any employee of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, the indemnification obligation under this Paragraph 9.10 shall not be limited in any way by any limitation on the amount or type of



6M
AR

EXHIBIT 1

damages, compensation or benefits payable by or for the Contractor or and Subcontractor under workers or workmen's compensation acts, disability benefit acts or other employee benefit acts.

9.11 The Contractor shall pay for the Wood County, WV Building Permit.

## Article 10
## Subcontracts

10.1 A Subcontractor is a person or entity who has a direct contract with the Contractor to perform any of the Work at the site.

10.2 The Contractor shall not employ any Subcontractor to whom the Owner may have a reasonable objection. The Contractor shall not be required to contract with anyone to whom he has a reasonable objection. Contracts between the Contractor and the Subcontractors shall (1) require each Subcontractor, to the extent of the Work performed by the Subcontractor, to be bound to the Contractor by the terms of the Contract Documents, and to assume toward the Contractor all the obligations and responsibilities which the Contractor, by these Documents, assumes toward the Owner, and (2) allow to the Subcontractor the benefit of all rights, remedies and redress afforded to the Contractor by these Contract Documents.

## Article 11
## Work By Owner Or By Separate Contractors

11.1 The Owner reserves the right to perform work related to the Project with his own forces, and to award separate contracts in connection with other portions of the Project or other work on the site under these or similar Conditions of the Contract. If the Contractor claims that delay or additional cost is involved because of such action by the Owner, he shall make such claim as provided elsewhere in the Contract Documents.

11.2 The Contractor shall afford the Owner and separate Contractors reasonable opportunity for the introduction and storage of their materials and equipment and the execution of their work and shall connect and coordinate his Work with theirs as required by the Contract Documents.

11.3 Any costs caused by defective or ill-timed work shall be borne by the party responsible, therefore.

## Article 12
## Miscellaneous Provisions

12.1 The Contract shall be governed by the law of the place where the Project is located.

12.2 All claims or disputes between the Contractor and the Owner arising out of, or relating to, the Contract Documents or the breach thereof shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise. Notice of the demand for arbitration shall be filed in writing with the other party to the Construction Contract Agreement and with the American Arbitration Association and shall be made within



bM
CJR

reasonable time after the dispute has risen. The award rendered by the arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. Except by written consent of the person or entity sought to be joined, no arbitration arising out of or relating to the Contract Documents shall include, by consolidation, joinder or in any other manner, any person or entity to a party to the agreement under which such arbitration arises, unless it is shown at the time the demand for arbitration is filed that (1) such person or entity is substantially involved in a common question of fact or law, (2) the presence of such person or entity is required if complete relief is to be accorded in the arbitration, and (3) the interest or responsibility of such person or entity in the matter is not insubstantial. The agreement herein among the parties to the Agreement and any other written agreement to arbitrate referred to herein shall be specifically enforceable under the prevailing arbitration law.

12.3 The Contractor will not be required to furnish performance or payment bonds to the Owner.

## Article 13
## Time

13.1 The Contractor shall expedite the Work and achieve Substantial Completion as expeditiously as reasonably possible based upon a normal forty hour per week work schedule.

## Article 14
## Payments and Completion

14.1 Payments shall be made as provided in Article 4 and Article 5 of this Agreement.

14.2 Payments may be withheld on account of (1) defective work not remedied, (2) claims filed, (3) failure of the Contractor to make payments properly to subcontractor or for labor, materials, or equipment, (4) damage to the Owner or another contractor, or (5) persistent failure to carry out the Work in accordance with the Contract Documents.

14.3 Final payment shall not be due until the Contractor has delivered to the Owner a complete release of all liens arising out of this Contract. If any lien remains unsatisfied after all payments are made, the Contractor shall within 30 days satisfy such lien or bond the same.

14.4 The making of final payments shall constitute a waiver of all claims by the Owner except those arising from (1) unsettled liens, (2) faulty or defective Work appearing after Substantial Completion, (3) failure of the Work to comply with the requirements of the Contract Documents, or (4) terms of any special warranties required by the Contract Documents. The acceptance of final payment shall constitute a waiver of all claims by the Contractor as unsettled at the time of the final Application for Payment.



GM
[initials]

EXHIBIT 1

**Article 15**

**Protection of Persons and Property**

15.1 The Contractor shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the Work. He shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury, or loss to (1) all employees on the Work and others who may be affected thereby, (2) all the Work and all materials and equipment to be incorporated therein, and (3) other property at the site or adjacent thereto. He shall give all notices and comply with all applicable laws, ordinances, rules, regulations, and orders of any public authority bearing on the safety of persons and property and their protection from damage, injury, or loss. The Contractor shall promptly remedy all damage or loss to any property caused in whole or in part by the Contractor, any Subcontractor, any Sub-subcontractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts any of them may be liable, except damage or loss attributable to the acts or omission of the Owner or anyone for whose acts he may be liable, and not attributable to the fault or negligence of the Contractor. The foregoing obligations of the Contractor are in addition to his obligations under Paragraph 9.10

**Article 16**

**Insurance**

16.1 Contractor's liability insurance shall be purchased and maintained by the Contractor to protect him from claims under Workers' or Workmen's Compensation acts and other employee benefit acts, claims for damages because of bodily injury, including death, and from claims which may arise out of or result from the Contractor's operations under this Contract, whether such operations be by himself or by any Subcontractor or anyone directly or indirectly employed by any of them. This insurance shall be written for not less than the following limits of liability, or required by law, whichever is the greater, and shall include contractual liability insurance applicable to the Contractor's obligations under Paragraph 9.10. Certificates of such insurance shall be filed with the Owner prior to the commencement of the Work.

Worker's Compensation / Employer's Liability

a. Worker's Compensation – Statutory Limits
b. Employer's Liability (including Broad Form / Deliberate Intent Coverage)
   $1,000,000 – Bodily Injury by Accident / Each Accident
   $1,000,000 – Bodily Injury by Disease / Each Employee
   $1,000,000 – Bodily Injury by Disease / Policy

General Liability Insurance

$1,000,000 – Each Occurrence
$1,000,000 – Personal and Advertising Injury
$2,000,000 – Products & Completed Operations Aggregate



GM
JM

EXHIBIT 1

$2,000,000 – General Aggregate

Automobile Liability
$1,000,000 – Combined Single Limit (Each Accident)

Umbrella Liability
$2,000,000 – Each Occurrence
$2,000,000 - Aggregate

16.2 The Owner shall be responsible for purchasing and maintaining his own liability insurance and, at his option, may maintain such insurance as will protect him against claims which may arise from operations under the Contract.

16.3 Unless otherwise provided, the Contractor shall purchase and maintain property insurance upon the entire Work at the site to the full insurable value thereof. This insurance shall include the interests of the Owner, the Contractor, Subcontractors and Sub-subcontractors in the Work and shall insure against the perils of fire and extended coverage and shall include "all risk" insurance for physical loss or damage including, without duplication of coverage, theft, vandalism, and malicious mischief.

16.4 Any loss insured under Paragraph 16.3 is to be adjusted with the Owner and made payable to the Owner as trustee for the insured, as their interests may appear subject to the requirements of any mortgage clause.

16.5 The Contractor shall provide certificates of insurance to the Owner showing evidence of the required insurances before an exposure to loss may occur.

16.6 The Owner and Contractor waive all rights against each other for damages caused by fire or other perils to the extent covered by insurance obtained pursuant to this Article or any other property insurance applicable to the Work, except such rights as they may have to the proceeds of such insurance held by the Owner as trustee. The Contractor shall require similar waivers in favor of the Owner and the Contractor by Subcontractor and Sub-subcontractors.

16.7 The Owner will be listed as an additional insured on the Contractor's insurance policies.

**Article 17**
**Changes in the Work**

17.1 The Owner, without invalidating the Contract, may order Changes in the Work consisting of additions, deletions, or modifications.

**Article 18**
**Correction of Work**

18.1 The Contractor shall promptly correct any Work reflected by the Owner as defective or as failing to conform to the Contract Documents whether observed before or after Substantial Completion and whether or not fabricated, installed or completed, and shall correct any Work found to be



GM XR

EXHIBIT 1

defective or nonconforming within a period of one year from the Date of Substantial Completion of the Contract or within such longer period of time as may be prescribed by law or by the terms of any applicable special warranty required by the Contract Documents. The provisions of this Article 18 apply to Work done by Subcontractors as well as to Work done by direct employees of the Contractor.

## Article 19
## Termination of the Contract

19.1 If the Owner fails to make payment within a period of thirty days, the Contractor may, upon seven additional days written notice to the Owner, terminate the Contract and recover from the Owner payment for all work executed and for any proven loss sustained upon any material, equipment, tools, and construction equipment and machinery.

19.2 If the Contractor defaults or persistently fails or neglects to carry out the Work in accordance with the Contract Documents or fails to perform any provision of the Contract, the Owner, after seven days written notice to the Contractor and without prejudice to any other remedy he may have, may make good such deficiencies and may deduct the cost thereof from the payment then or thereafter due the Contractor or, at his option, may terminate the contract and take possession of the site and of all materials, and may finish the Work by whatever method he may deem expedient, and if the unpaid balance of the Contract Sum exceeds the expense of finishing the Work, such excess shall be paid to the Contractor, but if such expense exceeds such unpaid balance, the Contractor shall pay the difference to the Owner

**This Agreement for the Frito-Lay Product Exchange Center Facility Buildings, located at Emerson Ave Parkersburg, WV, 26101 in Wood County.**

**OWNER**
SMG Land Development, LLC
[signature] Principle
Title

**Date** 2/5/2024

**CONTRACTOR**
Phoenix Associates, Inc.
Travis Rector Project Manager
Title

**Date** 02/05/2024

EXHIBIT 1

# CERTIFICATE

## OF OCCUPANCY

Department of Code Enforcement

Business Name: FRITO LAY DISTRUBITION CENTER

This project has been inspected for conformance with the applicable codes in force when this project was considered and is hereby deemed to be in compliance therewith

Use of Occupancy: STORAGE/BUSINESS

Type of Construction: II

Name of Owner: FRITO LAY

Building Address: 255 BOSELY INDUSTRIAL PARK DR

Special Stipulations:

Case # ID: 24-1303

Certificate No: 25-7252025

Zoning: B-2

Design Occupant Load:

CHIEF BUILDING OFFICIAL

FIRE DEPARTMENT OFFICIAL

tabbies EXHIBIT 5

EXHIBIT 1

RETURN TO
BOWLES RICE LLP
ROBERT L. BAYS, ESQ.
P.O. BOX 49
PARKERSBURG, WV 26102-0049

# NOTICE OF MECHANIC'S LIEN

TO: SMG LAND DEVELOPMENT, LLC
P.O. Box 487
Allen, KY 41601

GREG ISAAC, Trustee
199 N. Lake Dr. Ste. 201
Prestonsburg, KY 41653

BANK OF HINDMAN
1362 Hindman Bypass
Hindman, KY 41822

2025 DEC 10 A 10:01

You will please take notice that the undersigned, Phoenix Associates, Inc., was and is a general contractor with SMG LAND DEVELOPMENT, LLC, for the furnishing of materials and doing of the work and labor necessary to the construction and/or improving of certain buildings, structures, or improvements owned by you located on real estate known as the Frito-Lay product Exchange Center Facility, situate in the Tygart District, Wood County, West Virginia, more particularly described on *Exhibit A* attached hereto. You are further notified that the undersigned has not been paid the sum of $262,058.11, the balance due and owing on its contract with you as evidenced by the attached list of charges and payments marked as *Exhibit B*, and that the undersigned claims, and will claim, a lien upon your interest in the above-described real estate and the building, structures and improvements thereon to secure payment of the sum of $262,058.11, plus interest. The last day of work on said construction project by the undersigned was September 8, 2025.

Given under my hand this 25 day of November 2025.

Phoenix Associates, Inc.

Tim Coffman

By: PRESIDENT
As: PHOENIX ASSOC.

EXHIBIT
tabbies
6

EXHIBIT 1

State of WEST VIRGINIA,
County of WOOD, ss:

TIMOTHY M COFFMAN, the PRESIDENT for Phoenix Associates, Inc., being first duly sworn, upon his/her oath says that the statements in the foregoing notice of mechanic's lien are true, as he/she verily believes.

Taken, subscribed and sworn to before me this 25 day of November 2025.

My commission expires: JUNE 14, 2026

SEAL:

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
Samantha Ann Joy
1707 Lawrence St Parkersburg, WV 26101
My Commission Expires June 14, 2026

Samantha Ann Joy
Notary Public

This instrument was prepared under the direction and supervision of Robert L. Bays, Attorney at Law, P. O. Box 49, Parkersburg, West Virginia, 26102
18152098.1

EXHIBIT 1

**EXHIBIT A**

Situate, lying and being on the waters of the Little Kanawha River and being in the District of Tygart, Wood County, West Virginia, more particularly bounded and described as follows:

BEGINNING AT A 5/8" CAPPED IRON REBAR FOUND IN THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, SAID REBAR BEING A COMMON CORNER TO THE 5.117 ACRE (TAXED) ORION PARKERSBURG WV LLC TRACT (DEED BOOK 1335, PAGE 599) AND to THE 8.53 ACRE (DEED) PIKE STREET LAND HOLDINGS LLC TRACT (DEED BOOK 1330, PAGE 467);

THENCE N 54°46'09" E 323.07 FEET, WITH THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, TO A 5/8" CAPPED IRON REBAR SET;

THENCE S 35°38'47" E 496.82 FEET, LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE AND BINDING ON THE 8.53 ACRE PIKE STREET LAND HOLDINGS LLC TRACT, TO A 5/8" CAPPED IRON REBAR SET IN THE NORTHERLY LINE OF THE 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT (DEED BOOK 1038, PAGE 520);

THENCE S 70°03'30" W 338.70 FEET, WITH SAID 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT AND THEN WITH THE 2.023 ACRE (TAXED JACKIE S. COOPER TRACT (DEED BOOK 926, PAGE 729), TO A 5/8" CAPPED IRON REBAR FOUND AT A COMMON CORNER TO SAID 5.117 ACRE ORION PARKERSBURG WV LLC TRACT, TO THE POINT OF BEGINNING

CONTAINING 3.370 ACRES, PER AN ACTUAL FIELD SURVEY PERFORMED BY RANDALL R. CLINE II ON OR ABOUT 05/15/2024 AS SHOWN ON PLAT ATTACHED HERETO AND MADE A PART THEREOF.

EXHIBIT 1

BEING A PART OF THE SAME TRACT OR PARCEL OF LAND CONVEYED TO PIKE STREET LAND HOLDINGS LLC IN DEED BOOK 1330, PAGE 467.

SUBJECT TO ALL LEGAL RIGHTS OF WAY, EASEMENTS, AND RESTRICTIONS OF RECORD.

BASIS OF BEARINGS: WEST VIRGINIA STATE PLANE (NORTH ZONE).

**EXHIBIT B**

Attached List of Charges and Payments

EXHIBIT 1

1:28 PM
11/20/25

# Phoenix Associates, Inc.
## Customer QuickReport
All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Debit |
|---|---|---|---|---|---|---|---|
| 224-02 Frito Lay Warehouse | | | | | | | |
| Invoice | 02/05/2024 | 2024-12 | | 1200 · *Accounts Re... | | 4000 · Constru... | 150,000.00 |
| Invoice | 02/05/2024 | 2024-13 | | 1200 · *Accounts Re... | | 4000 · Constru... | 448,291.00 |
| Payment | 02/07/2024 | 1005 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 150,000.00 |
| Invoice | 04/24/2024 | 2024-26 | | 1200 · *Accounts Re... | | 4000 · Constru... | 37,500.00 |
| Invoice | 05/29/2024 | 2024-47 | | 1200 · *Accounts Re... | | 4000 · Constru... | 54,000.00 |
| Payment | 06/10/2024 | 1011 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 539,791.00 |
| Invoice | 06/12/2024 | 2024-58 | | 1200 · *Accounts Re... | | 4000 · Constru... | 50,000.00 |
| Payment | 07/09/2024 | 1023 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 50,000.00 |
| Invoice | 07/29/2024 | 2024-65 | | 1200 · *Accounts Re... | | 4000 · Constru... | 64,077.12 |
| Payment | 08/06/2024 | 1028 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 64,077.12 |
| Invoice | 08/29/2024 | 2024-75 | | 1200 · *Accounts Re... | | 4000 · Constru... | 90,700.56 |
| Payment | 09/10/2024 | 1034 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 90,700.56 |
| Invoice | 10/03/2024 | 2024-84 | | 1200 · *Accounts Re... | | 4000 · Constru... | 207,633.22 |
| Payment | 10/15/2024 | 1038 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 207,633.22 |
| Invoice | 11/01/2024 | 2024-93 | VOID: | 1200 · *Accounts Re... | X | 4000 · Constru... | 0.00 |
| Invoice | 11/04/2024 | 2024-94 | | 1200 · *Accounts Re... | | 4000 · Constru... | 287,764.35 |
| Invoice | 12/04/2024 | 2024-... | | 1200 · *Accounts Re... | | 4000 · Constru... | 60,600.29 |
| Payment | 12/05/2024 | 1042 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 287,764.35 |
| Invoice | 01/09/2025 | 2025-1 | | 1200 · *Accounts Re... | | 4000 · Constru... | 51,726.45 |
| Payment | 01/14/2025 | 1046 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 60,600.29 |
| Payment | 01/14/2025 | 1047 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 51,726.45 |
| Invoice | 03/06/2025 | 2025-13 | | 1200 · *Accounts Re... | | 4000 · Constru... | 262,058.11 |
| Invoice | 04/02/2025 | 2025-23 | | 1200 · *Accounts Re... | | 4000 · Constru... | 177,831.40 |
| Payment | 04/10/2025 | 1060 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 177,831.40 |
| Payment | 04/10/2025 | 1059 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 262,058.11 |
| Invoice | 04/30/2025 | 2025-28 | | 1200 · *Accounts Re... | | 4000 · Constru... | 522,574.30 |
| Payment | 05/20/2025 | 1079 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 522,574.30 |
| Invoice | 06/03/2025 | 2025-45 | | 1200 · *Accounts Re... | | 4000 · Constru... | 393,136.95 |
| Payment | 06/11/2025 | 1085 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 393,136.95 |
| Invoice | 07/02/2025 | 2025-56 | | 1200 · *Accounts Re... | | 4000 · Constru... | 525,262.80 |
| Invoice | 08/05/2025 | 2025-63 | | 1200 · *Accounts Re... | | 4000 · Constru... | 177,730.15 |
| Payment | 09/15/2025 | 1102 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 400,000.00 |
| Invoice | 10/14/2025 | 2025-81 | | 1200 · *Accounts Re... | | 4000 · Constru... | 14,293.82 |
| Payment | 10/22/2025 | 5010 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 55,228.66 |

EXHIBIT 1

1:27 PM

11/20/25

# Phoenix Associates, Inc.
## Customer Open Balance
### All Transactions

| Type | Date | Num | Memo | Due Date | Open Balance | Amount |
|---|---|---|---|---|---|---|
| 224-02 Frito Lay Warehouse | | | | | | |
| Invoice | 07/02/2025 | 2025-56 | | 07/02/2025 | 70,034.14 | 525,262.80 |
| Invoice | 08/05/2025 | 2025-63 | | 08/05/2025 | 177,730.15 | 177,730.15 |
| Invoice | 10/14/2025 | 2025-81 | | 10/14/2025 | 14,293.82 | 14,293.82 |
| Total 224-02 Frito Lay Warehouse | | | | | 262,058.11 | 717,286.77 |
| TOTAL | | | | | 262,058.11 | 717,286.77 |

Wood County
Joe Gonzales, Clerk
Instrument 88368154
11/26/2025 @ 10:36:09 AM
MECHANICS LIEN
Book 2393 @ Page 619
Pages Recorded 7
Recording Cost $ 14.00

EXHIBIT 1

EXHIBIT 7

# PHOENIX ASSOCIATES, INC.

GENERAL CONTRACTORS
Contractor's License No. WV001100

**BILL TO**

SMG Land Development, LLC
PO Box 487
Allen, KY 41601
Attn: Accounts Payable

| DATE | INVOICE # |
|---|---|
| 3/6/2025 | 2025-13 |

| *JOB #* |
|---|
| 224-02 |

| *DESCRIPTION* | | AMOUNT |
|---|---|---|
| **Frito Lay Warehouse** | | |
| Contract Amount = $3,023,352.00 | Percent Complete/Stored = 50% | $1,503,268.50 |
| Professional Services = $154,000.00 | Percent Complete/Stored = 100% | $154,000.00 |
| Change Order #1 = $274,642.00 | Percent Complete/Stored = 30% | $82,392.60 |
| Change Order #2 = $24,690.00 | Percent Complete/Stored = 100% | $24,690.00 |
| Total Contract = $3,476,684.00 | | |
| | Total Complete | $1,764,351.10 |
| | Previous Billings | $1,502,292.99 |

**TOTAL** **$262,058.11**

EXHIBIT 1

**From:** GLENN MAY II <glenndavidmay@aol.com>
**Sent:** Monday, March 24, 2025 11:53 AM
**To:** Travis Rector <travis@phoenixwv.biz>
**Subject:** Fwd: Monthly Invoice (Feb.) for Frito-Lay Project

Sent from my iPhone

Begin forwarded message:

**From:** Travis Rector <travis@phoenixwv.biz>
**Date:** March 12, 2025 at 10:16:58 AM EDT
**To:** "Glenn D. May II" <glenndavidmay@aol.com>
**Cc:** Samantha Joy <samantha@phoenixwv.biz>, RJ Walker <rj@phoenixwv.biz>
**Subject: Re: RE: Monthly Invoice (Feb.) for Frito-Lay Project**

Good Morning Glenn,

Please see attached bank details.

Kindly note that payments are to be made to our subsidiary account
Details as we have a bunch of pending checks on our main operating account, hence the need to use our subsidiary account.

Please let us know once payment has been processed.

Thanks.

**Travis Rector**
Project Manager
Phoenix Associates, Inc.
Phone: (304) 485-3255
Fax: (304) 485-3261
Cell: (304) 699-6106
Website: www.phoenixincwv.com

EXHIBIT 8

EXHIBIT 1

---

**From:** Glenn D. May II <glenndavidmay@aol.com>
**Sent:** Tuesday, March 11, 2025 4:42 PM
**To:** Travis Rector <travis@phoenixwv.biz>
**Cc:** Samantha Joy <samantha@phoenixwv.biz>; RJ Walker <rj@phoenixwv.biz>
**Subject:** Re: RE: Monthly Invoice (Feb.) for Frito-Lay Project

I can pay via wire. Send info and I will do it tomorrow.

In a message dated 3/11/2025 4:30:39 PM Eastern Daylight Time, travis@phoenixwv.biz writes:

> Glenn,
>
> Could you please confirm if this invoice can be paid via ACH/Wire Transfer ?
>
> We are transitioning away from paper checks to EFT payments
> for all invoices and pay apps as this eliminates the payment delays
> associated with paper checks and also helps us to pay our vendors promptly
>
> If paying via EFT is possible, please let me know so I can have our
> bank information forwarded to you. Alternatively, if you have an ACH/Wire update form you would like to have me fill out, Please have it sent to me
>
> Please advise.
>
> Thanks.
>
> **Travis Rector**
> Project Manager
> Phoenix Associates, Inc.
> Phone: (304) 485-3255
> Fax: (304) 485-3261
> Cell: (304) 699-6106
> Website: www.phoenixincwv.com

EXHIBIT 1

**From:** Travis Rector
**Sent:** Thursday, March 6, 2025 3:19 PM
**To:** GLENN MAY II <glenndavidmay@aol.com>
**Cc:** Travis Rector <travis@phoenixwv.biz>; Samantha Joy <samantha@phoenixwv.biz>; RJ Walker <rj@phoenixwv.biz>
**Subject:** RE: Monthly Invoice (Feb.) for Frito-Lay Project

Glenn,

Please find the attached invoice for your review and payment submission. Remember, we skipped the monthly billing for January due to bad weather delays.

Feel free to contact us should you have any questions.

Thank you.

**Travis Rector**

Project Manager

Phoenix Associates, Inc.

Phone: (304) 485-3255

Fax: (304) 485-3261

Cell: (304) 699-6106

Website: www.phoenixincwv.com

EXHIBIT 1

**<u>ACH/WIRE Information for Phoenix Associates, Inc</u>**

**Physical Address : 501 East Street Parkersburg WV 26101.**

**TEL: Ph (304) 607-6497**

Payment information follows:

1. Beneficiary name: Otis Baker
2. Payment method: ACH/WIRE Payment
3. Transfer currency: USA Dollars
4. Beneficiary Bank: HSBC USA Bank
6. Bank account number: 841684979
7. Routing number (ACH ONLY) : 022000020
8. Routing Number (WIRE ONLY) : 021001088
9. Beneficiary Address : 501 East Street Parkersburg WV 26101.
10. Bank Address : 66 Hudson Blvd, E, New York, NY 10001, United States

EXHIBIT 1

EXHIBIT
tabbies
9

CROSBIE EATON OLESON

Scott A. Crosbie
scrosbie@ceo-lawyers.com

April 1, 2025

R.J. Walker, V.P.
Travis Rector, Project Manager *Via email:* travis@phoenixwv.biz
Phoenix Associates, Inc. rj@phoenixwv.biz
501 East St.
Parkersburg, West Virginia 26101

**Re: Payment of Invoice Dated March 6, 2025 – Reservation of Rights, Request for Preservation of Records, and Request for Insurance Policies**

Dear Mr. Walker and Mr. Rector:

Thank you for taking my telephone call this afternoon. As I advised, my law firm has been retained by SMG Land Development, LLC, and Glenn D. May (collectively, "SMG") to investigate and provide guidance regarding a recent third-party cyber fraud incident affecting SMG's business relationship with Phoenix Associates, Inc. ("Phoenix"). This incident specifically relates to SMG's progress payment in the amount of $262,058.11, made pursuant to an invoice sent on March 6, 2025, under the terms of the construction contract executed on February 5, 2025, between SMG and Phoenix (the "Contract").

As recently discovered, the original invoice and related email communications originating from Mr. Rector's email account were intercepted by an unauthorized third party, leading to the misdirection of SMG's payment on March 12, 2025. After Mr. May received the initial email correspondence with the attached invoice from Mr. Rector's email account on March 6, 2025, he subsequently received a follow-up email from the same email account on March 11, 2025, inquiring about the possibility of Mr. May making the outstanding invoice payment via ACH/Wire Transfer. This email indicated that Phoenix was transitioning its payment system for greater efficiency and stated that further bank details would follow. Mr. May responded that SMG could accommodate this request. On March 12, 2025, upon receiving the follow-up wire instructions from Mr. Rector's email address as anticipated, Mr. May authorized Community Trust Bank to initiate the wire transfer from SMG's business

EXHIBIT 1

account. It became clear last week, after Mr. Rector contacted Mr. May regarding payment status on the March 6th invoice, that fraud had occurred.

As I conveyed during our call today, Mr. May immediately informed Community Trust Bank about the fraud who sent notification to the recipient bank, HSBC USA, regarding the criminal activity associated with the HSBC account. Mr. May also promptly sought assistance from federal law enforcement. My office has had multiple communications with FBI Special Agent, Andrew P. Satornino, assigned to FBI Cyber Crimes Unit, about the incident and provided additional information. Based on our discussions, the FBI is prioritizing this investigation, and we are hopeful they will swiftly identify the responsible parties and recover the stolen funds. We have provided the FBI with your contact information, and Special Agent Satornino or another agent may reach out for your cooperation in the investigation.

To ensure uninterrupted continuation of the project and to fulfill SMG's contractual obligations under Article 4, Section 4.1 of the Contract, SMG is issuing an additional payment of $262,058.11 to Phoenix. This payment will be made by check and mailed via U.S. Mail this week. However, as discussed, this afternoon, <u>Mr. May is making this replacement payment under protest and with a full reservation of all rights and expressly waiving none. SMG does not concede liability related to the loss resulting from the fraudulent email scheme. Moreover, SMG expressly reserves all rights to seek indemnification, pursue insurance recovery, or undertake other appropriate legal actions available under applicable law.</u>

SMG remains committed to working collaboratively with Phoenix to resolve this matter efficiently. Accordingly, we respectfully request that Phoenix immediately take steps to preserve all internal records, electronic communications, and computer systems potentially relevant to this cyber fraud incident. This includes, without limitation, email servers, logs, security protocols, and any associated documentation that could assist in evaluating the breach's source and circumstances. It is my understanding from our conversation that Phoenix utilizes a local vendor to provide certain IT services for the company, and other IT services, including email hosting, are through cloud-service providers. To ensure there is no loss of electronically stored information, please forward this preservation demand to your service providers and request that they immediately institute necessary steps and controls to prevent destruction of electronic records related to Phoenix account(s).

As I explained, my office is also sending preservation demands to all known vendors which may have electronic records relevant to these circumstances, including Yahoo-AOL, and GoDaddy.com. This preservation will be crucial for both parties to thoroughly understand the incident, assess liability, and evaluate recovery options, including insurance claims. We would appreciate your confirmation of the preservation of these materials and are happy to coordinate with your team to minimize disruption.

EXHIBIT 1

Additionally, to evaluate potential insurance coverages as contemplated under the Contract, we kindly request copies of all insurance policies, including declarations, which are maintained by Phoenix, including risk, general liability, umbrella liability, and any cyber liability or related policies that may provide coverage(s) applicable to this incident. This will enable SMG, as an additional insured under Section 16.6, to assess coverage options beneficial to both parties. Please provide these documents at your earliest convenience and advise whether Phoenix has initiated an insurance claim for this incident, along with any related communications received from insurers.

SMG highly values its relationship with Phoenix and remains focused on successfully completing the warehouse project. I truly appreciated your professionalism and cooperation during our telephone call this afternoon. Kindly confirm receipt of this letter, the forthcoming payment, and your agreement to preserve the requested records. Additionally, please advise us when we may expect the requested insurance policy documents.

Should you have any questions or wish to discuss this further, please do not hesitate to contact me directly at (859) 287-2406 or via email at scrosbie@ceo-lawyers.com. We look forward to your response and continued cooperation in addressing this important matter.

Sincerely,

**CROSBIE EATON OLESON PLLC**

/s/ Scott A. Crosbie

Scott A. Crosbie

cc: Glenn D. May

Hon. Kate A. Bennett

EXHIBIT 1

# DECLARATIONS
# COMMERCIAL CYBER INSURANCE POLICY

**THIS INSURANCE POLICY PROVIDES COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED PERIOD.**

**DEFENSE EXPENSES, WHERE APPLICABLE, ARE INCLUDED IN THE LIMITS OF INSURANCE, AND PAYMENT THEREOF WILL ERODE, AND MAY EXHAUST THE LIMITS OF INSURANCE.**

**PLEASE READ YOUR POLICY CAREFULLY.**

The words "You" and "Your" refer to the Named Insured shown in the Declarations. The words "We", "Us" and "Our" refer to the Company providing this insurance.

In return for the payment of premium, and subject to all the terms and conditions of this Policy, We agree with You to provide the insurance as stated in this Policy.

| | |
|---|---|
| Company Name: | Spinnaker Insurance Company |
| Producer Name: | Cowbell Insurance Agency LLC<br>6800 Koll Center Pkwy, Suite 250<br>Pleasanton, CA 94566 |
| Named Insured:<br>*Phoenix Associates, Inc.* | |
| Policy Number:<br>*FLY-CB-DZP1ERYYU-002* | |
| Mailing Address:<br>*501 East St*<br>*Parkersburg, WV 26101-4903* | |
| Policy Period:<br>From: *Jan 01, 2025*<br>To: *Jan 01, 2026*<br>12:01 AM standard time at the Insured's mailing address shown above | |
| Website Address(es):<br>*www.phoenixincwv.com* | |
| Type Of Business Organization (Check appropriate box):<br>☑ Private<br>☐ Investment Fund<br>☐ Government<br>☐ Publicly Traded<br>☐ Not for Profit | |

EXHIBIT
10


Includes copyrighted material of Insurance Services Office, Inc., with its permission

EXHIBIT 1

| | | |
|---|---|---|
| Annual Premium: | *$1,942* | |
| Fees/Assessments:<br>(included in total Annual Premium, unless otherwise noted) | *$100* | |
| Policy Aggregate Limit of Insurance: | *$1,000,000* | |
| Policy Deductible Amount: | *$2,500*<br>*Per Cyber Incident, Extortion Threat, Security Breach, Wrongful Act, Interrelated Wrongful Acts, or Claim* | |
| Business Income and Contingent Business and Extra Expense Time Deductible: | *8 Hours* | |
| Social Engineering Coverage Limit (if applicable): | *N/A* | |
| Social Engineering Deductible (if applicable): | *N/A* | |
| Reverse Social Engineering Coverage Limit (if applicable): | *N/A* | |
| Reverse Social Engineering Deductible (if applicable): | *N/A* | |
| Breach Costs Outside of Limits Coverage Limit (if applicable): | *N/A* | |
| Service Fraud and Crypto jacking Coverage Limit (if applicable): | *N/A* | |
| Retroactive Date: | *Jan 01, 2023* | |
| Aggregate Sublimit(s) of Insurance: | Percentage | Coverage Limit |
| Insuring Agreement 1. Public Relations Expense | *5%* | *$50,000* |
| Insuring Agreement 2. Extortion Threat and Ransom Payments | *50%* | *$500,000* |
| Insuring Agreement 4. Business and Contingent Business Income and Extra Expense | *100%* | *$1,000,000* |
| Endorsements: | Effective Date | Coverage Limit |
| *West Virginia Amendatory Endorsement*<br>*SP WV 01 05 22* | *Jan 01, 2025* | |
| *Trade or Economic Sanctions*<br>*SP CW 96 05 22* | *Jan 01, 2025* | |
| *Policyholder Disclosure - Notice of Terrorism Insurance Coverage*<br>*SP CW 67 02 23* | | |
| *Electronic Delivery Policy*<br>*SP CW 94 05 22* | | |
| *Privacy Disclosure*<br>*Spinnaker Privacy Policy* | | |
| *Signature Page*<br>*SP CW 93 05 22* | | |
| *Include Retroactive Date*<br>*SP CW 79 05 22* | *Jan 01, 2025* | |
| *Computer and Funds Transfer Fraud*<br>*SP CW 80 02 23* | *Jan 01, 2025* | |

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

| | | |
|---|---|---|
| *Increase of or Elimination of Business Income and Extra Expense Sublimit Endorsement*<br>*SP CW 72 02 23* | *Jan 01, 2025* | *$1,000,000* |
| *Telecommunications Fraud Endorsement*<br>*SP CW 85 05 22* | *Jan 01, 2025* | *$50,000* |
| *Hardware Replacement Costs Endorsement*<br>*SP CW 86 05 22* | *Jan 01, 2025* | *$50,000* |
| *Website Media Content Liability*<br>*SP CW 83 05 22* | *Jan 01, 2025* | *$1,000,000* |
| *Post Breach Remediation Coverage Endorsement*<br>*SP CW 87 05 22* | *Jan 01, 2025* | *$50,000* |

Claims Information:

To report Claims, please use the contact information below:

| | |
|---|---|
| Phone Number: | 833-633-8666 |
| Email: | claims@cowbellcyber.ai |

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

# COMMERCIAL CYBER INSURANCE POLICY

THIS POLICY IS A CONTRACT OF INSURANCE BETWEEN YOU AND US. YOUR POLICY CONTAINS ALL THE DETAILS OF THE COVER THAT WE PROVIDE. THIS POLICY CONSISTS OF AND MUST BE READ TOGETHER WITH THE DECLARATIONS PAGE AND ANY ENDORSEMENTS.

THE INSURANCE PROVIDED UNDER THIS POLICY FOR CLAIMS MADE AGAINST YOU IS ON A CLAIMS MADE AND REPORTED BASIS, AND APPLIES TO CLAIMS ONLY IF THEY ARE FIRST DISCOVERED BY YOU DURING THE POLICY PERIOD AND REPORTED TO US DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD.

THE SECURITY BREACH LIABILITY INSURING AGREEMENT CONTAINED IN THIS POLICY PROVIDES COVERAGE FOR DEFENSE EXPENSES WHICH ARE PAYABLE WITHIN, AND NOT IN ADDITION TO, THE LIMIT OF INSURANCE. PAYMENT OF DEFENSE EXPENSES UNDER THIS POLICY WILL REDUCE THE LIMIT OF INSURANCE.

**PLEASE READ THE ENTIRE POLICY CAREFULLY.**

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the words "You" and "Your" refer to the **Named Insured** shown in the Declarations. The words "We," "Us," and "Our" refer to the company providing this insurance.

All terms that appear in bold print are defined terms and have special meaning as set forth in Section I – Insuring Agreements and Section VII – Definitions.

## SECTION I – INSURING AGREEMENTS

Coverage is provided under the following Insuring Agreements up to the Limits of Insurance shown in the Declarations.

Any **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** that arises out of the same facts or circumstances and results in **Loss** under one or more of the following Insuring Agreements will be deemed to be related and, as such, will be deemed to have been **Discovered** during the earliest policy period that any such related **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** was **Discovered**.

1. **Security Breach Expense**

   We will pay for **Loss** resulting directly from a **Security Breach** or **Cyber Incident Discovered** during the Policy Period or any **Extended Reporting Period**, if applicable.

   With respect to this Insuring Agreement 1, **Loss** means:

   a. **Forensics Expenses – Including Breach Counsel Expenses**

      The costs incurred with Our approval to establish whether a **Security Breach** or **Cyber Incident** has occurred or is occurring.

      If a **Security Breach** has occurred, the following costs are also included:

      **i.** costs to investigate the cause, scope and extent of a **Security Breach** and to identify any affected parties; and

EXHIBIT 1

ii. costs to determine any action necessary to remediate the conditions that led to or resulted from a **Security Breach** including, but not limited to, fees paid for legal and other professional advice on how to respond to the **Security Breach**.

b. **Notification Expenses – Including Breach Counsel Expenses**

Costs to notify all parties affected by a **Security Breach** including, but not limited to, notice to be transmitted through media:

i. as required by **Privacy Regulations**; or
ii. subject to Our prior approval, as appropriate on a voluntary basis.

c. **Overtime Salaries**

Reasonable overtime salaries paid to **Employees** assigned to handle inquiries from the parties affected by a **Security Breach**.

d. **Call Center Expenses**

Fees and costs of a company hired by You with Our prior approval for the purpose of operating a call center to handle inquiries from the parties affected by a **Security Breach**.

e. **Post-event Monitoring Expenses**

Costs to provide credit and identity monitoring services to the affected parties of a **Security Breach** for up to one year, or longer if required by applicable law, from the date of notification to those affected parties of such **Security Breach**.

f. **Public Relations Expense**

Fees and costs of a public relations firm and any other reasonable expenses incurred by You with Our prior written consent to protect or restore Your reputation solely in response to "negative publicity".

As used in this provision, "negative publicity" means information which has been made public that has caused, or is reasonably likely to cause, a decline or deterioration in the reputation of the **Named Insured** or of one or more of its products or services.

g. **Other Expenses**

Any other reasonable expenses incurred by You in connection with a **Security Breach** or **Cyber Incident** with Our prior written consent.

With respect to this Insuring Agreement 1, **Loss** does not include any costs or expenses associated with upgrading or improving a **Computer System** as a result of a **Security Breach**.

2. **Extortion Threats**

We will pay for **Loss** resulting directly from an **Extortion Threat** that is **Discovered** during the Policy Period or any extended reporting period, if applicable.

With respect to this Insuring Agreement 2, **Loss** means:

a. Fees and costs of:

i. a security firm; or


Includes copyrighted material of Insurance Services Office, Inc., with its permission

ii. a person or organization;

hired with Our consent to determine the validity and severity of an **Extortion Threat** made against You.

b. Interest costs paid by You for any loan from a financial institution taken by You to pay a ransom demand.

c. Reward payments paid by You to an "informant" which lead to the arrest and conviction of parties responsible for **Loss**.

As used in this provision, "informant" means a person, other than an **Employee**, providing information not otherwise obtainable, solely in return for a reward offered by You.

d. Any other reasonable expenses incurred by You with Our written consent, including, but not limited to:

i. fees and costs of independent negotiators; and
ii. fees and costs of a company hired by You, upon the recommendation of the security firm, to determine how to protect Your **Electronic Data** from further threats.

e. Monetary value of any **Ransom Payment** made by You to a third party for **Random Demands.**

3. **Replacement or Restoration of Electronic Data**

We will pay for **Loss** of Your **Electronic Data** or "computer programs" stored within a **Computer System** resulting directly from a **Cyber Incident** that is **Discovered** during the Policy Period or any extended reporting period, if applicable.

With respect to this Insuring Agreement 3, **Loss** means the costs to replace or restore Your **Electronic Data** or "computer programs" as well as the cost of data entry, reprogramming and computer consultation services.

With respect to this Insuring Agreement 3, **Loss** does not include the cost to duplicate research that led to the development of Your **Electronic Data** or "computer programs". To the extent that any of Your **Electronic Data** cannot be replaced or restored, We will pay the cost to replace the media on which such **Electronic Data** was stored with blank media of substantially identical type.

As used in this Insuring Agreement 3, "computer programs" means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enables the computer or devices to receive, process, store or send Your **Electronic Data**.

4. **Business Income, Contingent Business Income and Extra Expense**

We will pay for **Loss** due to an **Interruption** resulting directly from a **Cyber Incident** or an **Extortion Threat** that is **Discovered** during the Policy Period or during any extended reporting period, if applicable.

With respect to this Insuring Agreement 4, **Loss** means the actual **Loss** of: (1) "business and contingent business income" You sustain; and/or (2) "extra expense" You incur.

As used in this Insuring Agreement 4:

a. "Business and contingent business income" means the:

i. net income (net profit or loss before income taxes) that would have been earned or incurred; and

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

ii. continuing normal operating expenses incurred, including payroll.

"Business and contingent business" income does not include:

(1) Net Profit that may or would likely have been earned as a result of an increase in volume due to favorable business conditions caused by the impact of network security failures impacting other businesses, loss of market, or any other consequential loss

b. "Extra expense" means necessary and reasonable expenses You incur:

i. during an **Interruption** that You would not have incurred if there had been no interruption; or

ii. to avoid or minimize the suspension of Your **E-Commerce Activities.**

"Extra expense" does not include:

(1) any costs or expenses associated with upgrading, maintaining, repairing, remediating or improving a **Computer System** as a result of a **Cyber Incident** or **Extortion Threat**; or

(2) **Extortion Expenses** covered under Insuring Agreement 2 – Extortion Threats.

5. **Security Breach Liability** Including Payment Card Industry (PCI) Fines and Penalties

We will pay for:

a. **Loss** that the **Insured** becomes legally obligated to pay and **Defense Expenses** as a result of a **Claim** that is **Discovered** during the Policy Period or any **Extended Reporting Period**, if applicable, for a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

b. **Loss** and **Defense Expenses** as a result of a **Claim** in the form of a **Regulatory Proceeding** that is **Discovered** during the Policy Period or any extended reporting period, if applicable, in response to a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

c. **Loss** and **Defense Expenses** as a result of a **Claim** in the form of an action by a **Card Company** for non-compliance with the Payment Card Industry (PCI) Data Security Standards that is **Discovered** during the Policy Period or any extended reporting period, if applicable, in response to a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

With respect to this Insuring Agreement 5:

i. **Loss** means:

(1) compensatory damages, settlement amounts and costs awarded pursuant to judgments or settlements;

(2) punitive and exemplary damages to the extent such damages are insurable by law;

(3) fines or penalties assessed against the **Insured** to the extent such fines or penalties are insurable by law; or

(4) the monetary amount owed by You under the terms of a PCI merchant services agreement with a **Card Company** as a direct result of a **Security Breach.**

**Loss** does not include:

(a) civil or criminal fines or penalties imposed by law, except civil fines or penalties as provided under Paragraph i.(3) above;

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

(b) the multiplied portion of multiplied damages;
(c) taxes;
(d) royalties;
(e) the amount of any disgorged profits;
(f) matters that are uninsurable pursuant to law;
(g) any fees resulting from the recall, re-performance or correction of services, content, goods or activities;
(h) the costs to comply with injunctive or other non-monetary relief; or
(i) liquidated damages pursuant to a contract, to the extent such amount exceeds the amount for which You would have been liable in the absence of such contract, except for amounts under Paragraph i.(4) above.

ii. **Defense Expenses** means the reasonable and necessary fees (attorneys' and experts' fees) and expenses incurred in the defense or appeal of a **Claim**, including the cost of appeal, attachment or similar bonds (without any obligation on Our part to obtain such bonds) but excluding wages, salaries, benefits or expenses of Your **Employees**.

iii. **Wrongful Act** means any actual or alleged:

(1) **Security Breach;**
(2) failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing **Personal Information**;
(3) failure to prevent the transmission of a **Virus** through a **Computer System** into a computer network, any application software, or a computer operating system or related network that is not rented, owned, leased by, licensed to or under the direct operational control of the **Insured**; or
(4) failure to provide notification of any actual or potential **Security Breach** if such notification is required by any security breach notification law;

by, or asserted against, an **Insured**.

iv. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any i) fact, circumstance, situation, event, transaction or cause; or ii) series of causally connected facts, circumstances, situations, events, transactions or causes.

v. **Regulatory Proceeding** means an investigation, demand or proceeding brought by, or on behalf of, the Federal Trade Commission, Federal Communications Commission, the Department of Health and Human Services or other administrative or regulatory agency, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity, including, but not limited to any investigation, demand, or proceeding, brought by an administrative or regulatory agency whether involving the California Consumer Privacy Act (CCPA), the General Data Protection Regulation (GDPR), or similar privacy regulations.

## SECTION II – LIMITS OF INSURANCE

### 1. Policy Aggregate Limit of Insurance

The most We will pay for all covered **Loss** and **Defense Expenses** is the Policy Aggregate Limit of Insurance shown in the Declarations. The Policy Aggregate Limit of Insurance shall be reduced by any payment, including **Defense Expenses**, made under the terms of this Policy. Upon exhaustion of the Policy Aggregate Limit of Insurance by such payments, We will have no further obligations or liability of any kind under this Policy.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

2. **Aggregate Sublimit(s) of Insurance**

The Aggregate Sublimit(s) of Insurance set forth in the Declarations are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Any such Aggregate Sublimit(s) of Insurance shall be reduced by any payment for **Loss** and, if applicable, **Defense Expenses**, under the Insuring Agreement to which such Aggregate Sublimit of Insurance applies. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** or **Defense Expenses**, subject to such Sublimit of Insurance.

## SECTION III – DEDUCTIBLE

Subject to Section II – Limits of Insurance:

1. Under Insuring Agreements 1 – Security Breach Expense, 2 – Extortion Threats and 3 – Replacement or Restoration of Electronic Data, We will pay only the amount of **Loss** which is in excess of the Policy Deductible amount shown in the Declarations.

2. Under Insuring Agreement 4 – Business Income, Contingent Business Income and Extra Expense:

   We will pay only the amount of **Loss** which exceeds the greater of the following deductible amounts:

   a. The Policy Deductible Amount shown in the Declarations; or
   b. The amount of **Loss** incurred during the Time Deductible shown in the Declarations.

3. Under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties:

   We will pay only the amount of **Loss** and **Defense Expenses**, which is in excess of the Policy Deductible Amount shown in the Declarations, resulting from the same **Wrongful Act** or **Interrelated Wrongful Acts**. Such Policy Deductible Amount will be borne by You, self-insured, and at Your own risk.

4. The Policy Deductible applies separately to each **Cyber Incident**, **Extortion Threat**, **Security Breach**, **Wrongful Act**, **Interrelated Wrongful Acts**, or **Claim**. In the event a **Loss** is covered under more than one Insuring Agreement, only the single highest deductible amount applicable to the **Loss** shall be applied.

## SECTION IV – DEFENSE AND SETTLEMENT

The provisions contained within this section apply only to Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties:

We shall have the right and duty to select counsel and defend the **Insured** against any **Claim** covered under Paragraph 5.a of Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, even if the allegations of such **Claim** are groundless, false or fraudulent. However, We shall have the right but not the duty to defend the **Insured** against a **Claim** covered under Paragraph 5.b of Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties and We shall have no duty to defend the **Insured** against any **Claim** which is not covered under such Insuring Agreement.

We may, upon the written consent of the **Insured**, make any settlement of a **Claim** which We deem reasonable. If the **Insured** withholds consent to such settlement, Our liability for all **Loss** resulting from such **Claim** will not exceed the amount for which We could have settled such **Claim**, plus **Defense Expenses** incurred, as of the date We proposed such settlement in writing to the Insured. Upon refusing to consent to a settlement We deem reasonable, the **Insured** shall, at its sole expense, assume all further responsibility for its defense, including all additional **Defense Expenses**, costs associated with the investigation, defense and/or settlement of such **Claim**.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

## SECTION V – EXCLUSIONS

We will not be liable for **Loss** or **Defense Expenses** directly or indirectly based upon, attributable to or arising out of:

1. Lightning, earthquake, hail, volcanic action, wind, smoke, explosion, tidal wave or flood, landslide, electromagnetic pulse, or other electromagnetic disturbances and/or any Space Weather as classified by NOAA, tornado, or any other act of God or nature.

2. Any of the following:

   a. War, including undeclared or civil war or civil unrest;
   b. Warlike action by military force, including action hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents;
   c. Insurrection, rebellion, revolution, usurped power or action taken by government authority in hindering or defending against any of these;
   d. Any **Cyber Incident**, **Security Breach**, or other **Wrongful Act** by or on behalf of any government, sovereign, state, or other authority sponsored actor or group that results in, or is carried out in the course of, any of the events in part a, b, or c above.

3. The dispersal or application of pathogenic or poisonous biological or chemical materials, nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident, however caused.

4. **Bodily Injury** or physical damage to or destruction of tangible property, including loss of use thereof.

   **Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. It also means mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person.

   However, **Bodily Injury** does not mean mental anguish or emotional distress resulting directly from a **Security Breach** or **Cyber Incident**.

5. Any disruption in normal computer function or network service or function due to insufficient capacity to process transactions or due to an overload of activity on a **Computer System** or network. However, this exclusion shall not apply if such disruption is caused by a **Cyber Incident** or **Security Breach**.

6. Any disruption of i) internet service; or ii) any external telecommunication network, regardless of the cause; or iii) failure or termination of any core element of internet, telecommunications, or GPS infrastructure that results in a regional, countrywide, or global outage of such infrastructure; or iv) failure of power supply and other utilities unless the provision of power and other utility services is under the **Named Insured's** direct control.

   However, parts i) and ii) of this exclusion shall not apply if such disruption is caused by a denial of service attack under Paragraph b. of Definition 5. **Cyber Incident**.

7. Any failure of, reduction in or surge of power, regardless of the cause.

8. Any actual or alleged violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) and its amendments, or similar provisions of any federal, state or local statutory or common law.

9. Any malfunction or failure of any satellite.

10. Any actual or alleged oral or written publication of material, if done by an **Insured** or at an **Insured's** direction with knowledge of its falsity.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

11. An **Insured's** assumption of liability by contract or agreement, whether oral or written. However, this exclusion shall not apply to any liability that an **Insured** would have incurred in the absence of such contract or agreement.

12. Any actual or alleged patent or trade secret violation, including any actual or alleged violation of the Patent Act, the Economic Espionage Act of 1996 or the Uniform Trade Secrets Act and their amendments.

13. Any of the following:

    a. The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** at any time;
    b. Any request, demand, order or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **Pollutants**; or
    c. Any **Claim** or **Suit** brought by, or on behalf of, any governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, **Pollutants**.

14. Any **Claim**, **Suit** or other proceeding against an **Insured** which was pending or existed prior to the Policy Period or arising out of the same or substantially the same acts, facts, circumstances or allegations which are the subject of, or the basis for, such **Claim**, **Suit** or other proceeding.

15. Any actions or activities related to an **Insured's** practices as an employer including, but not limited to, refusal to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution. This exclusion applies:

    a. Whether the injury-causing event described above occurs before employment, during employment or after employment of that person;
    b. Whether the **Insured** may be liable as an employer or in any other capacity; and
    c. To any obligation to share damages with or repay someone else who must pay damages because of the injury.

    However, this exclusion will not apply to any **Claim** resulting directly from a **Privacy Breach** related to the **Personal information** of an **Employee**.

16. Any **Cyber Incident**, **Extortion Threat**, **Security Breach**, **Wrongful Act**, or **Interrelated Wrongful Acts** that any **Insured** became aware of prior to the effective date of the Policy.

17. The same facts, **Cyber Incident**, **Extortion Threat**, **Security Breach**, **Wrongful Act**, or **Interrelated Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any insurance policy of which this Policy is a renewal or replacement.

18. Any criminal, dishonest, malicious or fraudulent act, error or omission or any willful violation of any statute or regulation committed by an **Insured**, acting alone or in collusion with others.

    However, with the exception of **Claims** excluded under Exclusion 12., this exclusion shall not apply to any dishonest, malicious or fraudulent act, error or omission committed by an **Employee** which gives rise to a **Claim** or **Loss** covered under Insuring Agreement 1 – Security Breach Expense or Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties. This exception does not apply to any **Employee** who is a Chief Executive Officer, Chief Financial Officer, Chief Security Officer, Chief Technology Officer, Chief Information Officer, Risk Manager, General Counsel, owner, general manager or any functionally equivalent positions of the **Insured** or any **Subsidiary**, regardless of title.

    With the exception of **Claims** excluded under Exclusion 12, We will defend the **Insured** against any **Claim** alleging such acts or violations until final adjudication is rendered against that **Insured**. Final adjudication

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

rendered against one **Insured** shall not be imputed to any other **Insured**.

We will not provide indemnification for any **Claim** to which any **Insured** enters a guilty plea or pleads no contest and We will not provide a defense from the time We become aware that any **Insured** intends to so plead.

19. Any action or proceeding brought by, or on behalf of, any governmental authority or regulatory agency including, but not limited to:

    a. The seizure or destruction of property by order of a governmental authority;
    b. Regulatory actions or proceedings brought by, or on behalf of, the Federal Trade Commission, Federal Communications Commission or other regulatory agency, except when covered under Paragraph c. a of Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties; or
    c. The shutdown or seizure of systems or services by a government or regulatory body.

    However, this exclusion shall not apply to actions or proceedings brought by a governmental authority or a regulatory agency acting solely in its capacity as a customer of the **Named Insured** or of a **Subsidiary**.

20. Any costs or expenses associated with upgrading or improving a **Computer System** regardless of the reason.

21. Any **Claim** brought or alleged by one **Insured** against another, except for a **Claim** brought or alleged by an **Employee** against an **Insured** as a result of a **Security Breach** or **Cyber Incident**.

22. Fines, penalties or assessments imposed pursuant to contract or agreement, whether oral or written, including, but not limited to, Payment Card Industry (PCI) fines, penalties or assessments. This exclusion shall not apply to the coverage provided under Paragraph c. of Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties.

23. Any costs related to loss of any virtual currency.

24. Any actual or alleged restraint of trade, monopolization, unfair trade, price fixing, violation of the Federal Trade Commission Act, the Sherman Antitrust Act, the Clayton Act, including any amendment thereto or any rule or regulation promulgated under any such statute, or any similar foreign, federal, state or local statute, rule or regulation. However, this exclusion shall not apply to a **Claim** alleging unfair or deceptive acts or practices in or affecting commerce under Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)).

25. any of the following:
    a. Unlawful or unauthorized collection, harvesting, processing, storage, transfer, distribution or sale of **Personal Information** or other data;
    b. Wiretapping, eavesdropping, improper consent practices, unlawful or unauthorized use of tracking/monitoring/surveillance software tools, or audio or video recording; or
    c. Violation of the Illinois Biometric Information Privacy Act or similar provisions of any federal, state, local, or foreign statutory or common law, directive or regulation regulating the collection, handling, use, or storage of biometric data and/or any required disclosures thereof.

    However, section 25.b of this exclusion will not apply to **Defense Expenses** incurred for the failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing identity information.

26. a. The purchase or sale of or offer to purchase or sell any securities or any violation of the Securities Exchange Act of 1934 or the Securities Act of 1933 and any amendments thereto or any other foreign, federal, state or local statute, or any rule or regulation promulgated under such statutes, that regulates the offering, sale or purchase of securities.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

b. Any **Claim** brought by any security holder of the **Insured**, in their capacity as such, whether directly, by class action, or derivatively on behalf of the **Insured**.

27. Any **Claim** arising out of, caused by or related to a "Technology Errors & Omissions Wrongful Act."

For purposes of this exclusion, the following definitions apply:

a. "Technology Errors & Omissions Wrongful Act" means any negligent act, error or omission, including any negligent act, error or omission resulting in a breach of contract or in a failure of "Technology Products" to perform the function or serve the purpose intended by an **Insured** or by a person or entity for whom the **Insured** is legally liable, in the performance of "Technology Services."

b. "Technology Services" means the following services performed for others for compensation by an **Insured** or by any other person or entity for whom the **Insured** is legally liable:
   - i. analysis, design, integration, wiring, cabling, or conversion of computer and electronic technology systems or networks;
   - ii. designing, developing, programming, servicing, distributing, licensing, installing, maintaining and repairing computer software, computer code and computer firmware or hardware;
   - iii. education and training in the use of computer hardware or software;
   - iv. information services;
   - v. computer consulting;
   - vi. computer and network security services, including but not limited to providing content filtering, patch administration and security audits;
   - vii. internet services; or
   - viii. data processing in connection with any of the above listed services, including but not limited to storing, collecting, compiling, processing, mining, conversion, encryption, recording or analysis of data.

c. "Technology Products" means any computer hardware, firmware, software, or related electronic product, equipment or device, specifically designed or intended for use in connection with any "Technology Services," telecommunication systems or telecommunication service that is created, manufactured, developed, distributed, licensed, leased or sold by the **Insured** or for any **Insured** by others acting under the **Insured's** trade name.

## SECTION VI – CONDITIONS

### 1. Cancellation

a. The first **Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to Us advance written notice of cancellation.

b. We may cancel this Policy by mailing or delivering to the first **Named Insured** written notice of cancellation at least:

   - i. 10 days before the effective date of cancellation if We cancel for nonpayment of premium; or
   - ii. 30 days before the effective date of cancellation if We cancel for any other reason.

c. We will mail or deliver Our notice to the first **Named Insured's** last mailing address known to Us.

d. Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

e. If this Policy is canceled, We will send the first **Named Insured** any premium refund due. If We cancel, the refund will be prorated. If the first **Named Insured** cancels, the refund may be less than pro rata. The cancellation will be effective even if We have not made or offered a refund.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

f. If notice is mailed, proof of mailing will be sufficient proof of notice.

2. **Changes**

This Policy contains all the agreements between You and Us concerning the insurance afforded. The first **Named Insured** shown in the Declarations is authorized to make changes in the terms of this Policy with Our consent. This Policy's terms can be amended or waived only by endorsement issued by Us and made a part of this Policy.

3. **Examination of Your Books and Records**

We may examine and audit Your books and records as they relate to this Policy at any time during the Policy Period shown in the Declarations and up to three years afterward.

4. **Inspections and Surveys**

We have the right to i) make inspections and surveys at any time; ii) give You reports on the conditions We find; and iii) recommend changes.

We are not obligated to make any inspections, surveys, reports or recommendations, and any such actions We do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And We do not warrant that conditions i) are safe or healthful; or ii) comply with laws, regulations, codes or standards.

Paragraph 2 of this condition applies not only to Us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

5. **Premiums**

The first **Named Insured** shown in the Declarations: i) is responsible for the payments of all premiums; and ii) will be the payee for any return premiums We pay.

6. **Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this Policy may not be transferred without Our written consent, except in the case of death of an individual **Named Insured**.

If You are a sole proprietor and You die, Your rights and duties will be transferred to Your legal representative but only while acting within the scope of duties as Your legal representative. Until Your legal representative is appointed, anyone having proper temporary custody of Your property will have Your rights and duties but only with respect to that property.

7. **Subrogation**

With respect to any payment made under this Policy, We shall be subrogated to the **Insureds** rights of recovery to the extent of such payment. The **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable Us to bring suit in the **Insured's** name. Any recoveries, less the cost of obtaining them, will be distributed as follows:

a. To You, until You are reimbursed for any **Loss** You sustain that exceed the sum of the Policy Limit of Insurance and the Deductible Amount, if any;
b. Then to Us, until We are reimbursed for the payment made under this Policy; and
c. Then to You, until You are reimbursed for that part of the payment equal to the Deductible Amount, if any.

8. **Bankruptcy**

Your bankruptcy, or the bankruptcy of Your estate if You are a sole proprietor, will not relieve Us of Our obligations under this Policy.

9. **Representations**

You represent that all information and statements contained in the **Application** are true, accurate and complete. All such information and statements are the basis for Our issuing this Policy. Misrepresentation of any material fact may be grounds for the rescission of this Policy.

10. **Changes in Exposure**

a. **Acquisition or Creation of Another Organization**

If before or during the Policy Period:

i. You acquire securities or voting rights in another organization or create another organization which, as a result of such acquisition or creation, becomes a **Subsidiary**; or
ii. You acquire any organization through merger or consolidation;

then such organization will be covered under this Policy but only with respect to **Wrongful Acts** or **Loss** which occurred after the effective date of such acquisition or creation provided, with regard to Paragraphs a.(i) and a.(ii) above, You:

(1) give Us written notice of the acquisition or creation of such organization within ninety (90) days after the effective date of such action;
(2) obtain Our written consent to extend the coverage provided by this Policy to such organization; and
(3) upon obtaining Our consent, pay Us an additional premium.

b. **Acquisition of Named Insured**

If during the Policy Period:

i. the **Named Insured** merges into or consolidates with another organization, such that the **Named Insured** is not the surviving organization; or
ii. another organization, or person or group of organizations and/or persons acting in concert, acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors, trustees or managers (if a limited liability company) of the **Named Insured**;

then the coverage afforded under this Policy will continue until the end of the Policy Period, but only with respect to **Claims** arising out of **Wrongful Acts** which occurred prior to the effective date of such merger, consolidation or acquisition.

The full annual premium for the Policy Period will be deemed to be fully earned immediately upon the occurrence of such merger, consolidation or acquisition of the **Named Insured**.

The **Named Insured** must give written notice of such merger, consolidation or acquisition to Us as soon as practicable, together with such information as We may reasonably require.

c. If, before or during the Policy Period, an organization ceases to be a **Subsidiary**, the coverage afforded under this Policy with respect to such **Subsidiary** will continue until the end of the Policy

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

Period but only with respect to **Claims** arising out of **Wrongful Acts** which occurred prior to the date such organization ceased to be a **Subsidiary**.

11. **Other Insurance**

Under Insuring Agreements 1 – Security Breach Expense, 2 – Extortion Threats or 3 – Replacement or Restoration of Electronic Data: If any covered **Claim** or **Loss** is insured by any other valid policy, then this Policy shall apply only in excess of the amount of any deductible, retention and limit applicable to such other insurance, whether such other policy is stated to be primary, contributory, excess, contingent or otherwise, unless such other policy is written specifically excess of this Policy by reference in such other policy to this Policy's policy number.

When this Policy is excess, We shall have no duty under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties to defend the **Insured** against any **Suit** if any other insurer has a duty to defend the **Insured** against that **Suit**.

If any covered **Claim** or **Loss** is insured by any other valid policy issued by Us, our liability under this Policy and such other policy combined shall not exceed the amount of the largest applicable Aggregate Limits or Sublimit(s) of Insurance.

12. **Legal Action Against Us**

No person or organization has a right: i) to join Us as a party or otherwise bring Us into a **Suit** asking for damages from an **Insured**; or ii) to sue Us under this Policy unless all of its terms have been fully complied with.

A person or organization may sue Us to recover on an agreed settlement or on a final judgment against an **Insured**, but We will not be liable for damages that are not payable under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, or that are in excess of the Policy Aggregate Limit of Insurance. An agreed settlement means a settlement and release of liability signed by Us, the first **Named Insured** and the claimant or the claimant's legal representative.

You may not bring any legal action against Us involving **Loss**: i) unless You have complied with all the terms of this Policy; ii) until ninety (90) days after You have filed proof of loss with Us; and iii) unless brought within two (2) years from the date You reported the **Loss** to Us.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

13. **Separation of Insureds**

Except with respect to the Policy Aggregate Limit of Insurance, and any rights or duties specifically assigned in Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties to the first **Named Insured**, this Policy applies separately to each **Insured** against whom a **Claim** is made.

14. **Duties in the Event of Claim or Loss**

After a situation that results in, or may result in, a **Loss** covered under this Policy is **Discovered**, You must notify Us in writing as soon as practicable, but not to exceed thirty (30) days from the date **Discovered**, and cooperate with Us in the investigation and settlement of the **Claim** or **Loss**. Additionally:

a. Under Insuring Agreements 1 – Security Breach Expense, 2 – Extortion Threats, 3 – Replacement or Restoration of Electronic Data, and 4 – Business Income and Extra Expense, You must:

   i. notify local law enforcement officials;

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

ii. submit to examination under oath at Our request and give Us a signed statement of Your answers; and

iii. At Our request give Us a detailed, sworn proof of loss within one hundred twenty (120) days.

In addition, under Insuring Agreement 2 – Extortion Threats, You must also:

(1) determine that the **Extortion Threat** has actually occurred; and

(2) with respect to **Ransomware**, make every reasonable effort to access Your **Electronic Data** from backup, if any, and to remediate the cause of the **Ransomware**; and

(3) make every reasonable effort to immediately notify Us before making any ransom payment based upon the **Extortion Threat**; and

(4) approve any ransom payment based upon the **Extortion Threat.**

b. Under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, You must:

i. immediately record the specifics of the **Claim** and the date **Discovered**;

ii. immediately send Us copies of any demands, notices, summonses or legal papers received in connection with the **Claims**;

iii. authorize Us to obtain records and other information; and

iv. assist Us, upon Our request, in the enforcement of any right against any person or organization which may be liable to You because of a **Loss** to which this Policy may also apply.

You will not, except at Your own cost, voluntarily make a payment, assume any obligation or incur any expense without Our consent.

**15. Extended Reporting Periods**

**a. Automatic Extended Reporting Period**

If the **Named Insured** cancels or non-renews this Policy, the Insurer cancels or non-renews this Policy, or if there is a decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change less favorable to the **Insured**, then the **Insured** will have an automatic, non-cancelable 60-day **Extended Reporting Period.**

**b. Supplemental Extended Reporting Period**

If the **Named Insured** cancels or non-renews this Policy, the Insurer cancels or non-renews this Policy, or if there is a decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change less favorable to the **Insured**, the **Named Insured** will have the right to purchase an optional **Extended Reporting Period** of up to three (3) years to immediately follow the automatic **Extended Reporting Period.**

The optional **Extended Reporting Periods** and their respective additional premiums are stated in the Declarations or by endorsement. The premium for such **Extended Reporting Period** is based on the rating of the canceled or terminated Policy. We must receive written notice of the optional **Extended Reporting Period** elected together with payment of the applicable additional premium, within either 1) sixty (60) days after the end of the Policy Period or 2) thirty (30) days from the effective date of mailing or deliver of the notification advising You of the availability of, the premium for, and the importance of purchasing optional **Extended Reporting Period.** If the Insurer does not receive payment within such period, the **Insurer** will not be required to provide any optional **Extended Reporting Period.**

If an optional **Extended Reporting Period** is purchased, we will provide an Additional Extended Reporting Period Additional Limit of Insurance equal to the remaining applicable Limit of Insurance of the canceled or terminated Policy.

16. **Valuation – Settlement**

All premiums, limit(s) of insurance, deductible amounts, **Loss** and any other monetary amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is agreed to or another component of **Loss** under this Policy is expressed in any currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is entered, settlement amount is agreed upon or the other component of **Loss** is due, respectively.

a. With respect to **Loss** covered under Insuring Agreement 4 – Business Income, Contingent Business Income and Extra Expense, the amount of "business and contingent business income" will be determined based on consideration of:

i. the net income generated from Your **E-commerce Activities** before the **Interruption** occurred;
ii. the likely net income generated by Your **E-commerce Activities** if no **Interruption** had occurred, but not including any net income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the **Cyber Incident** on customers or on other businesses;
iii. the operating expenses, including payroll, necessary to resume Your **E-commerce Activities** with the same quality of service that existed before the **Interruption**; and
iv. other relevant sources of information, including Your financial records and accounting procedures, bills, invoices and other vouchers, and debts, liens and contracts.

However, the amount of "business and contingent business income" will be reduced to the extent that the reduction in the volume of business from the affected **E-commerce Activities** is offset by an increase in the volume of business from other channels of commerce such as via telephone, mail or other sources.

b. With respect to Loss covered under Insuring Agreement 4 – Business Income, Contingent Business Income and Extra Expense, the amount of "extra expense" will be determined based on:

i. necessary expenses that exceed the normal operating expenses that would have been incurred in the course of Your **E-commerce Activities** during the period of coverage if no **Interruption** had occurred. We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the period of coverage once Your **E-commerce Activities** are resumed; and
ii. necessary expenses that reduce the "business and contingent business income" **Loss** that otherwise would have been incurred during the period of coverage.

17. **Confidentiality**

Under Insuring Agreement 2 – Extortion Threats, **Insureds** must make every reasonable effort not to divulge the existence of this coverage.

18. **Territory**

This Policy covers **Wrongful Acts, Security Breaches, Cyber Incidents** and **Extortion Threats** which occur anywhere in the world. However, **Suits** must be brought in the United States of America (including its territories and possessions).

EXHIBIT 1

19. **Policy Bridge – Discovery Replacing Loss Sustained**

If this Policy replaces insurance that provided You with an extended period of time after cancellation or nonrenewal in which to **Discover Loss** resulting directly from any **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** and which did not terminate when this Policy became effective:

We will not pay for any **Loss** resulting directly from any **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** that occurred during the Policy Period of that prior insurance which is **Discovered** during such extended period of time, unless the amount of that **Loss** exceeds the Limit of Insurance and Deductible Amount of that prior insurance. In that case, We will pay for the excess **Loss** subject to the terms and conditions of this Policy.

Condition 11 – Other Insurance does not apply to this condition.

20. **Nonrenewal**

We may non-renew this Policy for any reason allowable by applicable law. If We decide not to renew this Policy, We will mail or deliver to the first **Named Insured** written notice of the nonrenewal not less than thirty (30) days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION VII – DEFINITIONS

1. **Application** means the signed application for this Policy, including any attachments, attestations, and other materials submitted in conjunction with the signed application, digital or otherwise.

2. **Card Company** means American Express, Discover Financial Services, JCB International, MasterCard Worldwide, Visa Inc. or any other credit card company that requires its merchants to adhere to the Payment Card Industry (PCI) Data Security Standards.

3. **Claim** means:

   a. A written demand for monetary or nonmonetary damages, including but not limited to injunctive relief;
   b. A civil proceeding commenced by the service of a complaint or similar proceeding;
   c. Under Paragraph b. of Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, a **Regulatory Proceeding** commenced by the filing of a notice of charges, formal investigative order, service of summons or similar document; or
   d. Under Paragraph c. of Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties an action brought by a **Card Company** of the Payment Card Industry (PCI);

against any **Insured** for a **Wrongful Act**, including any appeal therefrom.

4. **Computer System** means any computer, including transportable or handheld devices, electronic storage devices and related peripheral components; any systems and applications software, or any related telecommunications networks connected to or used in connection with such computer or devices: i) which collects, transmits, processes, stores or retrieves Your **Electronic Data**; and ii) which is:

   a. Owned by You;
   b. Leased by You and operated by any **Insured**;
   c. Owned and operated by an **Employee** who has agreed in writing to Your personal device use policy; or
   d. Operated by an authorized **Third Party**, but only with respect to Your **Electronic Data**.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

5. **Cyber Incident** means:

a. Any i) **Hacker** attack; ii) malicious code; or iii) **Virus** that is directed at, enacted upon or introduced into a **Computer System** (including Your **Electronic Data**) and is designed to access, alter, corrupt, damage, delete, destroy, disrupt, encrypt, use or prevent or restrict access to or the use of any part of a **Computer System** (including Your **Electronic Data**) or otherwise disrupt its normal functioning or operation.

Recurrence of the same **Virus** after a **Computer System** has been restored shall constitute a separate **Cyber Incident**.

b. Any denial of service attack specifically directed at You which disrupts, prevents or restricts access to or use of a **Computer System** or otherwise disrupts the normal functioning or operation of a **Computer System**.

6. **Discovery** or **Discovered** means the time when any **Employee** who is a Chief Executive Officer, Chief Financial Officer, Chief Security Officer, Chief Technology Officer, Chief Information Officer, Risk Manager, General Counsel, owner, general manager, or any functionally equivalent positions of the **Insured** or any **Subsidiary**, regardless of title first becomes aware of facts which would cause a reasonable person to believe that a **Loss** covered by this Policy has been or will be incurred, regardless of when the act or acts causing or contributing to such **Loss** occurred, even though the exact amount or details of **Loss** may not then be known.

**Discovery** or **Discovered** also means the time when any **Insured** first receives notice of an actual or potential **Claim** in which it is alleged that You are liable to a third party under circumstances which, if true, would constitute a **Loss** under this Policy.

7. **E-commerce Activities** means those activities conducted by You in the normal conduct of Your business via Your web site or Your e-mail system.

8. **Electronic Data** means information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on electronic storage devices including, but not limited to, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment. **Electronic Data** is not tangible property.

**Electronic Data** does not include Your **Electronic Data** that is licensed, leased, rented or loaned to others.

9. **Employee** means any natural person who was, now is, or will be:

a. Employed on a full- or part-time basis;
b. Furnished temporarily to You to substitute for a permanent employee on leave or to meet seasonal or short-term workload conditions;
c. Leased to You by a labor leasing firm under an agreement between You and the labor leasing firm to perform duties related to the conduct of Your business but does not mean a temporary employee as defined in Paragraph 9.b. above;
d. An officer;
e. A director, trustee or manager (if a limited liability company);
f. A volunteer worker;
g. A partner or member (if a limited liability company); or
h. An **Independent Contractor**,

of the **Named Insured** and those of any organization qualifying as a **Subsidiary** under the terms of this Policy, but only while acting within the scope of their duties as determined by the **Named Insured** or such **Subsidiary**.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

10. **Extended Reporting Period** means a designated period immediately following cancellation, nonrenewal, decrease in limits, reduced coverage, increased deductible or self-insured retention, newly added exclusions, or any other changes which are less favorable to the **Insured** of the Policy, during which **Claims** first made against the **Insured** will be deemed made during the Policy Period, but only for **Wrongful Acts** or **Interrelated Wrongful Acts** that first occurred on or after the **Retroactive Date**, if any, and prior to the effective date of cancellation, nonrenewal, decrease in limits, reduced coverage, increased deductible or self-insured retention, newly added exclusions, or any other changes which are less favorable to the **Insured,** of the Policy.

11. **Extortion Threat** means a threat or series of related threats:

    a. To perpetrate a **Cyber Incident**;
    b. To disseminate, divulge or utilize: i) Your proprietary information; or ii) weakness in the source code within a **Computer System** by gaining unauthorized access to a **Computer System**;
    c. To destroy, corrupt or prevent normal access to a **Computer System** (including Your **Electronic Data**) by gaining or having gained unauthorized access to a **Computer System**;
    d. To inflict **Ransomware** on a **Computer System**; or
    e. To publish Your client's or **Employee's Personal Information.**

    **Extortion Threat** does not include a threat or series of threats to any **Third Party**.

12. **Hacker** means a person who accesses a **Computer System** (including Your **Electronic Data**) who is: i) not authorized to have such access; or ii) authorized to have such access but who uses such access in an unauthorized manner.

13. **Independent Contractor** means any person or entity contracted by the **Named Insured** to perform the same business operations as the **Named Insured**, but only while in the course of their performance of such business operations on behalf of, or at the direction of, the **Named Insured.**

14. **Insured** means any **Named Insured** and its **Employees**.

15. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any: i) fact, circumstance, situation, event, transaction or cause; or ii) a series of casually connected facts, circumstances, situations, events, transactions or causes.

16. **Interruption** means:

    a. With respect to a **Cyber Incident**:

        i. an unanticipated cessation or slowdown for Your **E-Commerce Activities**; or
        ii. Your suspension of Your **E-Commerce Activities** for the purpose of avoiding or mitigating the possibility of transmitting a **Virus** or malicious code to another person or organization;

        and, with regard to Paragraphs 16a.i and 16.a.ii. above, shall be deemed to begin when Your **E-Commerce Activities** are interrupted and ends at the earliest of:

        (1) one hundred-eighty (180) days after the **Interruption** begins;
        (2) the time when Your **E-Commerce Activities** are resumed; or
        (3) the time when service is restored to You.

    b. With respect to an **Extortion Threat**, Your voluntary suspension of Your **E-Commerce Activities**:

        i. based upon clear evidence of a credible threat; or
        ii. based upon the recommendation of a security firm, if any;

        and, with regard to Paragraphs 16.b.i and 16.b.ii. above, shall be deemed to begin when


Includes copyrighted material of Insurance Services Office, Inc., with its permission

EXHIBIT 1

Your **E-Commerce Activities** are interrupted and ends at the earliest of:

(1) one hundred-eighty (180) days after the Interruption begins;
(2) the time when Your **E-Commerce Activities** are resumed; or
(3) the time when service is restored to You.

17. **Loss** means the definitions set forth in each of the respective Insuring Agreements of this Policy.

18. **Named Insured** means the entity or entities shown in the Declarations and any **Subsidiary**.

19. **Personal Information** means any information not available to the general public for any reason through which an individual may be identified including, but not limited to, an individual's:

a. Social security number, driver's license number or state identification number;
b. Protected health information;
c. Financial account numbers;
d. Security codes, passwords, PINs associated with credit, debit or charge card numbers which would permit access to financial accounts; or
e. Any other nonpublic information as defined in **Privacy Regulations**.

20. **Policy Period** means the period of time from the inception date of this Policy shown in the Declarations to the expiration date shown in the Declarations, or its earlier cancellation or termination date, and specifically excludes any **Extended Reporting Period**.

21. **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

22. **Privacy Regulations** means any of the following statutes and regulations, and their amendments, associated with the control and use of personally identifiable financial, health or other sensitive information including, but not limited to:

a. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Public Law 104-191);
b. The Health Information Technology for Economic and Clinical Health Act (HITECH) (American Recovery and Reinvestment Act of 2009);
c. The Gramm-Leach-Bliley Act of 1999;
d. Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)), but solely for alleged unfair or deceptive acts or practices in or affecting commerce;
e. The Identity Theft Red Flags Rules under the Fair and Accurate Credit Transactions Act of 2003; or
f. Any other similar local, state, federal or foreign identity theft or privacy protection statute or regulation.

23. **Ransomware** means any software that is used to demand a ransom payment by: i) restricting access to a **Computer System**; or ii) encrypting Your **Electronic Data** held within a **Computer System**.

24. **Ransom Demand** means a demand by a third-party actor communicated in an electronic format to You as a request for payment in any form, including virtual currency, to rectify an **Extortion Threat** that is **Discovered** during the Policy Period.

**Ransom Payment** means a monetary payment made during the Policy Period in any form, including virtual currency, to a third-party actor with Our prior written consent to resolve an **Extortion Threat.**

**Security Breach** means a privacy breach that includes the acquisition of **Personal Information** held within a **Computer System** or in non-electronic form at or while in the care, custody or control of the **Insured** or authorized **Third Party** by a person: i) not authorized to have access to such information; or ii) authorized

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

to have access to such information but whose access results in the unauthorized disclosure of such information.

25. **Subsidiary** means any organization in which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors, trustees, managers (if a limited liability company) or persons serving in a similar capacity is owned, in any combination, by one or more **Named Insureds**.

26. **Suit** means a civil proceeding in which damages to which this Policy applies are claimed against the **Insured**. **Suit** includes:

    a. An arbitration proceeding in which such damages are claimed and to which the **Insured** submits with Our consent; or
    b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **Insured** submits with Our consent.

    **Suit** does not include a civil proceeding seeking recognition and/or enforcement of a foreign money judgment.

27. **Third Party** means any entity that You engage under the terms of a written contract to perform services for You.

28. **Virus** means any kind of malicious code designed to damage or destroy any part of a **Computer System** (including Your **Electronic Data**) or disrupt its normal functioning.

29. **Wrongful Act** means any actual or alleged:

    a. **Security Breach**;
    b. Failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing identity information;
    c. Failure to prevent the transmission of a **Virus** through a **Computer System** into a computer network, any application software, or a computer operating system or related network that is not rented, owned, leased by, licensed to or under the direct operational control of the **Insured**; or
    d. Failure to provide notification of any actual or potential **Security Breach** if such notification is required by any security breach notification law;

    by, or asserted against, an **Insured.**

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

EXHIBIT 1

Policy Number: FLY-CB-DZP1ERYYU-002
Issued Date: Dec 30, 2024
Effective Date: Jan 01, 2025

# SIGNATURE PAGE

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Juliette Song
(signature)
Juliette Song -
Secretary

Torben Ostergaard
(signature)
Torben Ostergaard -
President

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMPUTER AND FUNDS TRANSFER FRAUD

**Computer And Funds Transfer Fraud Coverage Limit:** *$1000000.00*
**Computer And Funds Transfer Fraud Deductible:** *$2500.00*

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

With regard to this Computer And Funds Transfer Fraud endorsement, the provisions of the Policy to which this endorsement is attached remain unchanged and apply, unless modified by this endorsement.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

I. The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS:**

**Computer And Funds Transfer Fraud**

a. Subject to the Computer and Funds Transfer Fraud Coverage Limit and Deductible set forth above, We will pay for:

i. **Loss** resulting directly from a fraudulent:

1. Entry of **Electronic Data** or **Computer System** into; or
2. Change of **Electronic Data** or **Computer System** within

a **Computer System**, by a person or organization without authorization to access such **Computer System**, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **a.i.(1)** and **a.i.(2):**

a. **Your** money, securities or other property to be transferred, paid or delivered; or
b. Your account at a financial institution to be debited or deleted, or

ii. **Loss** resulting directly from a **Fraudulent Instruction** directing a financial institution to debit your **Transfer Account** and transfer, pay or deliver money or securities from that account

that is first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS.**

b. As used in Paragraph **a.i.**, "fraudulent entry" or "fraudulent change" of **Electronic Data** or **Computer Program** shall include such entry or change made by an **Employee** acting, in good faith, upon a **Fraudulent Instruction** received from a computer software contractor who has a written agreement with You to design, implement or service **Computer Programs** for a **Computer System** covered under this Insuring Agreement.

II. Solely with respect to the coverage afforded under this endorsement:

a. **Computer Program** means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enables the computer or devices to receive, process, store or send your **Electronic Data**.

b. **Loss** means:

1. In Paragraph **I.a.i.:**
   (a) **Your** money, securities or other property fraudulently transferred, paid or delivered; or
   (b) Money or securities fraudulently debited or deleted from Your account at a financial institution.

2. In Paragraph **I.a.ii.,** transferring, paying or delivering money or securities from Your **Transfer Account**.

c. **Fraudulent Instruction** means:

(1) With regard to Paragraph **I.a.ii.:**

(a) A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instruction directing a financial institution to debit Your **Transfer Account** and to transfer, pay or deliver money or securities from that **Transfer Account**, which instruction purports to have been issued by You, but which in fact was fraudulently issued by someone else without Your knowledge or consent.

(b) A written instruction issued to a financial institution directing the financial institution to debit Your **Transfer Account** and to transfer, pay or deliver money or securities from that **Transfer Account**, through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by You, but which in fact was issued, forged or altered by someone else without your knowledge or consent.

(2) With regard to Paragraph **I.b.:**

A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic, written or voice instruction directing an **Employee** to enter or change **Electronic Data** or **Computer Programs** within a **Computer System** covered under this Insuring Agreement, which instruction in fact was fraudulently issued by Your computer software contractor.

d. **Transfer Account** means an account maintained by you at a financial institution from which You can initiate the transfer, payment or delivery of **Money** and **Securities**:

(1) By means of computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instructions; or

(2) By means of written instructions establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

**III.** The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

EXHIBIT 1

The most We will pay for all Loss covered under the Computer and Funds Transfer Fraud Insuring Agreement is the Computer and Funds Transfer Fraud Sublimit of Insurance shown above, which is part of, not in addition to the Policy Aggregate Limit of Insurance set forth in the Declarations to this Policy. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

**IV.** Paragraph **1.** of **Section III – Deductible** is deleted in its entirety and replaced with the following:

1. Under Insuring Agreements **1.** Security Breach Expense, **2.** Extortion Threats, **3.** Replacement Or Restoration Of Electronic Data, and Paragraph **I.a.** of this endorsement:

We will pay only the amount of **Loss** which is in excess of the Policy Deductible Amount shown above.

**V.** The following is added to **SECTION V – EXCLUSIONS:**

1. We will not be liable for **Loss** based upon, attributable to, arising out of or resulting from:

i. A fraudulent:

1. Entry of **Electronic Data** or **Computer Program** into; or
2. Change of **Electronic Data** or **Computer Program** within

a **Computer System**, by a person or organization with authorized access to such **Computer System**, except when covered under Paragraph **I.b.**

ii. The use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

iii. The giving or surrendering of property in any exchange or purchase.

iv. An **Employee** or financial institution acting upon any instruction to:

1. Transfer, pay or deliver money, securities or other property; or
2. Debit or delete Your account;

which instruction proves to be fraudulent, except when covered under Paragraph **I.b.**

2. We will not be liable for **Loss**, or that part of any **Loss**, the proof of which as to its existence or amount is dependent upon:

i. An inventory computation; or
ii. A profit and loss computation.

**VI.** The introductory statement to paragraph a. of Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS** is deleted in its entirety and replaced with the following:

**a.** Under Insuring Agreements **2.** Extortion Threats, **3.** Replacement Or Restoration Of Electronic Data and

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

this Computer Funds Transfer Fraud Insuring Agreement, you must:

All other terms and conditions remain unchanged.

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INCREASE OF OR ELIMINATION OF BUSINESS AND CONTINGENT BUSINESS INCOME AND EXTRA EXPENSE SUBLIMIT

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

## SCHEDULE

| |
|---|
| **Effective Date of Endorsement:** Jan 01, 2025 |
| **Business and Contingent Business Income and Extra Expense Sublimit:** $1,000,000.00 |
| **Premium:** $237.00 |

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

The following sentence is added to Paragraph 2. Aggregate Sublimit(s) of Insurance of **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

Insuring Agreement 4 – Business and Contingent Business Income and Extra Expense: is the Business Income and Extra Expense Aggregate Sublimit of Insurance, if any, shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TELECOMMUNICATIONS FRAUD ENDORSEMENT

**Telecommunications Fraud Coverage Limit:** $50000.00

This endorsement modifies insurance provided under the following:

**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Telecommunications Fraud Endorsement, all provisions of the Policy to which this endorsement is attached, as well as all terms and conditions, remain unchanged and applicable.

This endorsement extends certain coverages. The headers in this endorsement are only for convenience. Read the entire policy carefully to determine rights, duties and what is and is not covered.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

I. The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

**Telecommunications Fraud:**

Subject to the Telecommunications Fraud Coverage Limit set forth above and any Deductible specified in the Declarations to this policy, We will pay for any monetary **Loss** sustained by **You,** including but not limited to phone bills, first **Discovered** during the Policy Period and reported in accordance Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI - CONDITIONS**, directly resulting from an intentional unauthorized access to Your **Telephone System** by a third party.

With respect to this Telecommunications Fraud Insuring Agreement:

a. **Loss** solely means the monetary cost of unauthorized calls or unauthorized use of **Your Telephone System's** bandwidth.

b. **Telephone System** means the VoIP phone system directly under **Your** control.

II. The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

The most We will pay for all Loss covered under the Telecommunications Fraud Insuring Agreement is the Telecommunications Fraud Aggregate Sublimit of Insurance, if any, shown above or in the Declarations., which are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations of liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

III. The following is added to **SECTION III – DEDUCTIBLE**

Under the Telecommunications Fraud Insuring Agreement, We will pay only the amount of **Loss** which is in excess of the Policy Deductible shown in the Declarations.

All other terms and conditions remain unchanged.

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# HARDWARE REPLACEMENT COSTS ENDORSEMENT

**Hardware Replacement Costs Coverage Limit:** $50000.00

This endorsement modifies insurance provided under the following:

**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Hardware Replacement Costs Endorsement, all provisions of the Policy to which this endorsement is attached, as all terms and conditions, remain unchanged and applicable.

This endorsement extends certain coverages. The headers in this endorsement are only for convenience. Read the entire policy carefully to determine rights, duties and what is and is not covered.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.** The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

**Hardware Replacement Costs:**

Subject to the Hardware Replacement Costs Coverage Limit set forth above and any Deductible specified in the Declarations to this policy, We will pay for **Loss** directly resulting from a **Cyber Incident** first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**, to mitigate the potential of a future **Cyber Incident** or **Security Breach.**

With respect to this Hardware Replacement Costs Insuring Agreement:

a. **Loss** means the cost to replace hardware, including but not limited to, computers or any associated devices or equipment operated by, and either owned by or leased to, the **Insured** that are unable to function as intended due to corruption or destruction of software or firmware.

b. **Loss** does not include any sums related to labor costs associated with installing, connecting or setting up the hardware.

**II.** The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

The most We will pay for all Loss covered under the Hardware Replacement Costs Insuring Agreement is the Hardware Replacement Costs Aggregate Sublimit of Insurance, if any, shown above or in the Declarations, which are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations of liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**III.** The following is added to **SECTION III – DEDUCTIBLE:**

Under the Hardware Replacement Costs Insuring Agreement, We will pay only the amount of **Loss** which is in excess of the Policy Deductible shown in the Declarations.

**IV.** Exclusion **4** in **SECTION V – EXCLUSIONS** is deleted in its entirety and replaced with the following:

**4. Bodily Injury**

**Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. It also means mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person.

However, **Bodily Injury** does not mean mental anguish or emotional distress resulting directly from a **Security Breach**.

All other terms and conditions remain unchanged.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WEBSITE MEDIA CONTENT LIABILITY ENDORSEMENT

**Website Media Content Liability Coverage Limit:** $1000000.00
**Website Media Content Liability Deductible:** $2500.00

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Website Media Content Liability Endorsement, all provisions of the Policy to which this endorsement is attached, as well as all terms and conditions, remain unchanged and applicable.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.** The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

**Website Media Content Liability**

Subject to the Website Media Content Liability Coverage Limit and Deductible set forth above, We will pay for **Loss** that the Insured becomes legally obligated to pay and **Defense Expenses** as a result of a **Claim** that is **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**, for one or more of the following acts first committed on or after the retroactive date and before the end of the Policy Period in the course of Your display of **Media Material** on Your website or on social media web pages created and maintained by or on behalf of You:

**a.** invasion of or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice or likeness; or

**b.** plagiarism, piracy or misappropriation of ideas under implied contract; or

**c.** infringement of copyright; or

**d.** infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, slogan, service mark, service name; or

**e.** improper deep-linking or framing within electronic content.

With respect to this Website Media Content Liability Insuring Agreement:

**a. Media Material** means any information in electronic form, including words, sounds, numbers, images, or graphics and shall also include advertising, video, streaming content, webcasting, online forums, bulletin boards and chat room content, but does not mean computer software or the actual goods, products or services described, illustrated or displayed in such **Media Material**.

**II.** Exclusions Applicable to the Website Media Content Liability Insuring Agreement:


Includes copyrighted material of Insurance Services Office, Inc., with its permission

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

We will not be liable for any **Claim** resulting from an act based upon, attributable to or arising out of:

1. An actual or alleged infringement of, violation of, misappropriation of or assertion of any right to or interest in any:

   a. Patent, copyright, trademark, trade dress, certification mark, collective mark, service mark, expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade secret or other intellectual property right by or on behalf of any **Insured,** provided that this Exclusion does not apply to a claim resulting from an act based upon, attributable to or arising out of infringement of copyright, or infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, slogan, service mark, service name in the course of Your display of **Media Material** on Your website or on social media web pages created and maintained by or on behalf of You; or

   b. Software or computer code or its source content or material by or on behalf of any **Insured.**

III. The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

The most We will pay for all Loss covered under the Website Media Content Liability Insuring Agreement is the Website Media Content Liability Sublimit of Insurance shown above, which is part of, not in addition to the Policy Aggregate Limit of Insurance set forth in the Declarations to this Policy. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

All other terms and conditions remain unchanged.


Includes copyrighted material of Insurance Services Office, Inc., with its permission

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POST BREACH REMEDIATION COVERAGE ENDORSEMENT

**Post Breach Remediation Coverage Limit:** $50000.00

This endorsement modifies insurance provided under the following:

**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Post Breach Remediation Coverage Endorsement, all provisions of the Policy to which this endorsement is attached, as well as all terms and conditions, remain unchanged and applicable.

This endorsement extends certain coverages. The headers in this endorsement are only for convenience. Read the entire policy carefully to determine rights, duties and what is and is not covered.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.** The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

**Post Breach Remediation:**

Subject to the Post Breach Remediation Coverage Limit set forth above and any Deductible specified in the Declarations to this policy, We will pay **Loss** incurred with **Our** prior written approval during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**, to resolve any vulnerabilities or weaknesses in your **Computer System** that are identified by an independent security firm after a **Cyber Incident** or **Security Breach**. The upgrades or improvements must be determined by the independent security firm to reduce the probability or potential damage from a **Cyber Incident** or **Security Breach** in the future.

With respect to this Post Breach Remediation Insuring Agreement:

a. **Loss** solely means:

i. labor costs incurred by an independent security firm to determine whether any vulnerabilities or weaknesses exist in Your **Computer System** that are identified by an independent security firm after a **Cyber Incident** or **Security Breach**; and

ii. labor costs incurred to resolve any vulnerabilities or weaknesses in your **Computer System** that are identified by an independent security firm after a **Cyber Incident** or **Security Breach**.

**II.** The following is added to **SECTION II – LIMITS OF INSURANCE. 2. Aggregate Sublimit(s) of Insurance:**

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

The most We will pay for all Loss covered under the Post Breach Remediation Insuring Agreement is the Post Breach Remediation Aggregate Sublimit of Insurance, if any, shown above or in the Declarations, which are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations of liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

**III.** The following is added to **SECTION III – DEDUCTIBLE:**

Under the Post Breach Remediation Insuring Agreement, We will pay only the amount of **Loss** which is in excess of the Policy Deductible amount shown in the Declarations.

All other terms and conditions remain unchanged.

EXHIBIT 1

**POLICYHOLDER DISCLOSURE**

**NOTICE OF TERRORISM INSURANCE COVERAGE**

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism, as defined, in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Where coverage is provided under this Policy, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

**Your premium <u>will</u> include the additional premium for terrorism, as stated in the section of this Notice titled DISCLOSURE OF PREMIUM.**

**<u>DISCLOSURE OF PREMIUM</u>**

Your premium for terrorism coverage is: $ 2 (This charge/amount is applied to obtain the final premium).

You may choose to reject the offer by selecting the rejection option below. If you choose to reject the offer, Your Policy will be modified to exclude the described coverage. If you choose to accept this offer, you do not need to do anything further and such coverage will be provided as described herein.

**<u>REJECTION OF TERRORISM INSURANCE COVERAGE</u>**

☐ By clicking this box, I affirm that I have read this Notice and hereby choose to decline to purchase coverage for certified acts of terrorism, as defined in Section 102(1) of the Act. I understand that I will not have coverage for any losses resulting from any certified acts of terrorism and that an exclusion of certain terrorism losses will be made part of this Policy.

*Named Insured's consent to this Form provided electronically*
Policyholder/Applicant's Signature

Tim Coffman
Print Name of Policyholder/Applicant

Date: Dec 30, 2024

Tim Coffman
Named Insured

*Spinnaker Insurance Company*
Insurance Company

Policy Number: FLY-CB-DZP1ERYYU-002

EXHIBIT 1

## POLICY DOCUMENTATION DELIVERY METHOD SELECTION FORM

Spinnaker Insurance Company is required by law to obtain Your consent to engage in electronic delivery of Your policy and related forms. You may:

- Select ONLY electronic delivery;
- Select ONLY paper delivery;
- Select BOTH electronic delivery and paper delivery; or
- Withdraw Your previous consent to receive electronic delivery.

Please indicate Your choice from the options below. Your selection applies to You and any other insureds entitled to receive copies of such forms under the policy.

☒ **ELECTRONIC DELIVERY ONLY**

I select electronic delivery of the form(s) indicated below. I acknowledge that I will not receive paper copies of these form(s), unless I notify Spinnaker Insurance Company or my agent/broker of my decision to entirely withdraw electronic consent or modify my selection to also include paper delivery.

☒ Policy

☒ Notices of Cancellation and Nonrenewal

☒ Other forms related to my policy

☐ **PAPER DELIVERY ONLY**

I select paper delivery of my policy and all related forms. I acknowledge that I will only receive paper copies of such forms.

☐ **BOTH ELECTRONIC DELIVERY AND PAPER DELIVERY**

I select the option to receive both electronic and paper delivery of my policy and all related forms.

☐ **WITHDRAWAL OF CONSENT OF ELECTRONIC DELIVERY**

I withdraw my consent to receive electronic delivery of my policy and/or related forms. In the future, I will only receive paper copies of such forms.

**DISCLOSURE**

If You elect to have Your insurance policy and related documents sent to You by electronic delivery, it is Your responsibility to update Your email address should it change at any time during the life of the policy. Further, Your election to have Your insurance policy and related documents transmitted to You electronically shall remain in effect until You notify:

Spinnaker Insurance Company
*c/o Boost Insurance Agency, Inc.*
*22 W 21st Street. 7th Floor*
*New York, NY 10010*

in writing of Your withdrawal of such consent.

EXHIBIT 1

Tim Coffman

**Name of Individual to Receive Documents by Electronic Delivery**

Samantha@phoenixwv.biz

**E-mail Address of Individual to Receive Documents by Electronic Delivery**

Tim Coffman

**First Named Insured**

Tim Coffman

**Print Name of First Named Insured's Authorized Representative**

*Named Insured's consent to this Form provided electronically*

**Signature of First Named Insured's Authorized Representative**

Dec 30, 2024

**Date**

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WEST VIRGINIA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following: **COMMERCIAL CYBER INSURANCE POLICY**

I. Paragraph **3.** in **SECTION V – EXCLUSIONS** is replaced by the following:

**3.** Nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident, however caused.

II. Paragraph **f.** of **SECTION VI – CONDITIONS**, Condition **1. Cancellation** is deleted without replacement.

III. **SECTION VI – CONDITIONS**, Condition **9. Representations** is replaced by the following:

**9. Representations**

You represent that all information and statements contained in the **Application** are true, accurate and complete. All such information and statements are the basis for Our issuing this Policy and shall be considered as incorporated into and shall constitute a part of this Policy. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the Policy, unless:

**a.** Fraudulent;

**b.** Material either to the acceptance of the risk, or to the hazard assumed by the **Insurer**; or

**c.** The **Insurer** in good faith would either not have issued the Policy, or would not have issued a Policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the **Loss**, if the true facts had been made known to the **Insurer** as required either by the **Application** for the Policy or otherwise.

All other terms and conditions remain unchanged.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## TRADE OR ECONOMIC SANCTIONS

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

This insurance does not provide any coverage, and We shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited, to those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

Policy Number: FLY-CB-DZP1ERYYU-002
Endorsement Issued Date: Dec 30, 2024
Endorsement Effective Date: Jan 01, 2025

EXHIBIT 1

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INCLUDE RETROACTIVE DATE

This endorsement modifies insurance provided under the Discovery Form version of the following:

**COMMERCIAL CYBER INSURANCE POLICY**

**SCHEDULE**

| |
|---|
| **Named Insured:**<br>Phoenix Associates, Inc. |
| **Retroactive Date:**<br>12:01 AM on Jan 01, 2023 |

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

I. The following applies with respect to the coverage provided under Insuring Agreements **1.** Security Breach Expense, **2.** Extortion Threats, **3.** Replacement Or Restoration Of Electronic Data, and **4.** Business Income And Extra Expense:
The **Cyber Incident**, **Extortion Threat** or **Security Breach Discovered** during the policy period must take place on or after the Retroactive Date shown in the Schedule and before the end of the policy period.

II. Paragraphs **a.** and **b.** of Insuring Agreement **5. Security Breach Liability** are replaced with the following:

a. **Loss** that the **Insured** becomes legally obligated to pay and **Defense Expenses** as a result of a **Claim Discovered** during the Policy Period, or any applicable extended reporting period, for a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after the Retroactive Date shown in the Schedule and before the end of the Policy Period.

b. **Loss** and **Defense Expenses** as a result of a **Claim** in the form of a **Regulatory Proceeding Discovered** during the Policy Period in response to a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after the Retroactive Date shown in the Schedule and before the end of the Policy Period.

III. The following is added to **SECTION V – EXCLUSIONS:**
Any **Cyber Incident**, **Extortion Threat**, **Security Breach**, **Wrongful Act** or **Interrelated Wrongful Acts** that occurred before the Retroactive Date shown in the Schedule.

All other terms and conditions remain unchanged.

EXHIBIT 1

ACORD

# LIABILITY NOTICE OF OCCURRENCE / CLAIM

DATE (MM/DD/YYYY): 05/02/2025

| | |
|---|---|
| PRODUCER<br>Reagle & Padden, Inc.<br>200 Star Avenue, Suite 210<br>Parkersburg WV 26101 | INSURED LOCATION CODE: <br>DATE OF LOSS AND TIME: 03/12/2025 AM / PM |
| CONTACT NAME: Heather Frum | CARRIER: Cowbell Cyber<br>NAIC CODE: |
| PHONE (A/C, No, Ext): (304) 422-8476 | POLICY NUMBER: FLY-CB-DZP1ERYYU |
| FAX (A/C, No): (304) 428-7374 | LINE OF BUSINESS: |
| E-MAIL ADDRESS: Heather@Reagle-Padden.com | |
| CODE: SUBCODE: | |
| AGENCY CUSTOMER ID: 00004836 | |

## INSURED

| | |
|---|---|
| NAME OF INSURED (First, Middle, Last)<br>Phoenix Associates, Inc. , ETAL | INSURED'S MAILING ADDRESS<br>501 East Street<br>Parkersburg WV 26101 |
| DATE OF BIRTH: FEIN (if applicable): | |
| PRIMARY PHONE #: ☐ HOME ☒ BUS ☐ CELL<br>(304) 485-3255<br>SECONDARY PHONE #: ☐ HOME ☐ BUS ☐ CELL | PRIMARY E-MAIL ADDRESS: Tim@phoenixwv.biz<br>SECONDARY E-MAIL ADDRESS: |

## CONTACT ☐ CONTACT INSURED

| | |
|---|---|
| NAME OF CONTACT (First, Middle, Last)<br>Tim Coffman, Phoenix Associates | CONTACT'S MAILING ADDRESS<br>501 East Street<br>Parkersburg WV 26101 |
| PRIMARY PHONE #: ☐ HOME ☒ BUS ☐ CELL<br>(304) 485-3255<br>SECONDARY PHONE #: ☐ HOME ☐ BUS ☐ CELL | PRIMARY E-MAIL ADDRESS: Tim@phoenixwv.biz |
| WHEN TO CONTACT: | SECONDARY E-MAIL ADDRESS: |

## OCCURRENCE

| | |
|---|---|
| LOCATION OF OCCURRENCE<br>STREET:<br>CITY, STATE, ZIP:<br>COUNTRY: | POLICE OR FIRE DEPARTMENT CONTACTED: FBI<br>REPORT NUMBER: |

DESCRIBE LOCATION OF OCCURRENCE IF NOT AT SPECIFIC STREET ADDRESS:

DESCRIPTION OF OCCURRENCE (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Claimant,SMG Land Development, received an email purporting to be from Insured requesting a wire transfer of $262,058, which they processed. Opposing counsel now alleges that the request originated from a breach on an unsecured server belonging to Insured. However, Insured's IT department denies any breach occurred or that the email originated from their system. FBI is investigating.

## TYPE OF LIABILITY

| | |
|---|---|
| PREMISES: INSURED IS ☐ OWNER ☐ TENANT ☐ | TYPE OF PREMISES: |
| OWNER'S NAME & ADDRESS (If not insured) | PRIMARY PHONE #: ☐ HOME ☐ BUS ☐ CELL<br>SECONDARY PHONE #: ☐ HOME ☐ BUS ☐ CELL<br>PRIMARY E-MAIL ADDRESS:<br>SECONDARY E-MAIL ADDRESS: |
| PRODUCTS: INSURED IS ☐ MANUFACTURER ☐ VENDOR ☐ | TYPE OF PRODUCT: |
| MANUFACTURER'S NAME & ADDRESS (If not insured) | PRIMARY PHONE #: ☐ HOME ☐ BUS ☐ CELL<br>SECONDARY PHONE #: ☐ HOME ☐ BUS ☐ CELL<br>PRIMARY E-MAIL ADDRESS:<br>SECONDARY E-MAIL ADDRESS: |
| WHERE CAN PRODUCT BE SEEN? | |


© 1986-2019 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

EXHIBIT
tabbies
11

EXHIBIT 1

AGENCY CUSTOMER ID: 00004836

## INJURED / PROPERTY DAMAGED

| NAME & ADDRESS (Injured/Owner) | EMPLOYER'S NAME & ADDRESS |
|---|---|
| SMG, (opposing attorney) Scott Crosbie | |
| PRIMARY PHONE # ☐ HOME ☒ BUS ☐ CELL (859) 287-2406 / SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL | PRIMARY PHONE # ☐ HOME ☐ BUS ☐ CELL / SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL |
| PRIMARY E-MAIL ADDRESS: scrosbie@ceo-lawyers.com | PRIMARY E-MAIL ADDRESS: |
| SECONDARY E-MAIL ADDRESS: | SECONDARY E-MAIL ADDRESS: |
| AGE / SEX / OCCUPATION | DESCRIBE INJURY |
| WHERE TAKEN | WHAT WAS INJURED DOING? |
| DESCRIBE PROPERTY (Type, model, etc.) / ESTIMATE AMOUNT | WHERE CAN PROPERTY BE SEEN? |

## WITNESSES

| NAME AND ADDRESS | PRIMARY PHONE # ☐ HOME ☐ BUS ☐ CELL / SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL / PRIMARY E-MAIL ADDRESS: / SECONDARY E-MAIL ADDRESS: |
|---|---|
| NAME AND ADDRESS | PRIMARY PHONE # ☐ HOME ☐ BUS ☐ CELL / SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL / PRIMARY E-MAIL ADDRESS: / SECONDARY E-MAIL ADDRESS: |
| NAME AND ADDRESS | PRIMARY PHONE # ☐ HOME ☐ BUS ☐ CELL / SECONDARY PHONE # ☐ HOME ☐ BUS ☐ CELL / PRIMARY E-MAIL ADDRESS: / SECONDARY E-MAIL ADDRESS: |

## REMARKS (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)

Attaching attorney letter

Also attaching insured contract with SMG

| REPORTED BY | REPORTED TO |
|---|---|
| Tim Coffman | Kathy Richards |

EXHIBIT 1

AGENCY CUSTOMER ID: 00004836

**Applicable in Alabama:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or who knowingly presents false information in an application for insurance is guilty of a crime and may be subject to restitution, fines, or confinement in prison, or any combination thereof.

**Applicable in Alaska:** A person who knowingly and with intent to injure, defraud, or deceive an insurance company files a claim containing false, incomplete, or misleading information may be prosecuted under state law.

**Applicable in Arizona:** For your protection Arizona law requires the following statement to appear on this form. Any person who knowingly presents a false or fraudulent claim for payment of a loss is subject to criminal and civil penalties.

**Applicable in Arkansas:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Applicable in California:** For your protection California law requires the following to appear on this form. Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Applicable in Colorado:** It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**Applicable in Delaware:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**Applicable in the District of Columbia:** WARNING: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**Applicable in Florida:** Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**Applicable in Idaho:** Any person who knowingly, and with intent to defraud or deceive any insurance company, files a statement containing any false, incomplete or misleading information is guilty of a felony.

**Applicable in Indiana:** A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false, incomplete, or misleading information commits a felony.

**Applicable in Kansas:** Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written, electronic, electronic impulse, facsimile, magnetic, oral, or telephonic communication or statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

**Applicable in Kentucky:** Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime.

**Applicable in Louisiana:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Applicable in Maine:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines or denial of insurance benefits.

**Applicable in Maryland:** Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Applicable in Michigan:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Applicable in Minnesota:** A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**Applicable in Nevada:** Pursuant to NRS 686A.291, any person who knowingly and willfully files a statement of claim that contains any false, incomplete or misleading information concerning a material fact is guilty of a category D felony.

EXHIBIT 1

**AGENCY CUSTOMER ID:** 00004836

**Applicable in New Hampshire:** Any person who, with a purpose to injure, defraud or deceive any insurance company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud as provided in RSA 638:20.

**Applicable in New Jersey:** Any person who knowingly files a statement of claim containing any false or misleading information is subject to criminal and civil penalties.

**Applicable in New Mexico:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**Applicable in New York:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**Applicable in Ohio:** Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**Applicable in Oklahoma:** WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**Applicable in Oregon:** Any person who knowingly and with intent to defraud or solicit another to defraud the insurer by submitting an application containing a false statement as to any material fact may be violating state law.

**Applicable in Pennsylvania:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

**Applicable in Puerto Rico:** Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances be present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.

**Applicable in Rhode Island:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**Applicable in Tennessee:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Applicable in Texas:** Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**Applicable in Virginia:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Applicable in Washington:** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.

**Applicable in West Virginia:** Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

EXHIBIT 1

Bowles Rice
Attorneys at Law

501 Avery Street, Parkersburg, WV 26101
P.O. Box 49, Parkersburg, WV 26102
(304) 485-8500

600 Quarrier Street
Charleston, WV 25301

9627 Tuscarora Pike
Martinsburg, WV 25403

125 Granville Square, Suite 400
Morgantown, WV 26501

Southpointe Town Center
1800 Main Street, Suite 200
Canonsburg, PA 15317

480 West Jubal Early Drive, Suite 130
Winchester, VA 22601

Robert L. Bays
Of Counsel
rbays@bowlesrice.com
T (304) 420-5530
F (304) 420-5587

bowlesrice.com

December 9, 2025

Sarah Estephan
Claims Counsel
Cowbell Cyber, Inc.
6800 Koll Center Parkway, Suite 250
Pleasanton, California 94566

| | | |
|---|---|---|
| Re: | Insured: | Phoenix Associates, Inc. |
| | Matter: | Security Breach Expense & Liability |
| | Policy No.: | FLY-CB-DZPIERYYU-002 |
| | Policy Period: | January 1, 2025 to January 1, 2026 |
| | Claim No.: | CL01-FLY-DZPIERYYU-002 |

Dear Ms. Estephan:

This letter is to advise you that I represent Phoenix Associates, Inc., your insured referenced above. I am in receipt of and have reviewed your letter to Tim Coffman at Phoenix of July 9, 2025. In that letter you acknowledge a loss by Phoenix Associates, in the sum of $262,058.11 on or about March 12, 2025 due to a hacker that wrongfully appropriated Phoenix's computer system for the purpose of having a Phoenix invoice to SMG wrongfully directed causing the funds, that were owed to Phoenix by SMG, to be deposited in the hacker's bank account rather than having a check mailed to Phoenix. If you need further information respecting the actual event, please advise.

Phoenix has filed a mechanic's lien on the SMG property, where the construction work was done, but the invoice has yet to be paid. SMG has taken the position that the $262,058.11 was remitted in accordance with the instructions that received for Phoenix, although SMG acknowledges the existence of the hacker, and that Phoenix has never received those funds as SMG made payment to the hacker's bank account. A copy of the Mechanic's Lien is enclosed for your reference and as it is verified, it provides a verified proof of claim for the amount actually lost by Phoenix, due to the hacker's actions.

Your letter or January 9, 2025, deals with third-party claims that might arise against Phoenix, but artfully ignores Phoenix's right to make a first party claim against Cowbell for its loss in the sum of $262,058.11. Under West Virginia law, insurers are required to meet a duty of good faith and fair dealing with their insureds, and nowhere in your letter do you mention the fact that



EXHIBIT
tabbies
12

Bowles Rice

EXHIBIT 1



Phoenix had first party insurance coverage with Cowbell for security breaches, business income and contingent business income loss arising from security breaches. Accordingly, consider this a demand, under the terms of the policy, for payment to Phoenix of $262,058.11 less its' $2,500.00 deductible. I also provide, to you, recent cases in which similar claims have been made against similar cyber policies for hacker misdirected invoice payments and in which the court found that the policy, such as Cowbell's, provide coverage for those claims. The two cases included are *Fishbowl Sols, Inc. v. Hanover Ins. Co.*, 2022 US Dist. Lexis 200210 and *Kane vs. Syndicate*, 2623-623 Lloyd's of London 2025 N.M. App. Lexis 38.

Please direct your payment to Phoenix Associates, Inc., in the sum of $259,558.11, which constitutes the total of Phoenix's claim less the deductible.

Yours very truly,

Bowles Rice LLP

Robert L. Bays
Of Counsel

RLB/bln
Enclosures
cc: Phoenix Associates, Inc.

EXHIBIT 1

# NOTICE OF MECHANIC'S LIEN

BOWLES RICE LLP
ROBERT L BAYS, ESQ.
P.O. BOX 49
PARKERSBURG, WV 26102-0049

**TO:** SMG LAND DEVELOPMENT, LLC
P.O. Box 487
Allen, KY 41601

GREG ISAAC, Trustee
199 N. Lake Dr. Ste. 201
Prestonsburg, KY 41653

BANK OF HINDMAN
1362 Hindman Bypass
Hindman, KY 41822

You will please take notice that the undersigned, Phoenix Associates, Inc., was and is a general contractor with SMG LAND DEVELOPMENT, LLC, for the furnishing of materials and doing of the work and labor necessary to the construction and/or improving of certain buildings, structures, or improvements owned by you located on real estate known as the Frito-Lay product Exchange Center Facility, situate in the Tygart District, Wood County, West Virginia, more particularly described on *Exhibit A* attached hereto. You are further notified that the undersigned has not been paid the sum of $262,058.11, the balance due and owing on its contract with you as evidenced by the attached list of charges and payments marked as *Exhibit B*, and that the undersigned claims, and will claim, a lien upon your interest in the above-described real estate and the building, structures and improvements thereon to secure payment of the sum of $262,058.11, plus interest. The last day of work on said construction project by the undersigned was September 8, 2025.

Given under my hand this 25 day of November 2025.

Phoenix Associates, Inc.

By: PRESIDENT
As: PHOENIX ASSOC.

EXHIBIT 1

State of WEST VIRGINIA,
County of WOOD, ss:

TIMOTHY M COFFMAN, the PRESIDENT for Phoenix Associates, Inc., being first duly sworn, upon his/her oath says that the statements in the foregoing notice of mechanic's lien are true, as he/she verily believes.

Taken, subscribed and sworn to before me this 25 day of November 2025.

My commission expires: JUNE 14, 2026

SEAL:

OFFICIAL SEAL
STATE OF WEST VIRGINIA
NOTARY PUBLIC
Samantha Ann Joy
1707 Lawrence St Parkersburg, WV 26101
My Commission Expires June 14, 2026

Samantha Ann Joy
Notary Public

This instrument was prepared under the direction and supervision of Robert L. Bays, Attorney at Law, P. O. Box 49, Parkersburg, West Virginia, 26102
18152098.1

EXHIBIT 1

**EXHIBIT A**

Situate, lying and being on the waters of the Little Kanawha River and being in the District of Tygart, Wood County, West Virginia, more particularly bounded and described as follows:

BEGINNING AT A 5/8" CAPPED IRON REBAR FOUND IN THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, SAID REBAR BEING A COMMON CORNER TO THE 5.117 ACRE (TAXED) ORION PARKERSBURG WV LLC TRACT (DEED BOOK 1335, PAGE 599) AND to THE 8.53 ACRE (DEED) PIKE STREET LAND HOLDINGS LLC TRACT (DEED BOOK 1330, PAGE 467);

THENCE N 54°46'09" E 323.07 FEET, WITH THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE, TO A 5/8" CAPPED IRON REBAR SET;

THENCE S 35°38'47" E 496.82 FEET, LEAVING THE SOUTHERLY RIGHT OF WAY LINE OF BOSLEY INDUSTRIAL PARK DRIVE AND BINDING ON THE 8.53 ACRE PIKE STREET LAND HOLDINGS LLC TRACT, TO A 5/8" CAPPED IRON REBAR SET IN THE NORTHERLY LINE OF THE 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT (DEED BOOK 1038, PAGE 520);

THENCE S 70°03'30" W 338.70 FEET, WITH SAID 0.457 ACRE (TAXED) BRENDA K. VINCENT TRACT AND THEN WITH THE 2.023 ACRE (TAXED JACKIE S. COOPER TRACT (DEED BOOK 926, PAGE 729), TO A 5/8" CAPPED IRON REBAR FOUND AT A COMMON CORNER TO SAID 5.117 ACRE ORION PARKERSBURG WV LLC TRACT, TO THE POINT OF BEGINNING

CONTAINING 3.370 ACRES, PER AN ACTUAL FIELD SURVEY PERFORMED BY RANDALL R. CLINE II ON OR ABOUT 05/15/2024 AS SHOWN ON PLAT ATTACHED HERETO AND MADE A PART THEREOF.

EXHIBIT 1

BEING A PART OF THE SAME TRACT OR PARCEL OF LAND CONVEYED TO PIKE STREET LAND HOLDINGS LLC IN DEED BOOK 1330, PAGE 467.

SUBJECT TO ALL LEGAL RIGHTS OF WAY, EASEMENTS, AND RESTRICTIONS OF RECORD.

BASIS OF BEARINGS: WEST VIRGINIA STATE PLANE (NORTH ZONE).

EXHIBIT 1

**EXHIBIT B**

Attached List of Charges and Payments

EXHIBIT 1

1:28 PM

11/20/25

# Phoenix Associates, Inc.
## Customer QuickReport
All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | Debit |
|---|---|---|---|---|---|---|---|
| 224-02 Frito Lay Warehouse | | | | | | | |
| Invoice | 02/05/2024 | 2024-12 | | 1200 · *Accounts Re... | | 4000 · Constru... | 150,000.00 |
| Invoice | 02/05/2024 | 2024-13 | | 1200 · *Accounts Re... | | 4000 · Constru... | 448,291.00 |
| Payment | 02/07/2024 | 1005 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 150,000.00 |
| Invoice | 04/24/2024 | 2024-26 | | 1200 · *Accounts Re... | | 4000 · Constru... | 37,500.00 |
| Invoice | 05/29/2024 | 2024-47 | | 1200 · *Accounts Re... | | 4000 · Constru... | 54,000.00 |
| Payment | 06/10/2024 | 1011 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 539,791.00 |
| Invoice | 06/12/2024 | 2024-58 | | 1200 · *Accounts Re... | | 4000 · Constru... | 50,000.00 |
| Payment | 07/09/2024 | 1023 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 50,000.00 |
| Invoice | 07/29/2024 | 2024-65 | | 1200 · *Accounts Re... | | 4000 · Constru... | 64,077.12 |
| Payment | 08/06/2024 | 1028 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 64,077.12 |
| Invoice | 08/29/2024 | 2024-75 | | 1200 · *Accounts Re... | | 4000 · Constru... | 90,700.56 |
| Payment | 09/10/2024 | 1034 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 90,700.56 |
| Invoice | 10/03/2024 | 2024-84 | | 1200 · *Accounts Re... | | 4000 · Constru... | 207,633.22 |
| Payment | 10/15/2024 | 1038 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 207,633.22 |
| Invoice | 11/01/2024 | 2024-93 | VOID: | 1200 · *Accounts Re... | X | 4000 · Constru... | 0.00 |
| Invoice | 11/04/2024 | 2024-94 | | 1200 · *Accounts Re... | | 4000 · Constru... | 267,764.35 |
| Invoice | 12/04/2024 | 2024-... | | 1200 · *Accounts Re... | | 4000 · Constru... | 60,600.29 |
| Payment | 12/05/2024 | 1042 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 267,764.35 |
| Invoice | 01/09/2025 | 2025-1 | | 1200 · *Accounts Re... | | 4000 · Constru... | 51,726.45 |
| Payment | 01/14/2025 | 1046 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 60,600.29 |
| Payment | 01/14/2025 | 1047 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 51,726.45 |
| Invoice | 03/06/2025 | 2025-13 | | 1200 · *Accounts Re... | | 4000 · Constru... | 262,058.11 |
| Invoice | 04/02/2025 | 2025-23 | | 1200 · *Accounts Re... | | 4000 · Constru... | 177,831.40 |
| Payment | 04/10/2025 | 1050 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 177,831.40 |
| Payment | 04/10/2025 | 1059 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 262,058.11 |
| Invoice | 04/30/2025 | 2025-28 | | 1200 · *Accounts Re... | | 4000 · Constru... | 522,574.30 |
| Payment | 05/20/2025 | 1079 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 522,574.30 |
| Invoice | 06/03/2025 | 2025-45 | | 1200 · *Accounts Re... | | 4000 · Constru... | 393,136.95 |
| Payment | 06/11/2025 | 1085 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 393,136.95 |
| Invoice | 07/02/2025 | 2025-55 | | 1200 · *Accounts Re... | | 4000 · Constru... | 525,262.80 |
| Invoice | 08/05/2025 | 2025-63 | | 1200 · *Accounts Re... | | 4000 · Constru... | 177,730.15 |
| Payment | 09/15/2025 | 1102 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 400,000.00 |
| Invoice | 10/14/2025 | 2025-81 | | 1200 · *Accounts Re... | | 4000 · Constru... | 14,293.82 |
| Payment | 10/22/2025 | 5010 | | 1110 · Checking Ac... | X | 1200 · *Accou... | 55,228.66 |

EXHIBIT 1

1:27 PM

11/20/25

# Phoenix Associates, Inc.
## Customer Open Balance
### All Transactions

| Type | Date | Num | Memo | Due Date | Open Balance | Amount |
|---|---|---|---|---|---|---|
| 224-02 Frito Lay Warehouse | | | | | | |
| Invoice | 07/02/2025 | 2025-56 | | 07/02/2025 | 70,034.14 | 525,262.80 |
| Invoice | 08/05/2025 | 2025-63 | | 08/05/2025 | 177,730.15 | 177,730.15 |
| Invoice | 10/14/2025 | 2025-81 | | 10/14/2025 | 14,293.82 | 14,293.82 |
| Total 224-02 Frito Lay Warehouse | | | | | 262,058.11 | 717,286.77 |
| TOTAL | | | | | 262,058.11 | 717,286.77 |

Instrument 8026154
11/26/2025 @ 10:35:03 AM
MECHANICS LIEN
Book 2783 @ Page 619
Pages Recorded 7
Recording Cost $ 14.00

EXHIBIT 1

# Fishbowl Sols., Inc. v. Hanover Ins. Co.

United States District Court for the District of Minnesota

November 3, 2022, Decided; November 3, 2022, Filed

Case No. 21-cv-00794 (SRN/DJF)

**Reporter**
2022 U.S. Dist. LEXIS 200210 *

Fishbowl Solutions, Inc., Plaintiff, v. The Hanover Insurance Company, Defendant.

**Prior History:** *Fishbowl Sols., Inc. v. Hanover Ins. Co., 2022 U.S. Dist. LEXIS 64117*, 2022 WL 1037083 (D. Minn., Apr. 6, 2022)

**Counsel:** [*1] Daniel A. Ellerbrock, Joseph A. Nilan, and Nicholas J. Sideras, Gregerson, Rosow, Johnson & Nilan, Minneapolis, MN , for Plaintiff.

Erica Ramsey, Robins Kaplan LLP, Sioux Falls, SD; Rebecca Zadaka and Scott G. Johnson, Robins Kaplan LLP, MN, for Defendant.

**Judges:** SUSAN RICHARD NELSON, United States District Judge.

**Opinion by:** SUSAN RICHARD NELSON

## Opinion

ORDER ON DEFENDANT'S AND PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant The Hanover Insurance Company's ("Hanover") Motion for Summary Judgment [Doc. No. 51] and Plaintiff Fishbowl Solutions, Inc.'s ("Fishbowl") Motion for Summary Judgment [Doc. No. 57]. For the reasons set forth below, Plaintiff's Motion is granted and Defendant's Motion is denied.

### I. BACKGROUND

### A. Fishbowl's Operations and Email Breach

Fishbowl is a technical consulting and software development company. (Nilan Aff. [Doc. No. 60], Ex. 1 (Gruidl Dep. Tr.) at 11:21-12:1.) When projects are completed, Fishbowl's Accounting Department generates and sends its clients an invoice for the work performed via email. (*Id.* at 14:12-23.) Fishbowl's clients can pay through check, debit card, or ACH deposit (wire transfer). ( *[*2] Id.* at 16:5-6.)

In November 2019, an unknown bad actor gained unauthorized access to the email account of Fishbowl's Senior Staff Accountant, Wendy Williams. (*Id.* at 15:6-13, 32:1-12.) The bad actor created multiple "rules" within Ms. Williams' account that interfered with the proper receipt of incoming emails. (*Id.* at 33:16-34:25.) Among them, one rule redirected incoming emails with keywords such as "invoice," "wire transfer," or "payment" to an email account unaffiliated with Fishbowl. (*Id.*) Another rule diverted emails from Ms. Williams' inbox to a subfolder and marked them as read. (*Id.* at 38:2-16.) The rules impacted Ms. Williams' ability to communicate with certain Fishbowl

EXHIBIT 1



clients. (Nilan Aff., Ex. 2 (Maschino Dep. Tr.) at 122:21-124:3.) In addition, the bad actor sent emails to and from Ms. Williams' account, at times impersonating her and at times impersonating Fishbowl's clients. (Gruidl Dep. Tr. at 37:17-22, 42:1-22.)

Fishbowl issued two invoices (the "Invoices") to its client Federated Insurance ("Federated") while these rules were in place. (Gruidl Dep. Tr. at 21:15-23:4; Johnson Decl. [Doc. No. 54], Exs. C (Nov. 13, 2019 Invoice), D (Dec. 18, 2019 Invoice).) The first, [*3] issued on November 13, invoiced Federated $137,000 for its services; the second, issued on December 18, invoiced Federated an additional $39,962. (Gruidl Dep. Tr. at 21:15-24:4; Nov. 13, 2019 Invoice; Dec. 18, 2019 Invoice.)

On December 11, the bad actor emailed Federated, posing as Ms. Williams, and wrote that Fishbowl had "recently changed banks and our previous account . . . has been closed, hence, all payments effective immediately will be made directly to our new bank account in compliance with the policy of the company." (Johnson Decl., Ex. G (Fishbowl-Federated Email Chain) at Fishbowl_000453.) The bad actor requested confirmation as to when Federated would pay the first invoice "so we can forward our new bank account details." (*Id.*) The next day, Federated responded that it had sent the payment. (*Id.* at Fishbowl_000452-53; Gruidl Dep. Tr. at 42:23-43:5.) Because the payment never arrived in Fishbowl's account, Ms. Williams reached out to Federated on December 16 to confirm the payment. (Fishbowl-Federated Email Chain at Fishbowl_000451-52; Gruidl Dep. Tr. at 43:15-20.) The bad actor, posing as Federated, responded on December 17 saying that payment had been initiated and would [*4] appear in Fishbowl's account on December 18. (Gruidl Dep. Tr. at 44:3-13.) In fact, Federated had sent its payment to an account controlled by the bad actor. (*Id.* at 43:21-23.)

On December 18, after receiving a message from its bank, Federated reached out to Fishbowl to confirm the correct routing number for the payments. (Fishbowl-Federated Email Chain at Fishbowl_000451.) Later that day, the bad actor, posing as Ms. Williams, intercepted the email and responded confirming the fraudulent routing number. (*Id.* at Fishbowl_000450.) Federated remitted payment for the second invoice to the same fraudulent account around December 23. (Gruidl Dep. Tr. at 45:5-12, 61:23-62:9.) In total, Federated sent the bad actor the full balance of the two invoices: $176,962. (*Id.* at 45:5-12.)

Fishbowl discovered the bad actor's conduct on January 17, 2020. (*Id.* at 44:14-21.) With assistance from the United States Secret Service, Federated recovered $29,077.79 and remitted it to Fishbowl. (*Id.* at 27:1-9.) The remaining $147,926.21 has not been recovered. (Compl. [Doc. No. 1] ¶ 26).

### B. Fishbowl's Insurance Claim

Hanover insured Fishbowl under a Technology Professional Liability Policy ("TPL Policy") for the [*5] period of July 17, 2019 to July 17, 2020. (Nilan Aff., Ex. 4 (TPL Policy).) The TPL Policy incorporates a Data Breach Coverage Form, which includes a "Cyber Business Interruption and Extra Expense" clause (the "Clause"). (*Id.* at HAN0000572-73.) The Clause provides:

> We will pay actual loss of "business income" and additional "extra expense" incurred by you during the "period of restoration" directly resulting from a "data breach" which is first discovered during the "policy period" and which results in an actual impairment or denial of service of "business operations" during the "policy period".

(*Id.* at HAN0000573.)

Fishbowl submitted a claim to Hanover on January 20, 2020, seeking coverage under the Clause for the money lost to the bad actor. (Nilan Aff., Ex. 3 (Hanover Admissions) at 2.) Hanover denied Fishbowl's claim for coverage on November 19, 2020. (Johnson Decl., Ex. F (Nov. 19, 2020 Letter).)

### C. This Lawsuit

Fishbowl initiated this action on March 24, 2021, alleging that Hanover's denial of coverage breached the TPL Policy. (Compl. ¶ 71-76.) Fishbowl seeks a declaratory judgment that its loss is covered under the Clause as well as damages for the unrecovered amount that Federated [*6] paid, $147,926.21, plus attorney's fees and prejudgment interest. (*Id.* ¶ 71-81.)

Both parties move for summary judgment. The underlying facts of this case are not in dispute; rather, the parties debate the correct legal interpretation of the Clause. Hanover argues that, as a matter of law, the Clause does not provide coverage for the loss occasioned by the bad actor's conduct; Fishbowl argues that it does provide coverage as a matter of law.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or [*7] denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## III. DISCUSSION

Fishbowl argues that, consistent with the definitions in the Data Breach Coverage Form and the plain meaning of the TPL Policy language, this loss should be covered under the Clause. (Pl.'s Mem. [Doc. No. 59] at 10-17.) Hanover disagrees, arguing that Fishbowl's interpretation of the Clause contradicts the overall purpose of the TPL Policy and renders other provisions meaningless. (Def.'s Mem. [Doc. No. 53] at 9-26.)

State law determines the interpretation of insurance policies. *Nat'l Union Fire Ins. Co. of Pittsburg v. Terra Indus., Inc.*, 346 F.3d 1160, 1164 (8th Cir. 2003). In Minnesota, the interpretation of an insurance policy is a question of law governed by general contract interpretation principles. *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 894-95 (Minn. 2006). The goal is to "ascertain and give effect to the intentions of the parties as reflected in the terms of the policy." *King's Cove Marina, LLC v. Lambert Com. Constr., LLC*, 958 N.W.2d 310, 316 (Minn. 2021) (citation omitted).

The policy must be construed [*8] as a whole, and if possible, to give effect to all provisions. *Id.*; *Midwest Fam. Mut. Ins. Co. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013). Moreover, policies must be construed "according to the terms the parties have used." *Dairyland Ins. Co. v. Implement Dealers Ins. Co.*, 294 Minn. 236, 199 N.W.2d 806, 811 (Minn. 1972). When terms or phrases are not specifically defined, they are given their "plain, ordinary, and popular meaning." *Mattson Ridge, LLC v. Clear Rock Title, LLP*, 824 N.W.2d 622, 632 (Minn. 2012).

"Because most insurance policies are preprinted forms drafted solely by insurance companies—basically contracts of adhesion—policy words of inclusion will be broadly construed, and words of exclusion are narrowly considered." *Gen. Cas. Co. of Wis. v. Wozniak Travel, Inc.*, 762 N.W.2d 572, 575 (Minn. 2009). Though the insured bears the

burden of demonstrating coverage, ambiguous language is generally resolved in the insured's favor. *Midwest Fam. Mut. Ins. Co.*, 831 N.W.2d at 636. Language is ambiguous if it is susceptible to more than one reasonable interpretation, "as determined from the viewpoint of a layperson, not a lawyer." *Mut. Serv. Cas. Ins. Co. v. Wilson Twp.*, 603 N.W.2d 151, 153 (Minn. Ct. App. 1999). However, courts must not "read an ambiguity into the plain language of a policy in order to provide coverage." *Farkas v. Hartford Accident & Indem. Co.*, 285 Minn. 324, 173 N.W.2d 21, 24 (Minn. 1969) (citations omitted). "The language must be considered within its context, and with common sense." *Mut. Serv. Cas. Ins. Co.*, 603 N.W.2d at 153.

### A. Terms of the Clause

The Cyber Business Interruption and Extra Expense Clause requires Fishbowl to demonstrate: 1) an actual loss of "business income;" 2) which occurred during the "period of restoration;" 3) directly resulting [*9] from a "data breach;" 4) that it discovered during the "policy period;" and 5) which resulted in an actual impairment or denial of service of "business operations" during the "policy period." (TPL Policy at HAN0000573.) It is undisputed that Fishbowl both experienced a "data breach" and that it was discovered during the "policy period." (*See* July 19, 2022 Hr'g Tr. [Doc. No. 75] at 24:15-17; Nilan Aff., Ex. 5 (Cormier Dep. Tr.) at 59:2-17, 65:1-6.)

#### 1. Actual Loss of "Business Income"

The Data Breach Coverage Form defines "business income" as:

a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if there had been no impairment or denial of "business operations" due to a covered "data breach" and

b. Continuing normal operating expenses incurred, including payroll.

(TPL Policy at HAN0000580.)

Fishbowl argues that the money Federated paid to the bad actor constitutes "Net Income . . . that would have been earned" because sending invoices is part of its "business operations." (Pl.'s Mem. at 11-12.) Hanover argues that there was no loss of "business income" on two related grounds: first, because "business operations" only refers to income-generating activities, [*10] and invoicing clients does not generate income for Fishbowl; and second, because Fishbowl seeks recovery of money already earned, rather than money that "would have been earned." (Def.'s Mem. at 11-17, 20-21.)

##### a. "Business Operations"

The Data Breach Coverage Form defines "business operations" as an insured's "usual and regular business activities." (TPL Policy at HAN0000580.) Hanover urges the Court to ignore this definition, pointing to the phrase "business operations" in other provisions of the TPL Policy that purportedly restrict its meaning to only "income-generating" business activities. (Def.'s Mem. at 11-17.) Specifically, Hanover highlights the Clause itself, the definition of "business income," the definition of "Extra Expense," the definition of "Period of Restoration," and the Cyber Business Interruption Waiting Period Deductible ("Waiting Period Deductible"). (*Id.*)

Hanover highlights the Waiting Period Deductible, to which losses payable under the Clause are subject. (Def.'s Mem. at 15-16; TPL Policy at HAN0000576.) Because the Data Breach Coverage Form Schedule defines the Waiting Period Deductible as 24 hours, Hanover contends that the "first 24 hours of the income lost [*11] because of the interruption of the insured's income-generating activities" must be deducted from any claim. (Def.'s Mem. at 16; TPL Policy at HAN0000572.) Separately, Hanover asserts that finding coverage here would render the Waiting Period Deductible meaningless because Fishbowl does not identify any losses experienced within the first 24 hours to deduct from its claim. (Def.'s Mem. at 18-19; Def.'s Reply [Doc. No. 70] at 12-13.) For its part, Fishbowl argues that Hanover's interpretation leads to an absurd result: a policy under which the insured must sustain a loss within the first 24 hours, otherwise coverage is never triggered. (Pl.'s Reply [Doc. No. 71] at 16-17.)

The TPL Policy does not define "Waiting Period Deductible." Hanover argues that the ordinary meaning of "deductible" is "a monetary amount that is borne by the insured and deducted from any payment by the insurer." (Def.'s Reply at 12 (citing *Glossary of Insurance and Risk Management Terms* 92 (13th ed. 2016) and *Black's Law Dictionary* 501 (10th ed. 2014)).) For the generic phrase, "waiting period deductible," Hanover offers the following definition: "[a] deductible provision sometimes used in business interruption (BI) [*12] and other time element policies, in lieu of a dollar amount deductible, that establishes that the insurer is not responsible for loss suffered during a specified period (such as 72 hours) immediately following a direct damage loss." (Def.'s Mem. at 16 (quoting *Glossary of Insurance and Risk Management Terms* 320 (13th ed. 2016)).)

Minnesota courts have described a "deductible" as "exempt[ing] the insurer from paying a specified amount in the event of a claim." *Minn. Teamsters Pub. & L. Enf't Emps. Union, Loc. 320 v. Cnty. of St. Louis*, 726 N.W.2d 843, 846 n.1 (Minn. Ct. App. 2007) (quoting *The American Heritage College Dictionary* 369 (4th ed. 2002)); *see also City of Owatonna v. Rare Aircraft, Ltd.*, No. A08-1642, 2009 Minn. App. Unpub. LEXIS 645, 2009 WL 1684479, at *2 (Minn. Ct. App. June 16, 2009) (quoting the same definition). This definition aligns with Hanover's suggested ordinary meaning for "deductible" and demonstrates that it has provided a reasonable interpretation of the term. However, the TPL Policy contains a "waiting period" deductible, which, as Hanover's own definition of "waiting period deductible" underscores, focuses on deducting an amount of time rather than money. (TPL Policy at HAN0000572.)

Moreover, the variety of data breaches covered by the Clause makes it plausible that an insured could experience an impairment of "business operations," unrelated to income generation, that does not result in any losses within the first [*13] 24 hours. (TPL Policy at HAN0000580 (defining seven types of data breach).) For instance, one type of "data breach" covered is the "loss, theft, accidental release, or accidental publication of 'private personal data' entrusted to [the insured] as respects one or more 'potentially-identified persons'" that could "reasonably result in the fraudulent use of such information." (*Id.*)[1] The definition does not restrict this type of data breach to the theft of "private personal data" related to an insured's clients: "potentially-identified persons" includes employees. (*Id.* at HAN0000582.) In other words, the Clause covers losses from the theft of such data regardless of whether it pertains to an income-generating activity or is merely being stored by the insured as part of an employee's personnel file.

In addition, losses might not accrue from the theft of "private personal data" (like a financial account number) within the first 24 hours; to conceal the breach, the thief may not use the data for weeks. Yet the Clause covers impairment from such data breaches, too. Although in such circumstances the Waiting Period Deductible would be $0, an undesirable outcome for Hanover, that does not render [*14] the provision meaningless.

The data breaches covered suggest that Fishbowl's interpretation of "Waiting Period Deductible" is as equally reasonable as Hanover's. Faced with two reasonable interpretations, the Court must construe "Waiting Period Deductible" in Fishbowl's favor. *Gen. Cas. Co. of Wis.*, 762 N.W.2d at 575 ("If undefined terms are reasonably susceptible to more than one interpretation, the terms must be interpreted liberally in favor of finding coverage."). The Court finds that the Waiting Period Deductible does not constrain "business operations" to income-generating activities only.

Finally, because the Court must construe the TPL Policy "according to the terms the parties have used," it cannot insert "income-generating" into the TPL Policy's definition of "business operations." *Dairyland Ins. Co.*, 199 N.W.2d at 811; *see also Telex Corp. v. Data Products Corp.*, 271 Minn. 288, 135 N.W.2d 681, 687 (Minn. 1965) ("It is not ordinarily the function of courts to rewrite, modify, or set aside contract provisions fully considered and agreed upon between the parties."). Insurance policies "are contracts of adhesion between parties not equally situated." *Canadian Universal Ins. Co., Ltd. v. Fire Watch, Inc.*, 258 N.W.2d 570, 574-75 (Minn. 1977). If Hanover wanted to

---

[1] "Private personal data" is defined as a natural person's first and last name in combination with other variables, such as a financial account number, credit card numbers, or employment information, "which is intended to be accessible only by natural persons or entities you have specifically authorized to have such access." (TPL Policy at HAN0000582.)

EXHIBIT 1



restrict "business operations" to include only the "income-generating" subset of Fishbowl's "usual and regular business activities," it had the responsibility as drafter [*15] to write the governing contractual definition accordingly.

Thus, while "usual and regular business activities" may be broad, the phrase is not ambiguous.[2] "[A] reasonable person in the position of the insured would have understood [usual and regular business activities] to mean" all business activities performed with a certain frequency and consistency. *Midwest Fam. Mut. Ins. Co.*, 831 N.W.2d at 636. The definition of "business operations" makes no distinction based on the type of business activity.

Fishbowl communicates with its clients daily and sends them invoices for every project it completes. (Gruidl Dep. Tr. at 14:12-15:13.) Fishbowl's practices fit the broad description of "usual and regular business activities." Therefore, the Court finds that the definition of "business operations" encompasses Fishbowl's communication with, and invoicing of, its clients.

**b. "Would Have Been Earned"**

Hanover's second ground for arguing that Fishbowl did not suffer a loss of "business income" focuses on the phrase "would have been earned" in the "Net Income" portion of the "business income" definition. (Def.'s Mem. at 20-21.) Hanover contends that because Fishbowl uses an accrual accounting system, "income is 'earned' when Fishbowl performs [*16] the work and issues an invoice, not when it receives payment on invoices." (*Id.* at 20.) Consequently, Hanover submits, Fishbowl is seeking money that it would have "received," not "earned," but for the conduct of the bad actor. (*Id.*)

Fishbowl's accounting method is not relevant to the terms of the TPL Policy. Coverage provisions must be construed based on the expectations of the insured. *Travelers Indem. Co.*, 718 N.W.2d at 894. No language in the TPL Policy, or any other evidence in the record, demonstrates that the parties intended to define "earned" based on the insured's method of accounting.

Additionally, "earn" does not have as narrow a definition as Hanover argues. *See, e.g., Oxford English Dictionary Online*, https://www.oed.com/view/Entry/58995?rskey=irgH0j&result=3#eid (last visited Oct. 27, 2022) (defining "earn" as "to receive or be entitled to (money . . .) through work or another activity"). This definition supports finding that Fishbowl "would have [] earned" the income from Federated because it would have received, or at minimum would have been entitled to, Federated's payments if there had been no data breach.

Most importantly, Hanover's Property Claims Director, Jason Cormier, admitted that Fishbowl sustained [*17] an "actual loss of business income" under the TPL Policy. (Cormier Dep. Tr. at 57:3-17 ("Q: So you would agree that there is an actual loss of business income, correct? A: Yes.").)[3] Hanover attempts to undercut this admission by noting that Mr. Cormier had no knowledge of Fishbowl's accounting methods and that, just prior to this question, Mr. Cormier described Fishbowl's loss as "a loss of collections from a third party." (*Id.* at 57:5; Def.'s Opp'n [Doc. No. 69] at 21.) The fact remains that Mr. Cormier did not qualify his statement in any way and he is in the best position to opine as to whether this in fact was a loss of business income.

The broad definition of "business operations" and the ordinary meaning of "earn" support finding that Fishbowl suffered an "actual loss of business income." Fishbowl lost $147,926.21 that it "would have earned" because it could not perform its "usual and regular business activities" of emailing and invoicing its clients. The testimony of Hanover's corporate representative undermines its arguments to the contrary. As such, the Court finds that

---

[2] Neither party argues that "usual and regular business activities" is ambiguous, perhaps because the ordinary meaning of these terms is plain enough.

[3] The portions of Mr. Cormier's deposition included in the record reveal that Mr. Cormier worked at Hanover for six years as a claims adjuster before transitioning into a management role, and, in his current capacity as Property Claims Director, he oversaw the unit that assessed Fishbowl's claim. (*See* Nilan Aff., Ex. 5 (Cormier Dep. Tr.) at 6:21-9:25.)

EXHIBIT 1



Fishbowl suffered an "actual loss of business income" within the meaning of the TPL Policy as a matter [*18] of law.

**2. "Period of Restoration"**

As defined in the TPL Policy, the "Period of Restoration" begins, "[f]or the loss of 'Business Income,' after 24 hours or the number of hours shown as the Cyber Business Interruption Waiting Period Deductible in the SCHEDULE on this Coverage Forms [sic], whichever is greater, immediately following the time the actual impairment or denial of 'business operations' first occurs."[4] (TPL Policy at HAN0000581.) The Period of Restoration ends either when "'business operations' are restored" or 60 days after the impairment or denial of "business operations" first occurs, whichever is earlier. (*Id.*)

Fishbowl asserts that its loss occurred within the defined "Period of Restoration" because the bad actor gained access to Ms. Williams' account in November 2019 and Federated made its erroneous payments in December 2019. (Pl.'s Mem. at 12-13.) That is, Fishbowl experienced the loss more than 24 hours after the initial unauthorized access and before the end of the sixty-day period. (*Id.*)

Hanover does not directly contest the timing of the alleged Period of Restoration. Instead, Hanover argues that there was no loss of "business income" during the Period of Restoration [*19] because there was "no interruption in [Fishbowl's] revenue-generating activities." (Def.'s Opp'n at 22.) As the Court finds that there was a loss of business income, it also finds that Fishbowl sustained its loss within the "Period of Restoration" as defined by the TPL Policy.

**3. "Directly Resulting From" Data Breach**

The parties do not dispute that Fishbowl suffered a data breach within the meaning of the TPL Policy. (July 19, 2022 Hr'g Tr. at 24:15-17; Cormier Dep. Tr. at 59:2-17.) The debate concerns whether Fishbowl's loss "*directly*" resulted from the data breach. (TPL Policy at HAN0000573 (emphasis added).) The TPL Policy does not define the phrase, "directly resulting."

Hanover contends that Fishbowl's loss did not "directly result[]" from the conduct of the bad actor, but rather resulted from an "intervening agency or determining influence—Federated's negligence and breach of contract." (Def.'s Opp'n at 26.) Hanover asserts that Federated breached its contract with Fishbowl because the contract requires that payment be directed to Fishbowl's corporate offices. (*Id.* at 26-28; Johnson Decl., Ex. B (Fishbowl-Federated Contract) at 6.) Federated acted negligently, Hanover argues, by [*20] failing to notice warning signs in the fraudulent emails and the changed payment instructions. (Def.'s Opp'n at 26-28.) Hanover notes that another Fishbowl client caught these warning signs and consequently did not pay the bad actor. (*Id.* at 26-27.)

To support its interpretation, Hanover submits dictionary definitions for "directly" and "resulting." (Def.'s Mem. at 23-24 (citing *Websters Third New International Dictionary* 641, 1937 (1993)).) In response, Fishbowl urges the Court to follow the Eighth Circuit's interpretation of "loss resulting directly from" under Minnesota law in the context of a standardized financial institution bond. (Pl.'s Opp'n [Doc. No. 67] at 21 (citing *BancInsure, Inc. v. Highland Bank*, 779 F.3d 565 (8th Cir. 2015)).) However, this Court's interpretation of "directly resulting from" is largely immaterial because Hanover cannot show that Federated's actions constitute an "intervening agency" as a matter of law.[5]

---

[4] The Cyber Business Interruption Waiting Period Deductible is 24 hours. (TPL Policy at HAN0000572.)

[5] Hanover cites to two cases, *Jetcrete N. Am. LP v. Austin Truck & Equip., Ltd.*, 484 F. Supp. 3d 915 (D. Nev. 2020) and *JPMorgan Chase Bank, N.A. v. Freyberg*, 171 F. Supp. 3d 178 (S.D.N.Y 2016), in support of its position. While these cases involve losses resulting from the interference of a bad actor, the similarities end there. Rather, these cases address legal claims unrelated to insurance contracts that are analyzed under the respective state's version of the Uniform Commercial Code. *Jetcrete N. Am. LP*, 484 F. Supp. 3d (analyzing claim of breach of contract for the sale of goods under Nevada's Uniform Commercial Code); *Freyberg*, 171 F. Supp. 3d (analyzing claims of breach of bank account contract and equitable estoppel

EXHIBIT 1



The factual record in this case is not sufficiently developed to determine that Federated breached its contract or acted negligently as a matter of law. Hanover asserts that Federated's contract with Fishbowl required it to remit payment to Fishbowl's corporate offices. (Def.'s Mem. at 24.) Though it never says so [*21] explicitly, Hanover seems to suggest that the contract obligated Fishbowl to pay by check. (*Id.*) While the contract states that Federated "shall send payments to [Fishbowl's corporate address]," it does not specify a payment method. (Fishbowl-Federated Contract at 6.) As Fishbowl's representative testified, clients are permitted to pay by check, debit card, or wire transfer. (Gruidl Dep. Tr. at 16:5-6.) Additionally, the Invoices merely restate the same language found in the contract. (Nov. 13, 2019 Invoice; Dec. 18, 2019 Invoice.) Nothing in the contract, or in Fishbowl and Federated's course of performance or dealing, demonstrates that Federated breached its contract by not physically remitting payment to the corporate offices.

As for negligence, Hanover contends that Federated should have called Fishbowl to verify the change in payment. (Def.'s Mem. at 24-25.) The Federated-Fishbowl contract does not require a phone call and the Invoices state that Federated can contact Fishbowl with questions via phone or email. (*See* Federated-Fishbowl Contract; Nov. 13, 2019 Invoice; Dec. 18, 2019 Invoice.) That Federated chose to reach out directly to Ms. Williams, rather than to Fishbowl's general [*22] Accounting Department email account, does not demonstrate that it was negligent in doing so as a matter of law.

Hanover further argues that Federated should have been alerted to the scam by "several grammatical errors" in one of the fraudulent emails from Ms. Williams' account. (Def.'s Mem. at 25.) The grammatical errors in question are indeed noticeable, but minor: one improper capitalization of "Scheduled" and one use of "sometimes" instead of "some time." (Fishbowl-Federated Email Chain at Fishbowl_000453.) The typos are simply insufficient to establish that Federated acted negligently as a matter of law. And the Court cannot draw any inferences about Federated's behavior based on the fact that some of Fishbowl's clients caught the scam before making payments. The record contains no evidence about the behavior of the bad actor or the responses of the clients in those transactions.

In sum, Hanover speculates about Federated's conduct without testimony from Federated, without attempting to implead or join Federated to this action, and without a full evidentiary record. Given the paucity of evidence, the Court cannot rule as a matter of law that Federated's actions constituted an "intervening [*23] agency." Because Fishbowl's loss would not have occurred without the bad actor accessing Ms. Williams's email and sending fraudulent communications, the Court finds that Fishbowl's loss "directly result[ed] from" the data breach.

#### 4. Impairment of Business Operations

Fishbowl argues that because the TPL Policy does not define "impairment," the Court must apply its ordinary meaning. (Pl.'s Mem. at 15-17 (providing definitions from *Black's Law Dictionary* (11th ed. 2019) and *American Heritage Dictionary of the English Language* 904 (3d ed. 2019)).) It contends that the rules imposed in Ms. Williams' email impaired Fishbowl's business operations by preventing her from communicating with Fishbowl's clients and by preventing Fishbowl from receiving payment for the work it had performed. (*Id.* at 16.)

In response, Hanover asserts that there was no "impairment" or interruption of Fishbowl's "business operations" because Fishbowl continued to conduct its income-generating activities (consulting, reselling software, selling maintenance contracts) while the bad actor accessed Fishbowl's email system. (Def.'s Mem. at 17-18.) It agrees with Fishbowl's definitions as to the ordinary meaning of the word [*24] "impairment." (Def.'s Opp'n at 28.) Even so, Hanover argues that the data breach did not impair Fishbowl's ability to communicate with or send invoices to Federated and "just allowed a bad actor to *also* communicate" with Federated. (Def.'s Reply at 16.)

The definition of "impairment" is relatively consistent across dictionaries. *Compare Black's Law Dictionary* ("[t]he quality, state, or condition of being damaged, weakened, or diminished"), *with American Heritage Dictionary of the English Language* 904 (defining "impair" as "[t]o cause to diminish as in strength, value, or quality"), *and Oxford*

---

under New York's Uniform Commercial Code). These cases, therefore, provide no support for Hanover's position that there is no coverage here.

*English Dictionary Online*, https://www.oed.com/view/Entry/92049?rskey=aJerwP&result=3&isAdvanced=false#eid (last accessed Oct. 27, 2022) (defining "impair" as "to make worse, less valuable, or weaker"). In essence, the ordinary meaning of impairment is an inability to function at full capacity.

The Court finds that the ordinary meaning of "impairment" is sufficiently broad to encompass the impact here of the bad actor's interference with Ms. Williams' email. As Hanover rightly notes, after the breach, Ms. Williams retained the ability to communicate with and send invoices to Fishbowl's clients; [*25] in fact, she sent Federated the invoices while the bad actor's rules were in place and even emailed Federated after the bad actor began to interfere with their communications. (Nov. 13, 2019 Invoice; Dec. 18, 2019 Invoice; Gruidl Dep. Tr. at 43:15-20.) But the bad actor's interference meant that Ms. Williams could not reliably, at all times, communicate and send invoices. (Gruidl Dep. Tr. at 32:1-5, 33:22-34:25, 36:3-7, 37:20-22, 38:2-19, 42:7-43:23; Maschino Dep. Tr. at 122:13-124:3.) The bad actor intercepted her emails before she could read them and sent out fraudulent emails impersonating her. (Gruidl Dep. Tr. 33:16-34:25, 38:2-19; Fishbowl-Federated Email Chain.) Hanover's representative agreed that "impairment" does not require the business to cease functioning entirely and acknowledged that Fishbowl's system had been "altered" by the bad actor. (Cormier Dep. Tr. at 66:15-22, 68:9-19.) While Fishbowl's ability to communicate with its clients may not have been debilitatingly disrupted, it was certainly diminished. Accordingly, the Court finds that the bad actor's data breach resulted in an "impairment" to Fishbowl's business operations.

## B. Purpose and Context of the TPL Policy

[*26] Hanover argues that a finding of coverage here contradicts the overall purpose of the TPL Policy and of business interruption insurance. (Def.'s Mem. at 9-11.)

The Court acknowledges that, historically, the purpose of business interruption insurance may have been to "protect the prospective earnings of the insured business only to the extent that they would have been earned if no interruption occurred, not to exceed the per diem limits of the policy." (*Id.* at 9 (quoting *Metalmasters of Minneapolis, Inc. v. Liberty Mut. Ins. Co.*, 461 N.W.2d 496, 499-500 (Minn. Ct. App. 1990)).) In the cases cited by Hanover, manufacturing businesses invoked such insurance when their production was allegedly interrupted by physical accidents at their facilities. *Metalmasters*, 461 N.W.2d at 498 (describing flooding from a ruptured water pipe); *Great N. Oil Co. v. St. Paul Fire & Marine Ins. Co.*, 303 Minn. 267, 227 N.W.2d 789, 791 (Minn. 1975) (describing a crane collapsing into a construction area). And the Court largely agrees with Hanover that Fishbowl's attempt to distinguish the data breaches covered under the TPL Policy from coverage for physical destruction creates "a distinction without a difference." (Def.'s Reply at 18.) In fact, the Court does not distinguish these cases based on the type of interruption that was experienced.

However, a close reading of *Metalmasters* and *Great N. Oil Co.* reveals that they are distinguishable because of the specific language [*27] of the policies at issue. The contested provisions in these cases insured the plaintiff against losses from an "interruption" of business. *Metalmasters*, 461 N.W.2d at 499 (insuring against "loss resulting from *necessary interruption*") (emphasis added); *Great N. Oil Co.*, 227 N.W.2d at 792 (insuring against losses "directly resulting from such *interruption* of business") (emphasis added). Here, the Clause insures against losses from "actual impairment or denial of service." (TPL Policy at HAN0000573.)

Minnesota law instructs that "[w]here explicit language indicates a purpose different from that thought to be the main purpose of the agreement, the language must be given its obvious meaning and cannot be overruled." *Reliable Metal, Inc. v. Shakopee Valley Printing, Inc.*, 407 N.W.2d 684, 687 (Minn. Ct. App. 1987); *see also Frauendorfer v. Meridian Sec. Ins. Co.*, No. 27-cv-15-20388, 2017 Minn. App. Unpub. LEXIS 330, 2017 WL 1316110, at *3 (Minn. Ct. App. Apr. 10, 2017) ("[i]n contract law, even if it looks like a duck and quacks like a duck, it is not a duck if the parties sign an agreement that expressly says it is not."). Thus, notwithstanding the general purpose of business interruption insurance, the Court must pay heed to the actual language of the TPL Policy. The use of "impairment" rather than "interruption" in the Clause itself demonstrates that the TPL Policy specifically grants coverage when a business suffers something less than a total suspension of operations.

Moreover, although the [*28] Cyber Business Interruption and Extra Expense Clause contains "Interruption" in its title, the TPL Policy prohibits the Court from deriving meaning from this fact. The TPL Policy addresses the use of section titles under its "Conditions" heading: "15. Section Titles. The titling of sections and paragraphs within this policy is for convenience only and shall not be interpreted as a term or condition of this policy." (TPL Policy at HAN0000561.) Hanover argues that this provision has no effect here because it appears in the beginning of the TPL Policy, under the general "Technology Professional Advantage Plus" heading and not within the Data Breach Coverage Form. (Def.'s Reply at 16-17.) It argues that the Data Breach Coverage Form has its own "Conditions" that do not contain a restriction on giving meaning to the section titles. (TPL Policy at HAN0000577-79.)

The Court must construe the TPL Policy as a whole. *Midwest Fam. Mut. Ins. Co.*, 831 N.W.2d at 636. The overall structure of the TPL Policy demonstrates that the "Technology Professional Advantage Plus" pages are the base of the TPL Policy, with the endorsements that follow modifying its terms. The Data Breach Coverage Form is prefaced by: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." [*29] (TPL Policy at HAN0000572.) Every other form following the "Technology Professional Advantage Plus" pages contains the same warning. (TPL Policy at HAN0000567 (Exclusion — Electromagnetic Radiation), HAN0000568 (Exclusion — Fungi or Bacteria), HAN0000569 (Exclusion — Multiple Retroactive Date for "Anomalies"), HAN0000571 (Minnesota Amendatory Endorsement), HAN0000583 (Minnesota Changes — Data Breach Coverage Form).) The consistent use of this preface demonstrates that the provisions outlined in the "Technology Professional Advantage Plus" pages apply to the endorsements except as expressly modified by them. *See also Frauendorfer*, 2017 Minn. App. Unpub. LEXIS 330, 2017 WL 1316110, at *2-3 (interpreting an identical endorsement preface to mean that the endorsement modifies the overall policy). Thus, the lack of an equivalent "Sections" provision among the "Conditions" in the Data Breach Coverage Form does not prohibit the Court from applying the provision here.

The Court finds that Fishbowl's loss meets every element of the Cyber Business Interruption and Extra Expense Clause. Moreover, finding coverage here conforms to the type of business interruption contemplated by the explicit terms of the TPL Policy and gives effect to all its provisions.[6] The TPL Policy therefore covers [*30] the loss. Accordingly, the Court grants summary judgment to Fishbowl on its claim that Hanover breached the TPL Policy by denying coverage under the Clause.

## IV. CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment [Doc. No. 57] is **GRANTED** as to all claims;
2. Defendant's Motion for Summary Judgment [Doc. No. 51] is **DENIED** as to all claims;
3. The Court awards Fishbowl $147,926.21 in damages;

---

[6] Hanover also insists that the existence of insurance specifically covering invoice manipulation supports finding that the TPL Policy does not provide such coverage. (Def.'s Mem. at 21-23.) Hanover cites blog posts suggesting that invoice manipulation schemes are a growing problem inadequately addressed by most insurance policies. (*Id.*)

Be that as it may, the TPL Policy lacks any reference to an exclusion for invoice manipulation coverage, making it improper to use the general availability of another type of coverage for interpretive purposes. Even if there were a question of ambiguity on this point, the Court construes insurance policy language in favor of coverage and reads exclusions narrowly. *King's Cove Marina, LLC*, 958 N.W.2d at 316. The insurer has the burden of establishing the applicability of an exclusion. *Id.*

Hanover admitted that it does not now offer Invoice Manipulation Coverage and did not offer it as of July 17, 2019, when Hanover issued the TPL Policy to Fishbowl. (Second Nilan Aff. [Doc. No. 68], Ex. 6 (Hanover Admissions 20-21).) Hanover also admitted that the TPL Policy does not expressly exclude Invoice Manipulation Coverage. (*Id.*) The Court therefore finds that Hanover has not carried its burden to establish that the TPL Policy excludes invoice manipulation coverage as a matter of law.

EXHIBIT 1



4. To the extent Fishbowl contends that it is entitled to prejudgment interest and/or attorneys' fees, it must submit briefing no later than November 17, 2022 (no longer than five pages) identifying the legal basis of that contention as well as a calculation as to any amounts owed.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: November 3, [*31] 2022

/s/ Susan Richard Nelson

SUSAN RICHARD NELSON

United States District Judge

End of Document

EXHIBIT 1

# Kane v. Syndicate 2623-623 Lloyd's of London

Court of Appeals of New Mexico

June 16, 2025, Filed

No. A-1-CA-41254

**Reporter**
2025 N.M. App. LEXIS 38 *; 2025 LX 125790

ALICE T. *KANE*, Superintendent of Insurance, in her official capacity as Receiver for NEW MEXICO HEALTH CONNECTIONS, INC., a New Mexico not-for-profit corporation, Plaintiff-Appellee, *v.* *SYNDICATE* *2623*-*623* *LLOYD'S* OF *LONDON* d/b/a BEAZLEY USA SERVICES, INC, Defendant-Appellant.

**Notice:** THIS SLIP OPINION IS SUBJECT TO FORMAL REVISION UPON RELEASE OF THE FINAL VERSION.

**Prior History:** [*1] APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY. Matthew J. Wilson, District Court Judge.

**Counsel:** Office of the Superintendent of Insurance, Stephen Thies, Lawrence M. Marcus, Santa Fe, NM for Appellee.

Rodey, Dickason, Sloan, Akin & Robb, P.A., Edward Ricco, Albuquerque, NM Day Pitney LLP, Jonathan S. Zelig, Candace J. Hensley, Boston, MA for Appellant.

**Judges:** JANE B. YOHALEM, Judge, J. WE CONCUR: MILES HANISEE, Judge, MEGAN P. DUFFY, Judge.

**Opinion by:** JANE B. YOHALEM

## Opinion

YOHALEM, Judge.

P1 This appeal asks this Court to construe the coverage provided by a cyber insurance policy for a claim of damage to a third party "for a security breach." The policy defines a "security breach" as "a failure of computer security to prevent . . . unauthorized access or use of [the insured's] computer systems." The insurer, *Syndicate* *2623*/*623* *Lloyd's* of *London* d/b/a Beazley USA Services, Inc. (Beazley), appeals the district court's order granting New Mexico Health Connections, Inc.'s (NMHC)[1] motion for summary judgment, concluding that the phrase "for a security breach" is ambiguous, and construing the phrase to provide coverage under the policy for injury to a third-party "because of" or "resulting from" a security breach. We agree [*2] with the district court that the phrase "for a security breach" is ambiguous, and construe this ambiguity under well-established principles of insurance law in favor of the insured. We also agree with the district court that the exclusions to coverage relied on by Beazley do not clearly apply to the loss at issue in this case. Therefore, we affirm the district court.

### BACKGROUND

---

[1] NMHC's claim is brought by the Superintendent of Insurance, Alice *Kane*, as a receiver for NMHC, pursuant to NMSA 1978, Sections 59A-41-18 (1984) and - 40(A)(1) (1984). That statute authorizes the Superintendent of Insurance to attempt to recover money due to a health-care provider from an insolvent insurer. NMHC is an insolvent insurer that owes money to OptumRX, a health-care provider. Although *Kane* is the named appellant, we refer to NMHC, the insured in this case, to avoid confusion.

EXHIBIT 1



**The Policy**

P2 NMHC, a health-care insurer, purchased a comprehensive cyber breach response policy (the Policy) from Beazley to protect it from breaches of computer security. The Policy covered claims first made during the period from May 1, 2020, to May 1, 2021. Coverage was provided for damages to NMHC from cyber extortion, for the costs of recovering lost data, for the cost of crisis management, for losses due to business interruption, and lesser coverage was provided for losses due to fraudulent instructions, funds transfer fraud, and telephone fraud.[2] The Policy also covered damages and claims expenses incurred by NMHC in connection with third-party liability claims. The Policy has a $7 million aggregate limit of liability.

P3 The third-party liability coverage at issue appears in a section of the Policy entitled [*3] "Data and Network Liability." That section of the Policy specifies that coverage is provided for damages (defined as "a monetary judgment, award or settlement"); and claims expenses (defined as legal defense costs) that NMHC "is legally obligated to pay because of a claim against [it] during the policy period for . . . a [s]ecurity [b]reach."[3] The Policy defines a "security breach," as "a failure of computer security to prevent . . . unauthorized access or use of computer systems, including unauthorized access or use resulting from the theft of a password from a computer system or from any insured."

P4 Also relevant to this appeal is the loss of money exclusion. Beazley relies on the two following exclusions to argue that even if there is coverage, it does not apply to the loss of funds at issue here.

The coverage under this Policy will not apply to any loss arising out of:

> . . . .
>
> 2. any loss, transfer or theft of monies, securities or tangible property of the insured or others in the care, custody or control of the insured organization;
>
> 3. the monetary value of any transactions or electronic fund transfers by or on behalf of the insured which is lost, diminished, or damaged during transfer [*4] from, into or between accounts.

**NMHC's Claim for Coverage**

P5 The facts giving rise to NMHC's claim for third-party coverage are undisputed. In April 2020, a third-party posing as a senior accountant manager of one of NMHC's vendors, OptumRX, emailed a fraudulent invoice to NMHC on the form used by OptumRX for its invoices, requesting payment at a fraudulent bank account. In response, NMHC wired $4,415,833.11 to the fraudulent bank account from its Wells Fargo account over the course of five different transfers between April 30, 2020, and May 27, 2020.

P6 The parties agree that the fraud was perpetrated by a third-party who gained unauthorized access to NMHC's computer system and email. A copy of a legitimate OptumRX invoice had been obtained from the computer system, and fraudulent account numbers were substituted for OptumRX's account. Beazley does not dispute that this was "a security breach" as defined by the Policy.

P7 Because of this security breach and the fraudulent use of the information obtained, the amounts due to OptumRX under NMHC's contract with OptumRX were not paid. OptumRX sent a letter to NMHC demanding

---

[2] The parties agree that the Policy's fraudulent instruction coverage, limited to $250,000, applied here. Beazley does not argue that this coverage was exclusive. The issues of contract interpretation before this Court concern only the third-party liability coverage under the Policy's data and network agreement.

[3] The Policy capitalizes many terms to indicate that they are defined in the definition section of the Policy. Because signaling these definitions is not relevant to this opinion, we use the lower case where it normally would be used when quoting from the Policy to make reading easier.

EXHIBIT 1



payment of the outstanding invoice amounts owed by NMHC to OptumRX [*5] under the parties' contractual agreement.

P8 NMHC reported the claim to Beazley on July 1, 2020, through its legal counsel. The July 1, 2020, email from counsel stated that NMHC "hereby requests that Beazley investigate, defend, and indemnify NMHC for the [third-party] claims asserted by OptumRX." Beazley denied third-party liability coverage, claiming that the OptumRX claim for the unpaid invoice amounts did not trigger third-party liability coverage under the Policy, and even if it did, the loss of money exclusions quoted above barred coverage for the OptumRX third-party claim.

### Procedure in the District Court

P9 NMHC filed this suit in district court against Beazley for breach of the Policy's third-party liability provision. Beazley counterclaimed, arguing the two exclusions identified above applied. The parties filed cross-motions for summary judgment. Beazley argued that the Policy did not provide liability coverage to NMHC under the provision governing third-party claims because OptumRX's claim is not a claim for damages "*for* a security breach," covered by the Policy, but is instead a garden-variety claim for breach of contract based on NMHC's failure to pay OptumRX's invoices. Beazley [*6] claimed that the Policy's third-party coverage applies only to claims directly "for" the security breach itself. Beazley's example of a covered claim is a suit for damages for an insured's loss or public exposure of third-party private data. Claims for a breach of contract, like OptumRX's claim for damages, even where the breach of contract was "caused by" a security breach, are not, according to Beazley, claims "for" a security breach.

P10 Beazley further argued that even if the district court found that coverage extended to OptumRX's breach of contract claim, the two specific exclusions in the Policy applying to claims for the loss of money quoted above each bar any recovery by NMHC. The parties' dispute about the first exclusion from coverage focused on whether money in NMHC's Wells Fargo bank account was "in the care, custody or control" of NMHC when it was transferred to the fraudulent account. The controversy over the second exclusion concerned whether the funds transferred to the fraudulent account were "lost, diminished, or damaged during transfer from, into or between accounts."[4]

### The District Court's Ruling

P11 At the hearing on the parties' cross-motions for summary judgment, [*7] the district court made an oral ruling that "[a]s a result of a security breach and fraudulent instructions, funds were withdrawn from NMHC's accounts that were in the care, custody, and control of Wells Fargo Bank." The district court concluded that the OptumRX claim was "*for* . . . a security breach" covered by the Policy because the claim "*arose from* a security breach and *flowed from* a security breach." As to the application of the loss of money exclusions, the district court ruled that "[t]he exclusion language does not apply to the facts underlying the OptumRX claim" because "[t]he funds that were stolen were not in the care, custody, and control of the insured"; the stolen funds "were in the care, custody, and control of Wells Fargo Bank." Although rejecting Beazley's argument that the exclusion for funds "lost, diminished, or damaged during transfer" barred coverage, the district court did not state its reasoning. Concluding that the Policy's third-party liability provision covered OptumRX's claim against NMHC, and that no exclusion applied, the district court granted summary judgment in favor of NMHC, awarding it $3,533,804.95, the invoiced amount

---

[4] We note that in addition to the arguments it successfully made in the district court on the meaning of the third-party coverage provision and the exclusions to the policy, NMHC has argued for the first time on appeal that Beazley's initial letter disclaiming coverage failed to adequately alert NMHC to Beazley's reasons for denying coverage, a violation of New York law—the law the parties contracted to apply to the Policy. We do not reach this argument, both because it would be unfair to Defendant who was not able to defend against this argument in the district court and because we affirm on the grounds raised in the district court. *See Eldin v. Farmers All. Mut. Ins. Co.*, 1994-NMCA-172, ¶ 21, 119 N.M. 370, 890 P.2d 823 (declining to apply the right for any reason doctrine on grounds that it would be unfair to the appellant).

remaining unpaid to OptumRX [*8] after law enforcement recovered a portion of the funds diverted by the security breach. Beazley appeals.

## DISCUSSION

P12 On appeal, Beazley again argues, as it did in the district court: (1) that the Policy's third-party liability coverage does not apply because OptumRX's breach of contract claim was not "a claim for . . . a security breach"; and (2) that two of the listed loss of money exclusions bar coverage because the lost funds were (a) in the "care, custody or control" of NMHC, and (b) were lost during transfer from, into or between accounts. We address each of Beazley's arguments in turn, after addressing the standard of review and general principles of law governing the construction of insurance contracts.

### I. Standard of Review

P13 We review a district court's order granting or denying summary judgment de novo. *See United Nuclear Corp.* v. *Allstate Ins. Co.*, 2012-NMSC-032, ¶ 9, 285 P.3d 644. Where, as here, an appellant does not assert the existence of a genuine issue of material fact precluding summary judgment, but rather agrees that the facts are undisputed, "our task is to determine whether the district court correctly applied the law to the facts." *See Gonzales* v. *Allstate Ins. Co.*, 1996-NMSC-041, ¶ 7, 122 N.M. 137, 921 P.2d 944. "Similarly, the interpretation of terms within an insurance policy is a matter of law about which [*9] the court has the final word, and is subject to de novo review." *United Nuclear Corp.*, 2012-NMSC-032, ¶ 9 (internal quotation marks and citation omitted).

### II. Choice of Law

P14 The Policy includes a choice of law provision stating that New York law will apply to any dispute. The parties, however, agree that this Court may apply New Mexico law governing the construction of insurance contracts because our law is nearly identical to New York law on this question. We agree that the principles of law governing the interpretation of insurance contracts are nearly the same in both states and therefore accept the parties' invitation to apply New Mexico law. We apply New York law, however, in accordance with the Policy terms, on any issue other than the general law of contract construction.

### 1 III. Governing Principles of Insurance Policy Interpretation

P15 The questions before this Court on appeal are questions of contract construction. Insurance policies are interpreted by our courts (and New York courts) applying the principles generally applicable to the interpretation of contracts. "Our analysis of the insurance policy proceeds with the primary goal of ascertaining the intentions of the contracting parties with respect to the challenged [*10] terms at the time they executed the contract." *Ponder* v. *State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 11, 129 N.M. 698, 12 P.3d 960 (alteration, internal quotation marks, and citation omitted). "As with other contracts, where an insurance policy's terms have a common and ordinary meaning, that meaning controls in determining the intent of the parties." *United Nuclear Corp.*, 2012-NMSC-032, ¶ 10 (internal quotation marks and citation omitted).

P16 A term is ambiguous when it "is reasonably and fairly susceptible of different constructions." *Id.* (internal quotation marks and citation omitted). So long as the insured's expectations are reasonable, we will be guided by those expectations and will, as a matter of public policy, construe ambiguities in an insurance policy "in favor of the insured and against the insurer." *Ponder*, 2000-NMSC-033, ¶ 26. Public policy recognizes that insurance companies control the language of the policy, and "[an insurance company] does so with far more knowledge than the typical insured of the consequences of particular words." *Sanchez* v. *Herrera*, 1989-NMSC-073, ¶ 21, 109 N.M. 155, 783 P.2d 465.

EXHIBIT 1



### IV. Third-Party Coverage "*for* a Security Breach"

P17 We begin by applying these principles of interpretation to the parties' dispute about the construction of the coverage provisions of the Policy. Only if we determine that there is coverage under the Policy do we then determine whether [*11] an exclusion applies to bar coverage. *See Pulte Homes of N.M., Inc. v. Ind. Lumbermens Ins. Co.*, 2016-NMCA-028, ¶ 9, 367 P.3d 869.

### A. The Parties' Contentions

P18 As we have already noted, the parties' coverage dispute focuses on the policy terms under the heading "Data and Network Liability." That section of the Policy specifies that coverage is provided for damages (defined as a judgment or settlement), and claims expenses (defined as legal defense costs),

> which the [i]nsured is legally obligated to pay because of any claim first made against an insured during the policy period for:
>
> . . . .
>
> 2. a security breach.

P19 There is no dispute on appeal about the meaning of the term "security breach." The parties agree that the unauthorized invasion of NMHC's email and the theft from that account of an OptumRX invoice that was then modified to redirect payments to OptumRX to a fraudulent account was a "security breach," as that term is defined by the contract. The dispute about coverage here, therefore, focuses on the meaning of the preposition "for" in the phrase "for a security breach." Beazley argues that OptumRX does not assert "a claim against NMHC "*for* a security breach," because OptumRX "does [not] allege that, as a result of such a breach, information pertaining to OptumRX [*12] was stolen or compromised." Beazley argues that the preposition "for" plainly and solely means "equivalent to" and concludes that coverage is provided only for a loss directly connected to the security breach. Beazley's construction would narrow the Policy's coverage for third-party claims to recover damages to the loss or disclosure of private, third-party data from the insured's computer system.

P20 NMHC, in contrast, construes the phrase "a claim *for* a security breach" to include a third-party claim for damages where a security breach was causally connected to the loss. According to NMHC, the preposition "for" in the Policy's coverage provision requires only a causal connection between the loss or damages claimed and the security breach. NMHC would define "for" as meaning "because of," "arising out of," or "as a result of."

### B. The Sources Relied on by This Court to Construe Words in an Insurance Policy

P21 Although New Mexico law allows this Court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity, extrinsic evidence often involves testimony as to the parties' circumstances at the time the policy was purchased, their business interests, and other [*13] external evidence of intent. *See Ponder*, 2000-NMSC-033, ¶ 13. No such evidence was presented by either party in this case. We turn, therefore, to other forms of extrinsic evidence as tools of contract construction. We generally look first to other relevant terms of the policy to see whether construing the policy as a whole explains the meaning and intent of the word or phrase at issue. *See United Nuclear Corp.*, 2012-NMSC-032, ¶¶ 16-18. We then look to the dictionary definitions of the disputed word or phrase, to any opinions by our courts or the courts of other jurisdictions on the meaning of similar language, and finally to any industry practice or drafting history. *See Id.* ¶¶ 16-37. No one of these factors is dispositive on the question of ambiguity but, taken together, they help resolve the question. *See Id.* ¶ 38 (relying on these factors together).

#### 1. Other Provisions in the Policy

P22 We note first that the Policy does not define the word "for" or provide any explanation elsewhere in the Policy of the extent of coverage intended for claims "for a security breach." There is, for example, no provision limiting third-party liability for a security breach specifically to the loss of data. Indeed, the Policy lists "a data breach" separately from "a security breach" as a type [*14] of claim covered by the Policy. Generally, we would not expect two types of coverage to be coextensive. Although not dispositive, the third-party claim provision, read as a whole, suggests that a claim for damages for a breach of security may extend beyond damages arising from a data breach—the only damages Beazley's definition would cover.

P23 Beazley points to other provisions in the Policy that use the phrases "arising out of" or "resulting from," and argues that the use of the word "for," rather than these other terms, makes clear that the word "for" means something different and narrower than "arising out of" or "resulting from." We do not agree. Despite a lengthy list of definitions in the Policy, including many common words, there is no definition of "arising out of," "resulting from," or "for" to distinguish these terms, or to indicate that they mean something special. These terms are commonly used interchangeably in everyday language, and without a definition in the Policy, an insured would likely read them as interchangeable. Moreover, we do not see how the use of the phrase "resulting from" or "arising out of" in a handful of other provisions throughout the Policy clarifies [*15] the meaning of the word "for" in the provision at issue. We note that the Policy also uses in the "Data Recovery Costs" provision a phrase clearly restricting coverage to costs incurred "*as a direct result of* a security breach." Although Beazley seeks to define "for a security breach" as meaning "as a direct result of a security breach," it does not use that far clearer phrase in the provision at issue.

P24 Concluding that the other terms used in the Policy do not definitively resolve the question of ambiguity, we continue our review by next examining the dictionary definitions of the preposition "for."

**2. Dictionary Definitions**

P25 "When a term is undefined in the policy, a reviewing court may look to that term's usual, ordinary, and popular meaning, such as found in a dictionary." *Id.* ¶ 19 (internal quotation marks and citation omitted). "Although the mere existence of multiple dictionary definitions of a word, without more, does not create an ambiguity, dictionary definitions can serve as an appropriate starting point for analysis." *Id.* ¶ 20 (text only) (citations omitted).

P26 Beazley directs this Court to one specific definition of the word "for" from *Webster's Third New International Dictionary* [*16] (Unabridged ed. 2002) (*Webster's Third*), defining "for" as "in exchange as the equivalent of" (as in "all that trouble *for* nothing," or "my kingdom *for* a horse"). We note that *Webster's Third* also defines "for," in relevant part, as "because of," "on account of," "as regards," and "*for* this reason or on this ground," definitions that suggest a causal connection rather than equivalence between the two *nouns* it connects—in this case *damages* and *claims expenses* "because of," "on account of," or "resulting from" a security breach."

P27 Like the word "sudden," construed by our Supreme Court in *United Nuclear Corp.*, the word "for" has multiple commonplace definitions. Both Beazley's preferred meaning of "equivalent to" and NMHC's preferred meaning of "because of" or "resulting from" are included in the common usage of the word "for." As our Supreme Court found in *United Nuclear Corp.*, competing definitions—reflecting both parties' views—tend to demonstrate the ambiguity of a term. 2012-NMSC-032, ¶ 22.

**3. Divergence of Opinion Among Courts**

P28 The parties turn to the opinions of courts in other jurisdictions that have construed the word "for." We emphasize at the outset that neither party has pointed to an opinion construing that word in the context of a cyber insurance policy. Indeed, our research shows that there are few published decisions interpreting such policies anywhere in the country.

P29 We do not find either party's analogies to decisions differentiating claims "for bodily injury" from claims "because of" or "resulting from" bodily injury helpful. First, these decisions [*17] are divided, similar to the division

in dictionary definitions.[5] Most importantly, however, this is an area of insurance policy construction developed over decades by insurers and courts addressing phrases widely used in common insurance policies. The parties each cite to several cases supporting their viewpoint. Despite the common use in insurance policies of this phrase, these courts still differ on the meaning of the phrase "for bodily injury." The Georgia Supreme Court, in *Greenwood Cemetery, Inc. v. Travelers Indemnity Co.*, 238 Ga. 313, 232 S.E.2d 910, 913 (Ga. 1977), in construing the word "for" in the phrase "for mental anguish," highlighted the multiple reasonable meanings of the word "for":

> [t]he word 'for' has numerous meanings. The insurer would read the word 'for' as meaning 'equivalent to' (and therefore not greater than) or 'to the amount, value or extent of.' The insured would read the word 'for' as meaning 'by reason of' or 'because of, on account of.

P30 We, therefore, conclude that there is a lack of an interpretive consensus among courts, and take this as an "indicator of ambiguity." *See United Nuclear Corp.*, 2012-NMSC-032, ¶ 29 (noting that a lack of consensus both among courts and outside the courts may itself indicate ambiguity).

#### 4. Industry Practice and Drafting [*18] History

P31 As we have already noted, neither party provided any details in the summary judgment record surrounding the formation of the insurance contract here. We note, however, that cybersecurity insurance is a relatively new area of insurance coverage. As technological advances have occurred and the use of internet and computer data systems have become commonplace in business, and more and more businesses run on cyber platforms, there has been an "exponential increase in the number of cyber security breaches in recent years." *See* Deborah L. Johnson, *Demystifying the Elusive Quest for Cyber Insurance Protection: The Need for New Contract Language*, 44 Cardozo L. Rev. 2361, 2367 (2023).

P32 Purchasers of a cyber insurance policy often have little knowledge about the breadth and sophistication of the cybersecurity risks they face. *Id.* at 2408. The insurers are far more knowledgeable. This imbalance is exacerbated by the lack of standard policy language among insurers to define or limit coverage. *Id.* at 2373. A business purchasing cybersecurity coverage is unlikely to imagine all of the consequences of the increasingly sophisticated methods of breaching computer security and may view the insurance policy as protecting against all but the most [*19] clearly stated exceptions to coverage. *See Sanchez*, 1989-NMSC-073, ¶ 21 (noting that "[t]he typical insured does not bargain for individual terms within policy clauses," making "only broad choices regarding [the] general concepts of coverage, risk, and cost").

P33 Again, although this context and history of cyber risks and cyber insurance is not alone dispositive on the question of ambiguity, it is another indication that the phrase "for a security breach" would not have a single, obvious meaning to an insured.

### 3 C. The Phrase "for a Security Breach" Is Ambiguous

P34 Because every one of the aids this Court looks to for assistance in determining whether a phrase or a word in an insurance policy is ambiguous supports multiple reasonable meanings of the phrase at issue here and of the word "for," we hold that the phrase is ambiguous. We interpret an ambiguous phrase in an insurance policy as purely a question of law, and we construe ambiguity in a policy in the insured's favor. *United Nuclear Corp.*, 2012-NMSC-032, ¶ 39. We, therefore, agree with the district court that the Policy's coverage includes claims of loss "because of," resulting from," or "on account of" a security breach.

---

[5] *Compare Am. Ins. Co. v. Naylor*, 103 Colo. 461, 87 P.2d 260, 265 (Colo. 1939) (applying the broad definition of "for" to mean "because of," "on account of," and "in consequence of"), *with Farmers Tex. Cnty. Mut. Ins. Co. v. Zuniga*, 548 S.W.3d 646, 652-54 (Tex. Ct. App. 2017) (concluding that the insurance policy agreement to "pay all damages for bodily injury" is unambiguous because "[t]he plain meaning of the word 'for' is 'in exchange as the equivalent of'" (quoting *Webster's Third* 886)); *see also Lumbermens' Mut. Cas. Co. v. Yeroyan*, 90 N.H. 145, 5 A.2d 726, 727 (N.H. 1939) (finding "for" is "synonymous with the phrase 'on account of'" (quoting *Cormier v. Hudson*, 284 Mass. 231, 187 N.E. 625, 626 (Mass. 1933)).

### IV. The Exclusions Do Not Apply

P35 We now turn to the two loss of money exclusions [*20] that Beazley argues bars coverage. Exclusionary clauses are construed under the same rules of construction that apply to coverage provisions. "It is the obligation of the insurer to draft an exclusion that clearly and unambiguously excludes coverage." *Computer Corner, Inc. v. Fireman's Fund Ins. Co.*, 2002-NMCA-054, ¶ 7, 132 N.M. 264, 46 P.3d 1264. Generally, if ambiguous, we construe exclusionary clauses in insurance contracts narrowly against the insurer. *See Knowles v. United Servs. Auto. Ass'n*, 1992-NMSC-030, ¶ 9, 113 N.M. 703, 832 P.2d 394.

### A. The Money Was Not "Lost, Diminished, or Damaged During Transfer"

P36 Section three of the loss of money exclusion states that coverage under the Policy will not apply to any loss of monetary value "during transfer from, into or between accounts." Beazley summarily states that this exclusion applies to deny coverage for OptumRX's third-party claim, without explaining the basis for its belief that this language clearly covers the loss of the NMHC payments transferred to a fraudulent address, apparently without a loss in value of the funds *during* the transfer. There are no facts in the summary judgment record showing that the transfer was flawed or the security of the transfer breached "during transfer."

P37 We employ a presumption of correctness in the rulings of the district court, and the burden is on the appellant to [*21] clearly demonstrate error. *See Farmers, Inc. v. Dal Mach. & Fabricating, Inc.*, 1990-NMSC-100, ¶ 8, 111 N.M. 6, 800 P.2d 1063. In the absence of a developed argument by Beazley, we decline to address this issue further. *See State v. Dickert*, 2012-NMCA-004, ¶ 46, 268 P.3d 515.

### B. The Funds Were Not in the "Care, Custody or Control" of NMHC

P38 Beazley next argues that the funds transferred pursuant to the fraudulent instructions were in the "care, custody or control" of NMHC and that, therefore, the Policy's loss of money exclusion applies. This section excludes coverage under the Policy for any loss, transfer or theft of money "*in the care, custody or control of the insured organization.*" The district court concluded that the stolen money was not in the "care, custody or control" of NMHC; it was in the "care, custody, and control of Wells Fargo Bank." Therefore, this exclusion from coverage did not apply.

P39 Beazley argues that the phrase "care, custody or control" should be read disjunctively, requiring this Court to find only that NMHC had "control" of the funds in its Wells Fargo account for the exclusion to apply. The dispute between the parties as to the meaning of this exclusion turns on whether the words "care, custody or control," are to be understood in the disjunctive, as independent words separately defined in the [*22] law, or whether the phrase "care, custody or control," is a phrase with its own meaning in the law.

P40 We first note that neither the individual words nor the phrase "care, custody or control" are defined in the Policy. Given the absence of a definition in the Policy, we turn to New York law to resolve this issue. Although the parties have agreed that New Mexico law is the same as New York law as to the principles governing the construction of an insurance policy, on the question of the meaning of a phrase used in the Policy, the Policy directs that we apply New York law. We honor the plain language of the parties' choice of law contract term.

P41 New York courts have repeatedly construed "care, custody or control," as a phrase with a particular meaning in the law.[6] Moreover, commentators have agreed that "care, custody or control" is an established legal phrase or

---

[6] *See, e.g., Greater N.Y. Mut. Ins. Co. v. Pro. Sec. Bureau, Ltd.*, 61 A.D.2d 975, 402 N.Y.S.2d 448 (N.Y. App. Div. 1978); *Broome Cnty. v. Travelers Indem. Co.*, 88 A.D.2d 720, 451 N.Y.S.2d 272 (N.Y. App. Div. 1982).

term of art widely used in the insurance context to denote exclusive physical dominion over property. *See generally* 9 *Couch on Insurance* § 126:22, Westlaw (database updated June 2025).

P42 The question under New York law, then, is whether the depositor, NMHC, or the bank, Wells Fargo, had exclusive dominion over the [*23] property—the money in NMHC's account—at the time the payment at issue was made. Our research shows that "[i]t is well-settled under New York law that the relationship between a bank and its depositor is the contractual relationship of debtor and creditor and the amount on deposit represents an indebtedness by the bank to the depositor." *Reichling v. Cont'l Bank*, 813 F. Supp. 197, 198 (E.D.N.Y. 1993); *see* 9 NY Jur. 2d, Banks, § 226, Westlaw (database updated May 2025). Under New York law, "the money deposited with the bank *belongs to the bank* and is not the property of the depositor." *Reichling*, 813 F. Supp. at 198 (emphasis added) (alteration, internal quotation marks, and citation omitted). New York law, therefore, arguably places the "care, custody or control" of a depositor's funds with the bank holding the account. NMHC deposited the funds with Wells Fargo; Wells Fargo, under contract, had the funds in its "care, custody and control" at the time the money was transferred. The body of New York law we reference is sufficient to allow a reasonable insured to conclude that this exclusion did not apply to funds placed in the protection of a bank account, and only applied to property, securities and funds directly held in the "care, custody and control" of NMHC.

**CONCLUSION**

P43 Because a reasonable insured [*24] would construe the ambiguous coverage term at issue to afford coverage and would not read the exclusions to apply here, we affirm.

P44 **IT IS SO ORDERED.**

/s/ Jane B. Yohalem

**JANE B. YOHALEM, Judge**

**WE CONCUR:**

/s/ J. Miles Hanisee

**J. MILES HANISEE, Judge**

/s/ Megan P. Duffy

**MEGAN P. DUFFY, Judge**

---

End of Document

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

EXHIBIT 1

Sarah Estephan
Cowbell Cyber, Inc.
Cyber Claims Counsel
(470) 579-3872
sarah.estephan@cowbellcyber.ai

July 9, 2025

**VIA EMAIL:** tim@phoenixwv.biz

Tim Coffman
Vice President
Phoenix Associates, Inc.
501 East St
Parkersburg, WV 26101-4903

| | | |
|---|---|---|
| Re: | **Insured:** | Phoenix Associates, Inc. |
| | **Matter:** | Security Breach Expense & Liability |
| | **Policy No.** | FLY-CB-DZP1ERYYU-002 |
| | **Policy Period:** | January 1, 2025 to January 1, 2026 |
| | **Claim No:** | CL01-FLY-DZP1ERYYU-002 |

Dear Mr. Coffman,

Cowbell Cyber, Inc. ("Cowbell") is the claims administrator handling claims on behalf of Spinnaker Insurance Company ("Spinnaker" or "Insurer") arising under Prime 100 Commercial Cyber Insurance Policy No. FLY-CB-DZP1ERYYU-002 ("Policy"), effective January 1, 2025 to January 1, 2026 issued to Phoenix Associates, Inc. ("Phoenix Associates" or the "Insured"). As you know, I am the assigned adjuster handling this matter. Kindly address all future correspondence to me. The purpose of this letter is to advise you of our coverage position under the Policy, which is subject to a mutual reservation of rights.

For the reasons set forth below, **we advise that there is no coverage available for this matter.** We set forth below our understanding of this matter, as well as a detailed analysis of how we arrived at this decision. If you believe there are additional facts that could alter our analysis, please do not hesitate to provide such information to us for further consideration.

In considering the matter for coverage, we reviewed the Policy and the information available to date, including the telephone calls and supporting documentation provided. No other policies were considered. To the extent you consider coverage is available under another policy, including any policy issued by any other program Insurer of Cowbell, then please submit notice pursuant to the notice provisions set out in that policy.

**SUMMARY**

On May 2, 2025, our office received notice of an incident involving Phoenix Associates. We understand that on or about May 1, 2025, Phoenix Associates received a letter ("May 1 Letter") from Crosbie Eaton Oleson on behalf of its client, SMG Land Development, Inc. ("SMG"), to whom Phoenix Associates has a business and contractual relationship via a Construction Contract Agreement dated February 5, 2024. The May 1 Letter demands that Phoenix Associates provide insurance documentation, including all general liability policies, all umbrella liability policies, and any and all cyber liability policies potentially applicable to a financial loss incident resulting from a potential business email compromise impacting Phoenix Associates.

Specifically, in early March 2025, SMG and Phoenix Associates were communicating via email regarding payment of an invoice due to Phoenix Associates from SMG for a total of $262,058.11. On or about March 12, 2025, while discussing the invoice, SMG received an email from a Phoenix Associates employee,

EXHIBIT
tabbies
13

tim@phoenixwv.biz, with updated banking information. SMG, believing the updated banking instructions to be legitimate, transferred $262,058.11 to the new bank account. Then, on March 24, 2025, when Phoenix Associates had still not received payment, the two parties spoke on the phone and discovered that SMG had received fraudulent instructions from a legitimate Phoenix Associates email account and that the $262,058.11 had been misdirected to a bad actor's account.

## THE POLICY

Spinnaker issued Prime 100 Commercial Cyber Insurance Policy No. FLY-CB-DZP1ERYYU-002 to the Insured for the Policy Period of January 1, 2025 to January 1, 2026. The Policy is subject to a $1,000,000 Aggregate Limit of Liability[1], which is the maximum limit of the Insurer's liability for all Loss under all Coverage Sections combined, including various sublimit and deductible obligations depending upon the applicable Insuring Agreement(s). The Policy has the following coverages: (1) **Security Breach Expense** Coverage; (2) **Extortion Threats** Coverage; (3) **Replacement or Restoration of Electronic Data** Coverage; (4) **Business Income, Contingent Business Income and Extra Expense** Coverage; (5) **Security Breach Liability** Coverage; (6) **Computer and Funds Transfer Fund** Coverage;[1] (7) **Telecommunications Fraud** Coverage;[2] (8) **Hardware Replacement Costs** Coverage;[3] and (9) **Website Media Content Liability** Coverage.[4]

As is applicable here, we have reviewed this matter under the Security Breach Expense and Security Breach Liability Insuring Agreements, which are subject to a limit of liability of $1,000,000 in excess of a $2,500 Deductible.

## COVERAGE DISCUSSION

***Security Breach Expense***

We first draw your attention to the **Security Breach Expense** Insuring Agreement in Section I of the Policy which provides:

> **1. Security Breach Expense**
>
> We will pay for **Loss** resulting directly from a **Security Breach** or **Cyber Incident Discovered** during the Policy Period or any extended reporting period, if applicable.

We draw your attention to the definitions of **Cyber Incident** and **Security Breach** under Section VII – Definitions of the Policy which provide in relevant part:

> **Cyber Incident** means:
> a. Any i) **Hacker** attack; ii) Malicious code; or iii) **Virus** that is directed at, enacted upon or introduced into **a Computer System** (including Your **Electronic Data**) and is designed to access, alter, corrupt, damage, delete, destroy, disrupt, encrypt, use or prevent or restrict access to or the use of any part of a **Computer System** (including Your **Electronic Data**) or otherwise disrupt its normal functioning or operation.

---

[1] Per the Computer and Funds Transfer Fund Endorsement.
[2] Per the Telecommunications Fraud Endorsement.
[3] Per the Hardware Replacement Costs Endorsement.
[4] Per the Website Media Content Liability Endorsement.

cowbell®

**Security Breach** means a privacy breach that includes the acquisition of **Personal Information** held within a **Computer System** or in non-electronic form at while in the care, custody or control of the **Insured** or authorized **Third Party** by a person: i) not authorized to have access to such information; or ii) authorized to have access to such information but whose access results in the unauthorized disclosure of such information.

We note that **Hacker** is defined to mean "a person who accesses a **Computer System** (including Your **Electronic Data**) who is: i) not authorized to have such access; or ii) authorized to have such access but who uses such access in an unauthorized manner."

We next draw your attention to the applicable definitions of **Loss** which provide in relevant part:

**Security Breach Expense Loss** means:

**a. Forensics Expenses**
The costs incurred with Our approval to establish whether a **Security Breach** or **Cyber Incident** has occurred or is occurring.

At this time, we do not have sufficient information to determine whether the Insured experienced a **Cyber Incident** or **Security Breach**, as defined by the Policy and as such, coverage is available for the costs incurred to establish whether a **Cyber Incident** or **Security Breach** occurred or is occurring under the Forensic Expenses. Should it be determined that the matter does not qualify as a **Security Breach** or **Cyber Incident** under the Policy, coverage will be limited to the **Forensics Expenses** only. Spinnaker reserves all rights accordingly.

***Security Breach Liability***

Next, we next draw your attention to the **Security Breach Liability** Including Payment Card Industry (PCI) Fines and Penalties Insuring Agreement which provides, in relevant part:

We will pay for:

**a.** **Loss** that the **Insured** becomes legally obligated to pay and **Defense Expenses** as a result of a **Claim** that is **Discovered** during the Policy Period or any extended reporting period, if applicable, for a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

With respect to this Insuring Agreement 5:

i. **Loss** means:

(1) compensatory damages, settlement amounts and costs awarded pursuant to judgments or settlements;
(2) punitive and exemplary damages to the extent such damages are insurable by law; or (3) fines or penalties assessed against the **Insured** to the extent such fines or penalties are insurable by law.

**Loss** does not include:

(a) civil or criminal fines or penalties imposed by law, except civil fines or penalties as provided under Paragraph i.(3) above;

cowbell®

(b) the multiplied portion of multiplied damages;
(c) taxes;
(d) royalties;
(e) the amount of any disgorged profits; or
(f) matters that are uninsurable pursuant to law.

ii. **Defense Expenses** means the reasonable and necessary fees (attorneys' and experts' fees) and expenses incurred in the defense or appeal of a **Claim**, including the cost of appeal, attachment or similar bonds (without any obligation on Our part to obtain such bonds) but excluding wages, salaries, benefits or expenses of Your **Employees**.

iii. **Wrongful Act** means any actual or alleged:

(1) **Security Breach**;
(2) failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing identity information;
(3) failure to prevent the transmission of a **Virus** through a **Computer System** into a computer network, any application software, or a computer operating system or related network that is not rented, owned, leased by, licensed to or under the direct operational control of the **Insured**; or
(4) failure to provide notification of any actual or potential **Security Breach** if such notification is required by any security breach notification law;

by, or asserted against, an **Insured**.

We draw your attention to the definition of **Claim** which is defined, in relevant part as "a written demand for monetary or nonmonetary damages, including injunctive relief ... against any **Insured** for a **Wrongful Act**, including any appeal therefrom." Although the May 1 Letter discusses the misdirected $262,058.11, it is not a written demand for monetary or nonmonetary damages as it merely requests that Phoenix Associates furnish its insurance policies as required under the Construction Contract Agreement dated February 5, 2024.

As such, we are constrained to advise that the **Security Breach Liability** Insuring Agreement is not triggered and there is no coverage for this matter. As such, Cowbell/Spinnaker will not select counsel to defend the **Insured** for this matter and the **Insured** should take whatever steps are necessary to protect its interests, without reference to the Policy.

**EXCLUSIONS**

Considering the circumstances, we draw your attention to **SECTION V- EXCLUSIONS** (11) which provides, in relevant part, that we will not be liable for **Loss** or **Defense Expenses** based upon, attributable to or arising out of:

> An **Insured's** assumption of liability by contract or agreement, whether oral or written. However, this exclusion shall not apply to any liability that an Insured would have incurred in the absence of such contract or agreement.

Notwithstanding that it is our position that the **Security Breach Liability** Coverage Insuring Agreement is not triggered for this matter, even if coverage had been afforded for the Demand, Cowbell, on behalf of

cowbell®

Spinnaker, reserves all rights with respect to the applicability of the aforementioned exclusion that may limit or otherwise exclude coverage for this matter.

## DUTIES IN THE EVENT OF CLAIM OR LOSS

We next draw your attention to the Duties in the Event of Claim or Loss as set out in **SECTION VI-CONDITIONS** at paragraph 14 which provides in relevant part:

> After a situation that results in, or may result in, a **Loss** covered under this **Policy** is **Discovered**, You must notify Us in writing as soon as practicable, but not to exceed thirty (30) days from the date **Discovered**, and cooperate with Us in the investigation and settlement of the **Claim** or **Loss**.

The policy defines **Discovered** as:

> **Discovery** or **Discovered** means the time when any **Employee** who is a Chief Executive Officer, Chief Financial Officer, Chief Security Officer, Chief Technology Officer, Chief Information Officer, Risk Manager, General Counsel, owner, general manager, or any functionally equivalent positions of the **Insured** or any **Subsidiary**, regardless of title first becomes aware of facts which would cause a reasonable person to believe that a **Loss** covered by this Policy has been or will be incurred, regardless of when the act or acts causing or contributing to such **Loss** occurred, even though the exact amount or details of **Loss** may not then be known.

Based on the information provided to date, Phoenix Associates received a letter from Crosbie Eaton Oleson on or about May 1, 2025, demanding that Phoenix Associates furnish its insurance policies potentially related to a financial loss experienced by its client, SMG. However, on or about March 24, 2025, Phoenix Associates discovered that SMG had received fraudulent banking instructions from one of its employee's legitimate email account, travis@phoenixwv.biz, when the two participated in a call to discuss why Phoenix Associates had not yet received the $262,058.11 payment. Thus, the incident was **Discovered** on or about March 24, 2025, and was not reported to the Policy until May 2, 2025, thirty-nine (39) days after the date of Discovery. **Accordingly, Cowbell/Spinnaker reserves all rights with regard to Section VI - Conditions 14. Duties in the Event of Claim or Loss, and specifically with regards to whether the claim has been prejudiced as a result of late notice.**

## CONCLUSION AND RESERVATION OF RIGHTS

In light of the foregoing, Cowbell, on behalf of Spinnaker, has determined that coverage is not afforded to Phoenix Associates, Inc. and the Insurer will not pay any amounts under the Policy or any related policies in connection with this matter. Spinnaker's coverage position is based on the information and/or material facts provided to date. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions, or other provisions of the Policy, or any other policies of insurance issued by Spinnaker, Cowbell, or any of its affiliates. Cowbell and Spinnaker continue to respectfully reserve all rights under the Policy, at law, and in equity, including, but not limited to the Cowbell and Spinnaker's right to rescind the Policy, to deny coverage in whole or in part, and/or to supplement this letter.

Should you receive any demands, suit/complaint papers or other legal documents, please send them to my attention at your earliest opportunity. Cowbell will address under separate cover coverage for any Claim arising from this matter. In the meantime, please keep me apprised of all significant developments as they occur.

EXHIBIT 1

cowbell®

Furthermore, if you have any other insurance policies that may respond to the matter, Cowbell recommends that you report the matter to the issuing carrier(s) immediately if you have not already done so.

If you would like to further discuss any aspect of this letter, please do not hesitate to contact me.

Sincerely,

Sarah Estephan

Sarah Estephan
Claims Counsel
Cowbell Cyber, Inc.
Phone: (470) 579-3872
sarah.estephan@cowbellcyber.ai

CC: nurishah@cowbellcyber.ai
john@reagle-padden.com
kathleen@reagle-padden.com
heather@reagle-padden.com

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

cowbell®

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

January 5, 2025

**VIA EMAIL:** rbays@bowlesrice.com

Robert L. Bays, Esq.
Bowles Rice Attorneys at Law
501 Avery Street
Parkersburg, WV 26101

| | |
|---|---|
| **Re: Insured:** | Phoenix Associates, Inc. |
| **Matter:** | SMG Land Development Inc.'s Misdirected Payment |
| **Policy No.** | FLY-CB-DZPIERYYU-002 |
| Policy Period: | January 1, 2025 to January 1, 2026 |
| **Claim No.:** | CL01-FLY-DZPIERYYU-002 |

Dear Mr. Bays,

Cowbell Cyber, Inc. ("Cowbell") is the claims administrator handling claims on behalf of Spinnaker Insurance Company ("Spinnaker" or "Insurer") arising under Prime 100 Commercial Cyber Insurance Policy No. FLY-CB-DZP1ERYYU-002 ("Policy"), effective January 1, 2025 to January 1, 2026 issued to Phoenix Associates, Inc. ("Phoenix Associates" or the "Insured"). As you are aware, this claim has been transferred to me and I am the newly assigned adjuster handling this matter. Kindly address all future correspondence to me. The purpose of this letter is to advise you of our supplemental coverage position for this matter under the Policy, which is subject to a mutual reservation of rights.

We previously sent correspondence dated July 9, 2025 which summarized our initial coverage determination that the Policy does not afford coverage for this matter. Since then, we have received your correspondence dated December 9, 2025. By way of response, this letter sets forth our supplemental analysis and reaffirms our coverage position that no coverage is available for this matter.

## SUMMARY

On May 2, 2025, our office received notice of an incident involving Phoenix Associates. We understand that on or about May 1, 2025, Phoenix Associates received a letter ("May 1 Letter") from Crosbie Eaton Oleson on behalf of its client, SMG Land Development, Inc. ("SMG"), to whom Phoenix Associates has a business and contractual relationship via a Construction Contract Agreement dated February 5, 2024. The May 1 Letter demands that Phoenix Associates provide insurance documentation, including all general liability policies, all umbrella liability policies, and any and all cyber liability policies potentially applicable to a financial loss incident resulting from a potential business email compromise impacting Phoenix Associates.

Specifically, in early March 2025, SMG and Phoenix Associates were communicating via email regarding payment of an invoice due to Phoenix Associates from SMG for a total of $262,058.11. On or about

EXHIBIT
tabbies
14

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

cowbell®

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

March 12, 2025, while discussing the invoice, SMG received an email from a Phoenix Associates employee, tim@phoenixwv.biz, with updated banking information. SMG, believing the updated banking instructions to be legitimate, transferred $262,058.11 to the new bank account. Then, on March 24, 2025, when Phoenix Associates had still not received payment, the two parties spoke on the phone and discovered that SMG had received fraudulent instructions from a legitimate Phoenix Associates email account and that the $262,058.11 had been misdirected to a bad actor's account.

Your December 9, 2025 correspondence does not challenge the accuracy of the facts as stated above, but adds that the Insured has since filed a mechanic's lien on the SMG property where the work was done, and that the invoice has yet to be paid by SMG. We have been further advised that SMG has taken the position that the $262,058.11 was remitted in accordance with the instructions received from an entity they believed to be Phoenix Associates, although SMG acknowledges that the instructions were fraudulent, and that Phoenix Associates never received the funds SMG paid to the fraudulent bank account.

## THE POLICY

Spinnaker issued Prime 100 Commercial Cyber Insurance Policy No. FLY-CB-DZP1ERYYU-002 to the Insured for the Policy Period of January 1, 2025 to January 1, 2026. The Policy is subject to a $1,000,000 Aggregate Limit of Liability, which is the maximum limit of the Insurer's liability for all **Loss** under all Coverage Sections combined, including various sublimit and deductible obligations depending upon the applicable Insuring Agreement(s). The Policy has the following coverages: (1) Security Breach Expense; (2) Extortion Threats and Ransom Payments; (3) Replacement or Restoration of Electronic Data; (4) Business and Contingent Business Income and Extra Expense; (5) Security Breach Liability; (6) Computer and Funds Transfer Fund;[1] (7) Telecommunications Fraud;[2] (8) Hardware Replacement Costs;[3] (9) Website Media Content Liability;[4] and (10) Post Breach Remediation[5].

Further, we note that there is no Social Engineering or Reverse Social Engineering coverage available on the Policy. The Declarations to the Policy provide in relevant part:

| | |
|---|---|
| Social Engineering Coverage Limit (if applicable): | *N/A* |
| Social Engineering Deductible (if applicable): | *N/A* |
| Reverse Social Engineering Coverage Limit (if applicable): | *N/A* |
| Reverse Social Engineering Deductible (if applicable): | *N/A* |

The Declarations to the Policy are consistent with the Application for a Commercial Cyber Insurance Policy submitted by the Insured. Specifically, the Application provides:

[1] Per the Computer and Funds Transfer Fraud Endorsement
[2] Per the Telecommunications Fraud Endorsement
[3] Per the Hardware Replacement Costs Endorsement.
[4] Per the Website Media Content Liability Endorsement.
[5] Per the Post Breach Remediation Coverage Endorsement.

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

cowbell®

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

## II. COVERAGE REQUESTED

| |
|---|
| **5. Social Engineering Coverage Limit (if applicable):**<br>*N/A* |
| **6. Social Engineering Deductible (if applicable):**<br>*N/A* |
| **7. Reverse Social Engineering Coverage Limit (if applicable):**<br>*N/A* |
| **8. Reverse Social Engineering Deductible (if applicable):**<br>*N/A* |

## V. OPTIONAL ENDORSEMENT

5.Do you want to purchase coverage for Social Engineering Incidents?

☐ Yes ☑ No

If you answered Yes, please fill out the following:

5.1 Do You or Your employees verify third-party bank accounts before adding to your accounts payable systems?

☐ Yes ☐ No

5.2 Do You have an established and documented verification procedure requiring that You or Your employees authenticate all funds transfer requests, whether made to a third-party or otherwise by way of a secondary method of communication from the initial request for funds transfer (as one example, by calling the intended recipient to verify the request at a predetermined phone number if the funds transfer request was made by email)?

☐ Yes ☐ No

5.3 Do You or Your employees prevent unauthorized employees from initiating wire transfers?

☐ Yes ☐ No

6.Do you want to purchase Reverse Social Engineering coverage?

☐ Yes ☐ No ☑ Currently Unavailable

e

Thus, while the facts of this matter most closely present as a reverse social engineering attack, the Insured did not seek to purchase social engineering or reverse social engineering coverage for the premium charged and there is no coverage available for the reported financial loss.

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

cowbell®

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

## COVERAGE DISCUSSION

As you requested in your December 9, 2025 correspondence, we have reviewed this matter under all the first party insuring agreements available on the Policy in addition to the **Security Breach Expense** and **Security Breach Liability** Insuring Agreements that were discussed in our preliminary coverage analysis letter dated July 9, 2025.

### *Security Breach Expense*

The **Security Breach Expense** Insuring Agreement in Section I of the Policy which provides:

> 1. **Security Breach Expense**
>
> We will pay for **Loss** resulting directly from a **Security Breach** or **Cyber Incident Discovered** during the Policy Period or any **Extended Reporting Period**, if applicable.

We draw your attention to the definitions of **Cyber Incident** and **Security Breach** under Section VII – Definitions of the Policy which provide in relevant part:

> **Cyber Incident** means: a. Any i) **Hacker** attack; ii) Malicious code; or iii) **Virus** that is directed at, enacted upon or introduced into a **Computer System** (including Your **Electronic Data**) and is designed to access, alter, corrupt, damage, delete, destroy, disrupt, encrypt, use or prevent or restrict access to or the use of any part of a **Computer System** (including Your **Electronic Data**) or otherwise disrupt its normal functioning or operation.
>
> **Security Breach** means a privacy breach that includes the acquisition of **Personal Information** held within a **Computer System** or in non-electronic form at while in the care, custody or control of the **Insured** or authorized **Third Party** by a person: i) not authorized to have access to such information; or ii) authorized to have access to such information but whose access results in the unauthorized disclosure of such information.

We note that **Hacker** is defined to mean "a person who accesses a **Computer System** (including Your **Electronic Data**) who is: i) not authorized to have such access; or ii) authorized to have such access but who uses such access in an unauthorized manner."

Further, **Security Breach Expense Loss** means:

> a. **Forensics Expenses – Including Breach Counsel Expenses**
>
> The costs incurred with Our approval to establish whether a **Security Breach** or **Cyber Incident** has occurred or is occurring.
>
> If a **Security Breach** has occurred, the following costs are also included:

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

cowbell®

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

i. costs to investigate the cause, scope and extent of a Security Breach and to identify any affected parties; and

ii. costs to determine any action necessary to remediate the conditions that led to or resulted from a **Security Breach** including, but not limited to, fees paid for legal and other professional advice on how to respond to the **Security Breach.**

b. **Notification Expenses – Including Breach Counsel Expenses**

Costs to notify all parties affected by a **Security Breach** including, but not limited to, notice to be transmitted through media:

i. as required by **Privacy Regulations**; or

ii. subject to Our prior approval, as appropriate on a voluntary basis.

c. **Overtime Salaries**

Reasonable overtime salaries paid to **Employees** assigned to handle inquiries from the parties affected by a **Security Breach.**

d. **Call Center Expenses**

Fees and costs of a company hired by You with Our prior approval for the purpose of operating a call center to handle inquiries from the parties affected by a **Security Breach.**

e. **Post-event Monitoring Expenses**

Costs to provide credit and identity monitoring services to the affected parties of a Security Breach for up to one year, or longer if required by applicable law, from the date of notification to those affected parties of such **Security Breach.**

f. **Public Relations Expense**

Fees and costs of a public relations firm and any other reasonable expenses incurred by You with Our prior written consent to protect or restore Your reputation solely in response to "negative publicity". As used in this provision, "negative publicity" means information which has been made public that has caused, or is reasonably likely to cause, a decline or deterioration in the reputation of the **Named Insured** or of one or more of its products or services.

g. **Other Expenses**

Any other reasonable expenses incurred by You in connection with a **Security Breach** or **Cyber Incident** with Our prior written consent.

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

cowbell®

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

With respect to this Insuring Agreement 1, Loss does not include any costs or expenses associated with upgrading or improving a **Computer System** as a result of a **Security Breach.**

At this time, we do not have sufficient information to determine whether the Insured experienced a **Cyber Incident** or **Security Breach,** as defined by the Policy and as such, coverage is available for the costs incurred to establish whether a **Cyber Incident** or **Security Breach** occurred or is occurring under the **Forensic Expenses**. Should it be determined that the matter does not qualify as a **Security Breach** or **Cyber Incident** under the Policy, coverage will be limited to the **Forensics Expenses** only. Spinnaker reserves all rights accordingly.

We draw your attention to the Duties in the Event of **Claim** or **Loss** provisions under SECTION VI - CONDITIONS under the Policy which provide, amongst other things, that the Insured shall not incur any expenses in connection with this matter, without the prior consent of the Insurer. Accordingly, Cowbell, on behalf of Spinnaker, reserves its right to deny coverage for any amounts incurred without its consent.

We further note that the **Security Breach Expense** Insuring Agreement provides coverage only for items that meet the Policy definition of a **Security Breach Expense Loss** as discussed above. Thus, the **Security Breach Expense** Insuring Agreement does not provide coverage for the financial loss the Insured has claimed here.

### *Computer and Funds Transfer Fraud*

The Computer and Funds Transfer Fraud Insuring Agreement provides:

a. We will pay for:
  i. **Loss** resulting directly from a fraudulent:
    1. Entry of **Electronic Data** or **Computer System** into; or
    2. Change of **Electronic Data** or **Computer System** within

  a **Computer System**, by a person or organization without authorization to access such **Computer System**, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **a.i(1)** and **a.i(2)**:

    a. **Your** money, securities, or other property to be transferred, paid, or delivered; or

    b. Your account at a financial institution to be debited or deleted, or

  ii. **Loss** resulting directly from a **Fraudulent Instruction** directing a financial institution to debit your **Transfer Account** and transfer, pay, or deliver money or securities from that account

  that is first **Discovered** during the Policy Period and reported in accordance with **Condition 14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS.**

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

b. As used in Paragraph **a.i.**, "fraudulent entry" or "fraudulent change" of **Electronic Data** or **Computer Program** shall include such entry or change made by an **Employee** acting, in good faith, upon a **Fraudulent Instruction** received from a computer software contractor who has a written agreement with You to design, implement or service **Computer Programs** for a **Computer System** covered under this Insuring Agreement.

II. With respect to this Insuring Agreement:

c. **Fraudulent Instruction** means:

(1) With regard to Paragraph I.a.ii.:

(a) A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instruction directing a financial institution to debit your **Transfer Account** and to transfer, pay or deliver money or securities from that **Transfer Account**, which instruction purports to have been issued by You, but which in fact was fraudulently issued by someone else without Your knowledge or consent.

(b) A written instruction issued to a financial institution directing the financial institution to debit Your **Transfer Account** and to transfer, pay or deliver money or securities from that **Transfer Account**, through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by You, but which in fact was issued, forged or altered by someone else without Your knowledge or consent.

(2) With regard to Paragraph I.b..:

A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic, written or voice instruction directing an **Employee** to enter or change **Electronic Data** or **Computer Programs** within a **Computer System** covered under this Insuring Agreement, which instruction in fact was fraudulently issued by Your computer software contractor.

The Policy defines a **Computer System** in relevant part as:

any computer, including transportable or handheld devices, electronic storage devices and related peripheral components; any systems and applications software, or any related telecommunications networks connected to or used in connection with such computer or devices: i) which collects, transmits, processes, stores or retrieves Your Electronic Data; and ii) which is:

a. Owned by You;

b. Leased by You and operated by any Insured;

c. Owned and operated by an Employee who has agreed in writing to Your personal

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

device use policy; or

d. Operated by an authorized Third Party, but only with respect to Your Electronic Data.

As discussed above, we understand that the Insured's client or customer, SMG, issued a payment intended for Insured, totaling approximately $262,058.11 but that the payment was sent to an unauthorized third party. Emails were exchanged between the Insured and its customer, but at some point, while discussing the invoice, SMG received an email from what appeared to be a Phoenix Associates employee, tim@phoenixwv.biz, with updated banking information. SMG, believing the updated banking instructions to be legitimate, transferred $262,058.11 to the new bank account without verbally verifying the change with the Insured.

Here, the payment did not constitute a "fraudulent entry" of or "fraudulent change" of **Electronic Data** or **Computer Program** into a **Computer System** by a person or organization without authorization to access such **Computer System**. Rather, the payment was made by SMG, the Insured's client or customer, pursuant to instructions provided from a person they believed to be an **Insured Employee**.

Additionally, this matter did not involve a **Fraudulent Instruction** to debit Your **Transfer Account**, as it was (1) not an instruction issued by the threat actor directly to a financial institution without Your knowledge or consent, it was also (2) not an instruction received by You that was purportedly from an **Employee** without Your or the **Employee's** knowledge or consent, and (3) the funds were not debited from Your **Transfer Account.** Rather, this matter involved a threat actor, purporting to be the Insured, requesting payment directly from SMG and SMG sent the funds directly from its own account. Thus, the Computer and Funds Transfer Fraud Insuring Agreement is not triggered, and there is no coverage under the Computer and Funds Transfer Fraud Insuring Agreement.

### *Extortion Threats*

The **Extortion Threats** Insuring Agreement provides:

> We will pay for **Loss** resulting directly from an **Extortion Threat** that is **Discovered** during the Policy Period or any extended reporting period, if applicable.

**Extortion threat** is defined by the Policy to mean a threat or series of related threats:

a. To perpetrate a **Cyber Incident**;
b. To disseminate, divulge or utilize:
  i) Your proprietary information; or
  ii) weakness in the source code within a **Computer System** by gaining unauthorized access to a **Computer System**;
c. To destroy, corrupt or prevent normal access to a **Computer System** (including Your **Electronic Data**) by gaining or having gained unauthorized access to a Computer System;
d. To inflict Ransomware on a **Computer System**; or
e. To publish Your client's or Employee's **Personal Information**.

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

cowbell®

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

**Extortion Threat** does not include a threat or series of threats to any **Third Party**.

**Loss** under the **Extortion Threats** Insuring Agreement means:

a. Fees and costs of:
i. a security firm; or
ii. a person or organization;
hired with Our consent to determine the validity and severity of an **Extortion Threat** made against You.

b. Interest costs paid by You for any loan from a financial institution taken by You to pay a ransom demand.

c. Reward payments paid by You to an "informant" which lead to the arrest and conviction of parties responsible for **Loss**. As used in this provision, "informant" means a person, other than an Employee, providing information not otherwise obtainable, solely in return for a reward offered by You.

d. Any other reasonable expenses incurred by You with Our written consent, including, but not limited to: i. fees and costs of independent negotiators; and ii. fees and costs of a company hired by You, upon the recommendation of the security firm, to determine how to protect Your **Electronic Data** from further threats.

e. Monetary value of any **Ransom Payment** made by You to a third party for **Random Demands**

Here, none of the enumerated threats discussed above were made to the Insured. Further, the financial loss the Insured is claiming does not fall within the Policy definition of a **Loss** under the **Extortion Threats** Insuring Agreement. Accordingly, the Extortion Threats Insuring Agreement has not been triggered and it does not afford coverage to the Insured for this matter.

***Replacement or Restoration of Electronic Data***

The Replacement or Restoration of Electronic Data Insuring Agreement provides:

> We will pay for **Loss** of Your **Electronic Data** or "computer programs" stored within a **Computer System** resulting directly from a Cyber Incident that is Discovered during the Policy Period or any extended reporting period, if applicable.

With respect to this Insuring Agreement 3, **Loss** means, in relevant part, the costs to replace or restore Your **Electronic Data** or "computer programs" as well as the cost of data entry, reprogramming and computer consultation services.

Here, the Insured has not reported any loss of **Electronic Data** or computer programs and, to our knowledge, is not seeking any costs related to the same. Thus, the **Replacement or Restoration of**

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

**Electronic Data** Insuring Agreement has not been triggered and it does not provide coverage to the Insured for its reported financial loss.

***Business Income, Contingent Business Income and Extra Expense***

The Business Income, Contingent Business Income and Extra Expense Insuring Agreement provides:

> We will pay for **Loss** due to an **Interruption** resulting directly from a **Cyber Incident** or an **Extortion Threat** that is **Discovered** during the Policy Period or during any extended reporting period, if applicable.

Further, with respect to this Insuring Agreement 4, the Policy defines **Loss to** mean the actual **Loss** of: (1) "business and contingent business income" You sustain; and/or (2) "extra expense" You incur.

Please also note that as used in this Insuring Agreement 4 "Business and contingent business income" is defined in relevant part to mean the:

> i. net income (net profit or loss before income taxes) that would have been earned or incurred; and
> ii. continuing normal operating expenses incurred, including payroll.

"Business and contingent business" income does not include:
(1) Net profit that may or would likely have been earned as a result of an increase in volume due to favorable business conditions caused by the impact of network security failures impacting other businesses, loss of market, or any other consequential loss.

Further, as used in this Insuring Agreement, "Extra expense" is defined in relevant part to mean the necessary and reasonable expenses You incur:

> i. during an **Interruption** that You would not have incurred if there had been no interruption; or
> ii. to avoid or minimize the suspension of Your **E-Commerce Activities**.

The Policy defines **Interruption** in relevant part to mean:

> a. With respect to a **Cyber Incident**:
> i. an unanticipated cessation or slowdown for Your **E-Commerce Activities**; or
> ii. Your suspension of Your **E-Commerce Activities** for the purpose of avoiding or mitigating the possibility of transmitting a **Virus** or malicious code to another person or organization; and, with regard to Paragraphs 16a.i and 16.a.ii. above, shall be deemed to begin when Your **E-Commerce Activities** are interrupted and ends at the earliest of:
> (1) one hundred-eighty (180) days after the **Interruption** begins;
> (2) the time when Your **E-Commerce Activities** are resumed; or
> (3) the time when service is restored to You.

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

**E-Commerce Activities** is defined by the Policy to mean those activities conducted by You in the normal conduct of Your business via Your web site or Your e-mail system.

Here, as discussed above, we do not have sufficient information to determine if the Insured has experienced a **Cyber Incident**. Regardless, the Insured has not reported any **Interruption** to any **E-Commerce Activities**. Thus, the **Business Income, Contingent Business Income and Extra Expense** Insuring Agreement has not been triggered and it does not afford any coverage for the Insured's reported financial loss.

***Telecommunications Fraud & Hardware Replacement Costs***

The **Telecommunications Fraud** Insuring Agreement provides in relevant part:

> We will pay for any monetary **Loss** sustained by **You**, including but not limited to phone bills, first **Discovered** during the Policy Period and reported in accordance Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI - CONDITIONS**, directly resulting from an intentional unauthorized access to Your **Telephone System** by a third party.

With respect to this **Telecommunications Fraud** Insuring Agreement: a. **Loss** solely means the monetary cost of unauthorized calls or unauthorized use of **Your Telephone System**'s bandwidth. b. **Telephone System** means the VoIP phone system directly under **Your** control.

The **Hardware Replacement Costs** Insuring Agreement provides in relevant part:

> We will pay for **Loss** directly resulting from a **Cyber Incident** first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**, to mitigate the potential of a future **Cyber Incident** or **Security Breach**.

With respect to this **Hardware Replacement Costs** Insuring Agreement:

> a. **Loss** means the cost to replace hardware, including but not limited to, computers or any associated devices or equipment operated by, and either owned by or leased to, the Insured that are unable to function as intended due to corruption or destruction of software or firmware.
>
> b. **Loss** does not include any sums related to labor costs associated with installing, connecting or setting up the hardware.

Here, the Insured has not reported any unauthorized use of its telephone system and the financial loss the Insured has reported does not meet the definition of a **Loss** under the **Telecommunications Fraud** Insuring Agreement. Further, to our knowledge, the Insured has not incurred and is not seeking any **Hardware Replacement Costs** as that term is defined in the Policy. Thus, these Insuring Agreements have not been triggered and they do not afford any coverage for the Insured's reported financial loss.

***Security Breach Liability***

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

The **Security Breach Liability** Including Payment Card Industry (PCI) Fines and Penalties Insuring Agreement provides in relevant part:

We will pay for:

> **a. Loss** that the Insured becomes legally obligated to pay and **Defense Expenses** as a result of a **Claim** that is **Discovered** during the Policy Period or any extended reporting period, if applicable, for a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

With respect to this Insuring Agreement 5:

i. **Loss** means:

(1) compensatory damages, settlement amounts and costs awarded pursuant to judgments or settlements;
(2) punitive and exemplary damages to the extent such damages are insurable by law; or
(3) fines or penalties assessed against the **Insured** to the extent such fines or penalties are insurable by law...

**Loss** does not include:

(a) civil or criminal fines or penalties imposed by law, except civil fines or penalties as provided under Paragraph i.(3) above;
(b) the multiplied portion of multiplied damages;
(c) taxes;
(d) royalties;
(e) the amount of any disgorged profits; or
(f) matters that are uninsurable pursuant to law;
(g) any fees resulting from recall, re-performance or correction of services, content, good or activities;
(h) the costs to comply with injunctive or other non-monetary relief; or
(i) liquidated damages pursuant to a contract, to the extent such amounts exceeds the amount for which You would have been liable in the absence of such contract, except for amounts under Paragraph i.(4) above.

ii. **Defense Expenses** means the reasonable and necessary fees (attorneys' and experts' fees) and expenses incurred in the defense or appeal of a **Claim**, including the cost of appeal, attachment or similar bonds (without any obligation on Our part to obtain such bonds) but excluding wages, salaries, benefits or expenses of Your **Employees**.

iii. **Wrongful Act** means any actual or alleged:

(1) **Security Breach**;

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

(2) failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing **Personal Information**;
(3) failure to prevent the transmission of a **Virus** through a **Computer System** into a computer network, any application software, or a computer operating system or related network that is not rented, owned, leased by, licensed to or under the direct operational control of the **Insured**; or
(4) failure to provide notification of any actual or potential **Security Breach** if such notification is required by any security breach notification law;

by, or asserted against, an **Insured**.

We also draw your attention to the definition of a **Claim** which is defined, in relevant part as "a written demand for monetary or nonmonetary damages, including injunctive relief ... against any Insured for a **Wrongful Act**, including any appeal therefrom."

Here, although the May 1 Letter discusses the misdirected $262,058.11, it is not a **Claim** as it is not a written demand for monetary or nonmonetary damages as it merely requests that Phoenix Associates furnish its insurance policies as required under the Construction Contract Agreement dated February 5, 2024. As such, the **Security Breach Liability** Insuring Agreement is not triggered and there is no coverage available for this matter. As such, Cowbell/Spinnaker will not select counsel to defend the Insured for this matter and the Insured should continue to take whatever steps are necessary to protect its interests, without reference to the Policy.

## EXCLUSIONS

Considering the circumstances, we draw your attention to SECTION V- EXCLUSIONS (11) which provides, in relevant part, that we will not be liable for **Loss** or **Defense Expenses** based upon, attributable to or arising out of:

> An **Insured's** assumption of liability by contract or agreement, whether oral or written. However, this exclusion shall not apply to any liability that an **Insured** would have incurred in the absence of such contract or agreement.

Notwithstanding that it is our position that the **Security Breach Liability** Insuring Agreement is not triggered for this matter, even if coverage had been afforded for the May 1 Letter, Cowbell, on behalf of Spinnaker, reserves all rights with respect to the applicability of the aforementioned exclusion that may limit or otherwise exclude coverage for this matter.

## DUTIES IN THE EVENT OF CLAIM OR LOSS

We next draw your attention to the Duties in the Event of Claim or Loss as set out in SECTION VI- CONDITIONS at paragraph 14 which provides in relevant part:

> After a situation that results in, or may result in, a **Loss** covered under this Policy is **Discovered**,

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

> You must notify Us in writing as soon as practicable, but not to exceed thirty (30) days from the date **Discovered**, and cooperate with Us in the investigation and settlement of the **Claim** or **Loss**.

The policy defines **Discovered** as the time when any **Employee** who is a Chief Executive Officer, Chief Financial Officer, Chief Security Officer, Chief Technology Officer, Chief Information Officer, Risk Manager, General Counsel, owner, general manager, or any functionally equivalent positions of the **Insured** or any **Subsidiary**, regardless of title first becomes aware of facts which would cause a reasonable person to believe that a **Loss** covered by this Policy has been or will be incurred, regardless of when the act or acts causing or contributing to such **Loss** occurred, even though the exact amount or details of **Loss** may not then be known.

Based on the information provided to date, Phoenix Associates received a letter from Crosbie Eaton Oleson on or about May 1, 2025, demanding that Phoenix Associates furnish its insurance policies potentially related to a financial loss experienced by its client, SMG. However, on or about March 24, 2025, Phoenix Associates discovered that SMG had received fraudulent banking instructions from one of its employee's legitimate email account, travis@phoenixwv.biz, when the two participated in a call to discuss why Phoenix Associates had not yet received the $262,058.11 payment. Thus, the incident was Discovered on or about March 24, 2025, and was not reported to the Policy until May 2, 2025, thirty-nine (39) days after the date of Discovery. **Accordingly, Cowbell/Spinnaker reserves all rights with regard to Section VI - Conditions 14. Duties in the Event of Claim or Loss, and specifically with regards to whether the claim has been prejudiced as a result of late notice.**

## CONCLUSION AND RESERVATION OF RIGHTS

In light of the foregoing, Cowbell, on behalf of Spinnaker, has determined that coverage is not afforded to Phoenix Associates, Inc. and the Insurer will not pay any amounts under the Policy or any related policies in connection with this matter. Spinnaker's coverage position is based on the information and/or material facts provided to date. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions, or other provisions of the Policy, or any other policies of insurance issued by Spinnaker, Cowbell, or any of its affiliates. Cowbell and Spinnaker continue to respectfully reserve all rights under the Policy, at law, and in equity, including, but not limited to the Cowbell and Spinnaker's right to rescind the Policy, to deny coverage in whole or in part, and/or to supplement this letter.

Should you receive any demands, suit/complaint papers or other legal documents, please send them to my attention at your earliest opportunity. Cowbell will address under separate cover coverage for any Claim arising from this matter. In the meantime, please keep me apprised of all significant developments as they occur. Furthermore, if you have any other insurance policies that may respond to the matter, Cowbell recommends that you report the matter to the issuing carrier(s) immediately if you have not already done so. If you would like to further discuss any aspect of this letter, please do not hesitate to contact me.

If you would like to further discuss any aspect of this letter, please do not hesitate to contact me.

Sincerely,

EXHIBIT 1

Cowbell Cyber, Inc.
6800 Koll Center Parkway
Suite 250
Pleasanton, CA 94566
www.cowbell.insure

cowbell®

Stephanie Hewerdine
Cowbell Cyber, Inc.
Director, Claims
Phone: 470-579-3872
stephanie.hewerdine@cowbellcyber.ai

Stephanie Hewerdine, J.D.
Cowbell Cyber, Inc.
Director, Claims
Phone: (470)-579-3872
Email: stephanie.hewerdine@cowbellcyber.ai

cc (via email):

kathleen@reagle-padden.com